IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| PARTNERS IN NUTRITION d/b/a PARTNERS IN QUALITY CARE,<br><br>    Plaintiff,<br><br>v.<br><br>MINNESOTA DEPARTMENT OF EDUCATION; MONICA HERRERA, in her individual capacity and official capacity as Director of Nutrition Program Services; EMILY HONER, in her individual capacity and official capacity as Program Integrity Work Manager and JEANETTE JOHNSON-REED, in her individual capacity and official capacity as Supervisor of Compliance,<br><br>    Defendants. | Case No. _____<br><br>**COMPLAINT**<br>**FOR DECLARATORY AND**<br>**INJUNCTIVE RELIEF**<br>**(Jury Trial Demanded)** |

The Plaintiff, Partners in Nutrition, d/b/a Partners in Quality Care ("Partners" or "PIQC"), states the following for its Complaint:

**INTRODUCTION**

1.     PIQC is a nonprofit organization located in downtown St. Paul, Minnesota that assists clients tasked with feeding underserved and underprivileged adult and child populations in Minnesota. PIQC's primary charitable mission consists of its operations through the Child and Adult Care Food Program ("CACFP" or the "Program"), a federal program established under the National School Lunch Act (the "Act") and regulated by the United States Department of Agriculture ("USDA"). PIQC operates under the Program

primarily as what is known as a "sponsor," partnering with organizations like early childhood programs and adult daycare centers that feed healthy and nutritious meals to qualifying children and dependent adults. These on-the-ground organizations with whom PIQC partners as a sponsor are called "sites." PIQC has operated as a CACFP sponsor working with sites serving the greater Twin Cities area since 2016.

2.     Although CACFP is a federal program, USDA regulations call for each state to administer CACFP within its own borders. In the State of Minnesota, Defendant Minnesota Department of Education ("MDE") is the state administrative agency tasked with administering CACFP.

3.     PIQC's relationship with MDE has been fraught over the years, nearly from the beginning. Throughout years of unsuccessful efforts to stymie PIQC's efforts to partner with sites, MDE's arbitrary treatment has made clear that PIQC is not MDE's preferred CACFP sponsor. Rather, MDE has made efforts to funnel all CACFP activity to a single organization, Providers Choice, which is located in Edina, Minnesota.

4.     In recent months, moreover, MDE's actions have gone from administration and oversight to what appears to be a form of vendetta. MDE began taking aggressive regulatory action against PIQC in January 2022 at the very instant that federal law enforcement efforts separately revealed the existence of a large investigation into alleged fraud perpetrated by other CACFP participants in the Minnesota. For its part, PIQC has never been accused of any illegality and has never been informed that it is a target of the 2022 federal investigation. Nonetheless, MDE has recklessly concluded that PIQC has, in fact, participated in the as-yet-unproven crimes that federal authorities are apparently still

investigating. MDE has done so without any evidence of specific wrongdoing by PIQC. Yet, the MDE's baseless assumptions are the very basis of a relentless effort to oust PIQC from CACFP participation. Between specious regulatory actions and thinly-veiled threats, it has become apparent that MDE will not stop its unlawful, arbitrary administrative efforts until PIQC has ceased all CACFP operations and has relented by shuttering its charitable organization altogether.

5.     While PIQC has tried to patiently challenge MDE's unlawful actions on a serial basis through the administrative process laid out by the federal CACFP regulations, it has become clear after an August 10, 2022 letter from Defendant Monica Herrera, Director, that MDE has no intention of adhering to the substantive or procedural rules mandated by the National School Lunch Act and imposed by USDA regulations. Plainly stated, MDE, a state actor, considers itself to be above its own procedures and to operate outside the confines of federal law.

6.     MDE's conduct has placed PIQC and its remaining staff of under ten dedicated, hardworking employees in a Hobson's choice: (i) continue trying to serve its charitable mission and risk massive organizational and possibly even personal liability from MDE's relentless assault; or (ii) cease CACFP operations entirely and abandon Partners' obligations to the sites that depend on PIQC's sponsorship to fund their nutrition programming for underprivileged and underserved communities. The dilemma is real: with the Summer Food programs ending and the Fall start of the school year beginning, many of PIQC's youth and educational sites are already scrambling for funding to cover the costs of their meal services – costs for which PIQC and the sites it sponsors would

normally be reimbursed by MDE through CACFP. But MDE has illegally terminated PIQC. With no resolution in sight, PIQC brings this lawsuit to put an end to MDE's unlawful campaign to shut down PIQC and bring its administration of CACFP back into conformity with federal law.

7. MDE's agency actions are unlawful and improper and must be put to an end. MDE is violating PIQC's Constitutional right to procedural Due Process, for which there is no administrative remedy. The agency has demonstrated that no amount of piecemeal regulatory litigation by Partners will stop MDE from arbitrarily and baselessly targeting PIQC for allegations that ultimately stem from MDE's own maladministration of CACFP in the State of Minnesota. PIQC should not be a scapegoat for MDE's dereliction of duty. After five administrative proceedings and the attendant delays incurred, this lawsuit is brought to put an end to MDE's abuse of government power that ultimately hurts the communities that are most deserving of its help.

## PARTIES

8. Partners in Nutrition, d/b/a Partners in Quality Care ("PIQC" or "Partners") is a non-profit organization incorporated under the laws of the State of Minnesota, with its principal place of business at 1035 W. 7th St., St. Paul, MN 55102. PIQC serves as a sponsoring organization assisting local entities offering meals and snacks to underprivileged populations in navigating the complexities of CACFP.

9. The Minnesota Department of Education ("MDE") is a state administrative agency located at 400 NE Stinson Blvd., Minneapolis, MN 55413. MDE is the state administrative agency tasked with administering CACFP in the State of Minnesota.

10.     Monica Herrera is the Director of the Minnesota Department of Education, Nutrition Program Services.  Upon information and belief, Ms. Herrera has participated in, coordinated, and/or directed the MDE's decisions and regulatory actions undertaken against PIQC concerning CACFP-related operations.

11.     Emily Honer is the Program Integrity Work Manager at the Minnesota Department of Education, Nutrition Program Services.  Upon information and belief, Ms. Honer has participated in, coordinated, and/or directed the MDE's decisions and regulatory actions undertaken against PIQC concerning CACFP-related operations.

12.     Jeanette Johnson-Reed is the Supervisor of Compliance at the Minnesota Department of Education, Nutrition Program Services.   Upon information and belief, Ms. Johnson-Reed has participated in, coordinated, and/or directed the MDE's decisions and regulatory actions undertaken against PIQC concerning CACFP-related operations.

## **JURISDICTION AND VENUE**

13.     This Court has original subject-matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because it presents a question of federal law by virtue of the Defendants' unlawful implementation of federal CACFP regulations, which interferes with PIQC's federal rights as a participant in CACFP created under Section 17 of the National School Lunch Act, 42 U.S.C. § 1766, and Title 7, Chapter 226 of the Code of Federal Regulations.  *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n. 14, 103 S. Ct. 2890 (1983); *Wright Elec., Inc. v. Minnesota State Bd. of Elec.*, 322 F.3d 1025, 1028 (8th Cir. 2003); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Nixon*, 210 F.3d 814, 817 (8th Cir.

2000), *abrogated on other grounds by E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 122 S. Ct. 754 (2002).

14.     This Court also has original subject-matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because it presents a question of federal Constitutional law by virtue of the Defendants' ongoing violations of PIQC's rights arising under the Due Process Clause of the 14th Amendment to the United States Constitution.

15.     This Court is authorized to award the requested declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

16.     This Court has the authority to provide preliminary and permanent injunctive relief under Rule 65 of the Federal Rules of Civil Procedure.  *See Ex Parte Young*, 209 U.S. 123 (1908).

17.     Venue is proper in the United States District Court for the District of Minnesota, Minneapolis Division, because all parties are domiciled in the State of Minnesota.

## FACTUAL ALLEGATIONS

### The Child and Adult Care Food Program (CACFP)

18.     This lawsuit concerns the administration of the Child and Adult Care Food Program ("CACFP"), which is run through the United States Department of Agriculture ("USDA") and regulated by 7 C.F.R. Part 226.  "The [CACFP] is intended to provide aid to child and adult participants and family or group day care homes for provision of nutritious foods that contribute to the wellness, healthy growth, and development of young

children, and the health and wellness of older adults and chronically impaired persons." 7 C.F.R. § 226.1.

19.    Congress passed the National School Lunch Act, Pub. L. 79-396, 60 Stat. 230, (June 4, 1946), to, in relevant part, "provide aid to child and adult care institutions and family or group day care homes for the provision of nutritious foods that contribute to the wellness, healthy growth, and development of young children, and the health and wellness of older adults and chronically impaired disabled persons." 42 U.S.C. § 1766(a)(1)(A)(ii). In Section 17 of the Act, Congress sought to further this purpose by authorizing USDA to "carry out a program to assist States through grants-in-aid and other means to initiate and maintain nonprofit food service programs for children in institutions providing child care." *Id.* § 1766(a)(1)(B).

20.    Institutions that operate under CACFP include childcare centers, at-risk afterschool care centers, outside-school-hours care centers, emergency shelters, and adult day care centers. *See* 7 C.F.R. § 226.2 (defining "Institution"). These specific types of organizations, which are tasked with supplying and serving the meals and snacks, are colloquially referred to as "sites."

21.    CACFP also allows for "sponsoring organizations," which include a "nonprofit private organization that is entirely responsible for the administration of the [CACFP] in . . . [a]ny combination of childcare centers, emergency shelters, at-risk afterschool care centers, outside-school-hours care centers, adult day care centers, and day care homes." *Id.* Sponsoring organizations—or "sponsors"—typically act as third-party intermediaries between MDE and the sites under their sponsorship. Sponsors serve a vital

role in the administration of CACFP because compliance with program requirements is complex and costly; sponsors provide consulting, training, compliance monitoring, and additional resources to help programs succeed in feeding nutritious meals to children and adults.

### Partners' Role as a Qualified CACFP Sponsor

22.     Partners in Nutrition d/b/a Partners in Quality Care ("PIQC") is a not-for-profit association serving as a CACFP sponsor. Its charitable mission is to pursue health equity by providing resources and support to programs that serve households experiencing food insecurity, and to do so with cultural humility. PIQC meets the definition of "sponsoring organization" under 7 C.F.R. § 226.2.

23.     Partners in Nutrition was formed in 2015 by Christine Twait and Aimee Bock. Each left another well-known sponsor, Providers Choice, Inc., ("Providers Choice") because they did not feel that Providers Choice adequately met the needs of Minnesota's ethnic minorities, particularly immigrant communities from East Africa. PIQC currently serves as a CACFP sponsor for 64 sites throughout Greater Minnesota.

24.     Ms. Bock left her role with PIQC in June 2018. She began operating a separate (and competing) sponsoring entity in Minnesota called Feeding Our Future. Since her departure, Ms. Bock has had no involvement whatsoever—formal or informal—with PIQC.

25.     Typically in each state, USDA has delegated responsibility for the administration of CACFP to as "the State educational agency or any other State agency that has been designated by the Governor or other appropriate executive, or by the

legislative authority of the State, and has been approved by the [United Stated Department of Agriculture] to administer the [CACFP] within the State . . . ." *See* 7 C.F.R. § 226.2, .3(b).

26.     MDE meets this definition of "State agency" and has been designated as the agency responsible for the administration of CACFP in the State of Minnesota.

27.     MDE's administration of CACFP in the State of Minnesota is bound by Section 17 of the National School Lunch Act, along with the regulations and guidance promulgated by USDA in implementing that Congressional statute.

28.     PIQC's participation in CACFP is governed by the regulations and guidance promulgated by USDA.   See generally 7 C.F.R. § 226.1 ("This part announces the regulations under which the Secretary of Agriculture will carry out the Child and Adult Care Food Program.").   Thus, in the State of Minnesota, CACFP sponsors such as PIQC are regulated by MDE.

## Federal CACFP Requirements Upon Governing Sponsors

29.     The CACFP regulations promulgated by USDA and governing the administration of that program are found in Title 7, Chapter 226 of the Code of Federal Regulations.   They generally impose various monitoring requirements on sponsoring organizations, like PIQC. *See generally* 7 C.F.R. §§ 226.15(e) (recordkeeping), .16(d), (e) (supervisory and operational management and monitoring of program facilities; recordkeeping).   Those regulations require PIQC to "establish procedures to collect and maintain all program records required under this part, as well as any records required by the State agency." 7 C.F.R. § 226.15(e).

30.     The regulations require PIQC to collect and maintain, among other items: copies of all applications and supporting documents; site participant enrollment documentation; daily attendance records and meal counts; daily meal records; copies of invoices, receipts, and other records to document administrative and operating costs; copies of all claims for reimbursement; receipts for all program payments; menus and other food service records; information on training sessions provided to sites; and records documenting attendance of sponsor staff training on monitoring responsibilities. 7 C.F.R. § 226.15(e).

31.     As a sponsoring organization, PIQC is required to provide sites under its sponsorship with program assistance, including review and reconciliation of sites' reimbursement documentation, as well as three facility reviews per year (at least two of which must be unannounced and one of those two unannounced reviews must include observation of a meal service). 7 C.F.R. § 226.16(d)(4).

### Federal CACFP Requirements Upon MDE as a State Agency

32.     The CACFP regulations also impose various monitoring and review requirements on state agencies, like MDE. *See generally* 7 C.F.R. § 226.7 (State agency responsibilities for financial management).

33.     The regulations require that MDE "shall maintain an acceptable financial management system, adhere to financial management standards" and "shall also have a system in place for reviewing the institutions' documentation of their nonprofit status to ensure that all Program reimbursement funds are used (1) [s]olely for the conduct of the

food service operation; or (2) [t]o improve such food service operations, principally for the benefit of the participants." 7 C.F.R. § 226.7(b).

34.     Moreover, the regulations require that MDE "shall establish procedures for institutions to properly submit claims for reimbursement. Such procedures must include State agency edit checks, including but not limited to ensuring that payments are made only for approved meal types and that the number of meals for which reimbursement is provided does not exceed the product of the total enrollment times operating days times approved meal types." 7 C.F.R. § 226.7(k).

35.     Typically, CACFP sites are required to serve meals (defined in 7 C.F.R. § 226.2 as "food which is served to enrolled participants at an institution, child care facility or adult day care facility and which meets the nutritional requirements set forth in this part"), and cannot merely provide ingredients. *See* 7 C.F.R. § 226.20. These meals are also typically required to be served on-site. 7 C.F.R. § 226.20.

36.     Participating institutions "may use their own procedures for procurement with Program funds" so long as they comply with general federal contracting regulations. *See* 7 C.F.R. § 226.22(c).

### Federal CACFP Requirements For Terminating Sponsors

37.     To effectuate the Act's mandate and provide fair and effective oversight of the Program, Congress ordered that USDA "shall establish procedures for the termination of participation by institutions and family or group day care homes under the program [CACFP]." 42 U.S.C. § 1766(d)(5)(A). These procedures "shall include standards for terminating the participation of an institution or family or group day care home that . . .

engages in unlawful practices [or] falsifies information provided to the State agency." *Id.* § 1766(d)(5)(B). Congress mandated that any termination of an institution participating in CACFP "shall" occur "in accordance with" these "procedures" and "standards" promulgated by USDA. 42 U.S.C. § 1766(d)(1)(E)(iii), (5).

38. The Act requires that any institution participating in CACFP "shall be provided a fair hearing in accordance with subsection (e)(1) prior to any determination to terminate participation." *Id.* § 1766(d)(5)(D)(i). It allows for suspension of a participating institution with a post-suspension review hearing only "[i]f a State agency determines that an institution has *knowingly* submitted a false or fraudulent claim for reimbursement." *Id.* § 1766(d)(5)(D)(ii)(I) (emphasis added).

39. Under the CACFP regulations, to suspend a sponsoring organization, the State agency "must notify the institution's executive director and chairman of the board of directors that the State agency intends to suspend the institution's participation … unless the institution requests a review of the proposed suspension." 7 C.F.R. § 226.6(c)(5)(ii)(A). This notice must include that the state is proposing termination; that the suspension is based on the institution's submission of a false or fraudulent claim; the effective date of the suspension (which "may be no earlier than 10 days after the institution receives the suspension notice)"; the name, address, and telephone number of the suspension review official; and details on how to request a suspension review. *Id.*

40. Under the CACFP regulations, a State agency cannot immediately terminate a sponsoring organization's participation in CACFP. Instead, it must first propose termination by notifying the organization "that the State agency is proposing to terminate

the institution's agreement." 7 C.F.R. § 226.6(c)(3). If a State agency proposes to terminate a sponsor's participation, it must also formally propose that organization's *disqualification* from future participation. 7 C.F.R. § 226.6(c)(3).

### The CACFP Requires an Appeal Process for Adverse Rulings Against Sponsors

41. Appeals of actions taken by State agencies like MDE tasked with administering CACFP are subject to numerous requirements described in 7 C.F.R. § 226.6.

42. The CACFP regulations promulgated by USDA specifically provide: "the State agency must follow the procedures in this paragraph (k)(5) when an institution or a responsible principal or responsible individual appeals any action subject to administrative review as described in paragraph (k)(2) of this section." 7 C.F.R. § 226.6(k)(5).

43. In Minnesota, administrative appeals of MDE actions taken under the CACFP are heard by the MDE Appeal Panel. Under the appeal procedure published by MDE, the appeal panel is "A three-person panel of independent and impartial MDE staff acting as the administrative review official required in 7 CFR 226.6(k)(5)(vii)."[1] Pursuant to 7 CFR § 226.6(k)(5)(vii), the officials must be "independent and impartial," meaning that the individual "must not have been involved in the action that is the subject of the administrative review, or have a direct personal or financial interest in the outcome of the administrative review."

---

[1]     *Available at*
https://education.mn.gov/mdeprod/idcplg?IdcService=GET_FILE&dDocName=004487
&RevisionSelectionMethod=latestReleased&Rendition=primary.

44. Although each Panel member purports to act outside the division of MDE responsible for administering the CACFP, each ultimately reports to the Chairwoman, who is the Deputy Commissioner of MDE, and adhere to the general policy prerogatives of the Commissioner of MDE.[2]

### The Covid-19 Pandemic Drastically Changes the Nature of CACFP Participation

45. The Centers for Disease Control ("CDC") reported its first laboratory-confirmed case of the Covid-19 novel coronavirus in the United States on January 20, 2020.[3] Covid-19 is highly transmissible and resulted in strict restrictions on public gatherings to avoid human-to-human spread of the virus. While these measures were reported as necessitated by public health considerations, they had the unintended consequence in compromising the central way in which CACFP sites served meals to their populations. Because it was dangerous to gather in groups to provide services like childcare or daycare, many families chose to keep their children at home. Many of these underprivileged and underserved communities obtained meals for their children through these programs, however, and depended on CACFP to do so. This problem was

---

[2]    In fact, MDE officials are feeling pressure to look tough on any hint of fraud in the CACFP program in Minnesota. In April 2022, Defendant Monica Herrera appeared alongside Daron Korte, an Assistant Commissioner of MDE, in responding to legislative inquiries concerning the federal CACFP fraud investigation that is alleged to have occurred on MDE's watch: *Available at*: https://sahanjournal.com/news/feeding-our-future-minnesota-department-of-education-minnesota-senate/.

[3]    *Available at* https://www.cdc.gov/museum/timeline/covid19.html.

exacerbated when schools moved to virtual online learning; many children who were also dependent on school lunches now had nowhere to obtain their meals.

46.     USDA took several steps during the COVID pandemic to alleviate the burdens on families who relied on CACFP by relaxing a number of the program's meal requirements.  On March 20, 2020, USDA released Policy Memo #2, "Nationwide Waiver to Allow Non-congregate Feeding in the Child Nutrition Programs," which waived the typical requirement to serve congregate meals.[4]  This waiver was extended three times for CACFP programs and expired June 30, 2021.  A similar memo titled "Nationwide Waiver to Allow Non-Congregate Meal Service for SY 2021–2022" (USDA Policy Memo #87) began on July 1, 2021, and remained in effect through June 30, 2022.[5]

47.     That same day, the USDA also released Policy Memo #1, "Nationwide Waiver to Allow Meal Service Time Flexibility in the Child Nutrition Programs," which allowed meals to be served at any time.[6]  This waiver was extended twice for CACFP programs and expired June 30, 2021.  A similar memo titled "Nationwide Waiver to Allow

---

[4]     *Available at*  https://fns-prod.azureedge.us/sites/default/files/resource-files/covid-19-child-nutrition-response-2.pdf.

[5]     *Available at* https://fns-prod.azureedge.us/sites/default/files/resource-files/covid-19-child-nutrition-response-87.pdf.

[6]     *Available at* https://fns-prod.azureedge.us/sites/default/files/resource-files/covid-19-child-nutrition-response-1.pdf.

Meal Service Time Flexibility for SY 2021–2022" (USDA Policy Memo #88) began on July 1, 2021, and remained in effect through June 30, 2022.[7]

48.     On March 25, 2020, USDA released Policy Memo #5, "Nationwide Waiver to Allow Parents and Guardians to Pick Up Meals for Children," which waived the requirement that meals be served directly to children and, instead, allowed multiple meals for children to be sent home with a parent/guardian.[8] This waiver was extended three times and eventually expired June 30, 2021. A similar memo titled "Nationwide Waiver to Allow Parents and Guardians to Pick Up Meals for Children for SY 2021–2022" (USDA Policy Memo #89) began on July 1, 2021, and remained in effect through June 30, 2022.[9]

49.     Further clarification on this issue has recently been provided by USDA at the National CACFP Sponsor Association Annual Conference held on April 20, 2022. At that event, USDA stated: "[Monitoring waivers] allow you to operate meal pickup and delivery models, flex the meal pattern requirements to respond to food shortages, serve foods in multi-day packages and help and access to nutritious meals to more children in need." It later stated:

> [S]tate agencies and sponsoring organizations should exercise discretion when determining whether CACFP operators should be found seriously

---

[7]     *Available at* https://fns-prod.azureedge.us/sites/default/files/resource-files/covid-19-child-nutrition-response-88.pdf.

[8]     *Available at* https://fns-prod.azureedge.us/sites/default/files/resource-files/covid-19-child-nutrition-response-5.pdf; https://www.fns.usda.gov/cn/covid-19-child-nutrition-response-91.

[9]     *Available at* https://fns-prod.azureedge.us/sites/default/files/resource-files/covid-19-child-nutrition-response-89.pdf; https://www.fns.usda.gov/cn/covid-19-child-nutrition-response-89.

deficient again, when meals fall short of meeting meal pattern requirements due to this COVID-19 related supply chain disruptions during this fiscal year federal fiscal year 22. This applies to institutions under a state agency and facilities under a sponsoring organization, including daycare homes. State agencies and sponsoring organizations should work to identify solutions again on a case-by-case basis looking at local circumstances.

*Id.*

50.     To clarify the impacts of these three memos combined (i.e., non-congregate meal service, meal time waivers, and parent pick-up), USDA released the guidance document, "Child and Adult Care Food Program: Providing Multiple Meals at a Time During the Coronavirus (COVID-19) Pandemic," which, among other things, provides examples of meals and types of food that meet federal requirements.[10] Specifically, this memo allowed sites to begin providing food in "bulk" packages, which are defined as "[f]ood packaging containing an amount of food that is more than what is required at a single meal under the CACFP meal patterns. A bulk food item may provide food to be eaten at more than one meal or snack."

51.     PIQC has taken steps to comply with the changes announced by USDA. For example, on April 18, 2021, PIQC made a technical assistance request of MDE to discuss what food items met the modified federal regulations, per recent USDA guidance. MDE responded to this request on April 28, 2021 and provided PIQC with guidance on its menus. Within 48 hours of MDE's response to PIQC's request for technical assistance, PIQC in turn alerted all of its sites of the rules put forth by MDE.

---

[10]     *Available at* https://fns-prod.azureedge.us/sites/default/files/resource-files/CFP_BulkFoods.pdf.

52.     PIQC has complied with the waivers and policy guidance issued by USDA, along with technical assistance from MDE, since those COVID-induced changes to CACFP requirements went into effect.

53.     PIQC, along with any other entity seeking status as a sponsoring organization under CACFP, has to re-apply to MDE each fiscal year (starting October 1) for annual renewal as a sponsoring organization.  In 2017, 2018, 2019, 2020, and 2021, MDE has accepted PIQC's application and approved PIQC as a sponsoring organization year after year, including most recently for 2021-2022.

54.     PIQC will submit its application by September 9, 2022, to be considered for annual renewal as a sponsoring organization for 2022-2023.

### The Open Federal Criminal Investigation Into CACFP Fraud

55.     On January 20, 2022, the United States Department of Justice ("DOJ") took the highly unusual step of causing to be unsealed in the U.S. District Court for the District of Minnesota three (3) search warrants directed to the homes and businesses of several individuals involved in providing CACFP-governed food service in Minnesota.  Even more unusual, the affidavits of federal agents supporting probable cause to obtain those search warrants were also unsealed. Those affidavits allege certain individuals and entities participating in CACFP in Minnesota had submitted claims for reimbursement for millions of dollars that were never used to provide needy and underprivileged children with meals.

56.     The first search warrant and supporting affidavit were directed to Aimee Bock, the President of Feeding Our Future.  Feeding Our Future is a CACFP sponsoring

organization operating under CACFP in the Greater Minnesota area. There is no corporate or legal affiliation between Feeding Our Future and PIQC.

57. The first affidavit directed to Ms. Bock alleges a series of entities received millions of dollars of CACFP money under the sponsorship of Feeding Our Future and funneled the money into various "shell companies" instead of using the funds to provide meals to underprivileged youth. It further noted that a $310,000 cashier's check from one of the entities under investigation was sent to Ms. Bock and deposited in her personal account, reflecting a suspected "kickback."

58. The first affidavit also alleges that Feeding Our Future managed its own sites that participated in CACFP under its sponsorship and alleged that Feeding Our Future itself used these sites to obtain federal money through reimbursement claims that were never used to serve meals. Finally, it accuses specific individuals at Feeding Our Future (including Ms. Bock) of stealing CACFP funds through the use of their own shell companies and receiving kickbacks from other CACFP sites. PIQC is not alleged to have done anything illegal in this first affidavit.

59. The second search warrant and supporting affidavit were directed to the individuals involved in the ownership and operations of two sites: (i) ThinkTechAct Foundation a/k/a Mind Foundry Learning Foundation ("ThinkTechAct" or "Mind Foundry") and (ii) Empire Cuisine & Market, LLC ("Empire Cuisine").

60. ThinkTechAct Foundation a/k/a Mind Foundry Learning Foundation was formerly a CACFP site operating under the sponsorship of Feeding Our Future as ThinkTechAct and under the sponsorship of PIQC as Mind Foundry.

61.     Empire Cuisine was a vendor in the Summer Food Service Program that operated, for a time, under the sponsorship of PIQC. In June 2021, however, Ms. Bock made a request to MDE that it transfer Empire Cuisine's sponsorship to Feeding Our Future.

62.     The second affidavit alleges Mind Foundry and Empire Cuisine acted in concert to fraudulently claim reimbursement for CACFP funds. PIQC is not alleged to have done anything illegal in this second affidavit.

63.     The third search warrant and supporting affidavit were directed to S&S Catering, Inc., an entity operating as both a vendor and site under the sponsorships of both PIQC and Feeding Our Future. This affidavit alleges S&S Catering also fraudulently obtained CACFP funds by submitting false claims for reimbursement in addition to receiving such funds from relate entities participating in CACFP. PIQC is not alleged to have done anything illegal in this third affidavit.

64.     Since the criminal investigation has been made public, two of its targets have been caught attempting to flee the country. They have each been charged with one count of one count of violating 18 U.S.C. § 1542 for giving a false statement in a passport application.

65.     A pre-indictment complaint charging one of those individuals, Abdiaziz Shafii Farah, owner and co-founder of Empire Cuisine and board member of ThinkTechAct, was filed on May 20, 2022. That complaint is accompanied by an affidavit in which a small number of the 106 paragraphs provide information about an individual

identified only as "J.S."—Julius Scarver—who was until recently a member of PIQC's Board of Directors.

66.     According to the affidavit, Mr. Scarver formed an entity called The Free Minded Institute in late July 2021, and for a brief time participated in CACFP as a site with PIQC as its sponsor, receiving federal funding through the submission of claims for reimbursement.  The affidavit also alleged The Free Minded Institute sent the majority of this money to Empire Cuisine.

67.     Mr. Scarver worked as a site operator from September 5, 2017, to May 28, 2021, when he left the employ of PIQC.

68.     Contrary to the allegations in the affidavit, Mr. Scarver never served in the capacity as employee and board member at the same time.  He did not join the Board of Directors of PIQC until August 2021.  As a board member, Mr. Scarver had no ability or authority whatsoever to approve claims for reimbursement, nor was he individually involved in or specifically authorized to exercise any control over PIQC's finances or claims approval processes.

69.     Moreover, Mr. Scarver's involvement with Free Minded Institute was fully disclosed to MDE by PIQC in conformance with applicable regulations.  Relying on Mr. Scarver's representations to PIQC, PIQC informed MDE of its understanding: Mr. Scarver did not receive improper remuneration associated with his role at Free Minded Institute.

70.     PIQC has never been formally accused of wrongdoing by any federal authorities. Nor has it been identified as a target of the federal criminal investigation described above.  Nor has MDE, in the charges leveled at PIQC (described below) ever

made any specific findings of fact that PIQC has engaged in any fraudulent conduct in its CACFP-related operations.

**MDE Pursues Aggressive, Unwarranted, and Unlawful Regulatory Action Against PIQC**

71.     The very same day that the three search warrants described above were unsealed (January 20, 2022), MDE sent a communication to PIQC (January 20 Letter). The January 20 Letter stated, "MDE is suspending all payments to Partners in Nutrition dba Partners in Quality Care." Ex. A. MDE's communication stated that its action was "being taken in response to the federal investigation of organizations participating in the USDA Child Nutrition programs for mail fraud, wire fraud, conspiracy and money laundering" and referenced "warrants and affidavits" documenting "CACFP site operators and organizations," "[a] number of" which "are connected to sites sponsored by [PIQC]." *Id.*

72.     MDE invoked 7 C.F.R. § 226.10(f) as legal authority for its January 20, 2022 action. That regulation provides:

> If, based on the results of audits, investigations, or other reviews, a State agency has reason to believe that an institution, child or adult care facility, or food service management company has engaged in unlawful acts with respect to Program operations, the evidence found in audits, investigations, or other reviews is a basis for non-payment of claims for reimbursement.

73.     MDE also cited to 2 C.F.R. § 200.339 as "[a]dditional federal regulatory authority of [sic] the withholding of payments." That regulation was not promulgated by USDA but rather by a different federal agency—the Office of Management and Budget. That OMB regulation provides:

If a non–Federal entity fails to comply with the U.S. Constitution, Federal statutes, regulations or the terms and conditions of a Federal award, the Federal awarding agency or pass-through entity may impose additional conditions, as described in § 200.208. If the Federal awarding agency or pass-through entity determines that noncompliance cannot be remedied by imposing additional conditions, the Federal awarding agency or pass-through entity may take one or more of the following actions, as appropriate in the circumstances:

> (a) Temporarily withhold cash payments pending correction of the deficiency by the non–Federal entity or more severe enforcement action by the Federal awarding agency or pass-through entity.

> (b) Disallow (that is, deny both use of funds and any applicable matching credit for) all or part of the cost of the activity or action not in compliance.

> (c) Wholly or partly suspend or terminate the Federal award.

> (d) Initiate suspension or debarment proceedings as authorized under 2 CFR part 180 and Federal awarding agency regulations (or in the case of a pass-through entity, recommend such a proceeding be initiated by a Federal awarding agency).

> (e) Withhold further Federal awards for the project or program.

> (f) Take other remedies that may be legally available.

74.     On January 31, 2022, MDE sent another communication to PIQC, proposing PIQC's termination from CACFP participation and disqualification from future CACFP participation (the "January 31 Letter"). Ex. B. Like its earlier communication, MDE's January 31 Letter also stated that MDE's action was "[b]ased on the evidence in the warrants and affidavits" from the "federal investigation of organizations participating in the USDA Child Nutrition programs for mail fraud, wire fraud, conspiracy and money laundering."

75.     The January 31 Letter further proposed the disqualification of PIQC's officers and directors, placing them on the "National Disqualified List." *See* 7 C.F.R. § 226.2 (defining "National disqualified list" as "the list, maintained by [USDA], of institutions, responsible principals and responsible individuals, and day care homes disqualified from participation in the CACFP"). According to the January 31 Letter, such action would prevent PIQC from future participation in CACFP "as an institution or facility" and prohibit the individuals from "serv[ing] as a principal in any institution or facility or as a day care home provider in the CACFP."

76.     MDE's January 31 Letter stated it "concern[ed] the Serious Deficiency Notice dated March 31, 2021," in which MDE had determined PIQC to have been "seriously deficient . . . for failure to conform to the [CACFP] performance standards" and claimed it was proposing these actions because it had "determined that [PIQC] has not fully and permanently corrected the serious deficiencies cited in the Serious Deficiency notice on March 31, 2021 as well as engaged in unlawful acts." The timing reeks of presumed guilt-by-association: In January 2022, MDE is first citing to a nascent federal investigation into conduct of others and then adding in reference to a Serious Deficiency letter from ten months earlier (March 2021).

77.     On February 2, 2022, MDE next transmitted to PIQC by email a document titled "Meal Claim Instructions" ("Meal Claims Instructions"). Ex. C. This document purports to be a list of documentation MDE was now requiring PIQC to submit during the suspension period initiated, without prior warning, against PIQC in MDE's January 20 Letter. *Id.* ("All claims must be entered in the Cyber-Linked Interactive Child Nutrition

System (CLiCS). MDE will then require the following documentation be uploaded to the SharePoint CACFP Centers site of your organization. . . . All documentation must be submitted to the Serious Deficiency Corrective Action folder set up in your organizations SharePoint site.").

78. Per MDE's February 2, 2022 Meal Claim Instructions, as a CACFP Center being subjected to suspension, PIQC was to support the future claims for reimbursement with the following documentation:

- Meal and snack count records;

- Attendance records;

- Menus for all meals and snacks served; and

- Receipts and invoices for the meals purchased.

79. MDE's February 2, 2022 Meal Claim Instructions also provided a list of required documents for CACFP At-Risk Afterschool Meal Programs that included:

- Meal and snack count records;

- Attendance records;

- Menus for all meals and snacks served;

- Educational and enrichment activities offered to children; and

- Receipts and invoices for the meals purchased.

80. Ordinary CACFP procedures set out in Title 7 of the Code of Federal Regulations do not require following the Meal Claim Instructions for submission of documents that support the approval of claims for reimbursement: 7 C.F.R. §§ 226.15(e) (requiring each participating institution to "establish procedures to *collect and maintain* all

program records required by [Title 7, Part 226 of the Code of Federal Regulations], as well as any records required by the State agency" (emphasis added)); 226.10(c) (requiring institution to "certify that the claim [for reimbursement] is correct and that records *are available* to support that claim" (emphasis added)); § 226.16(a), (e) (requiring sponsoring organizations to "comply with the recordkeeping requirements established in [7 C.F.R.] §§ 226.10(d) and 226.15(e) and any recordkeeping requirements established by the State agency").

81. Neither does PIQC's CACFP Agreement with MDE require the submission of records on a regular basis. Section 7(F) only requires PIQC to "collect and maintain" required CACFP records. The MDE previously agreed to exactly that: by engaging in CACFP, PIQC "agree[d] to make all accounts and records . . . available to MDE upon request." Ex. D; *accord* 7 C.F.R. § 226.10(d).

82. In the time PIQC has been approved by MDE as a sponsoring organization, it has never been the case that a claim was not approved on the grounds that a few invoices or receipts were missing from PIQC's claims documentation. That includes the time period March-December 2021, after the Serious Deficiency Letter had issued. In every case prior to January 20, 2022, if MDE felt that a claim was not sufficiently supported, MDE staff would work collaboratively with PIQC to allow it to obtain the supporting documentation or recover funds for insufficiently documented meal(s).

83. In response to the January 20 Letter, the January 31 Letter, and the Meal Claim Instructions, PIQC appealed to the MDE Appeal Panel in a consolidated proceeding. Ex. E. There, PIQC argued that MDE was attempting to suspend and propose termination

and disqualification based on an unrelated—and previously resolved—"serious deficiency." *See* Ex. F; *see also* Ex. E at 9–10.

84.    PIQC also argued the documents and information upon which MDE purported to base its actions—consisting solely of the affidavits supporting the federal applications for search warrant—were inadequate to support PIQC's suspension, termination, and disqualification from CACFP participation. *See* Ex. F; *see also* Ex. E at 10–13. Among other arbitrary and erroneous grounds, MDE conflated the allegation of fraud by other entities with PIQC's participation in or failure to monitor it. PIQC also pointed out that the unspecified and unsubstantiated allegations in the federal search warrant affidavits failed to articulate any wrongdoing, as opposed to others, committed by PIQC specifically and instead assumed guilt by association.

85.    PIQC further pointed out that neither of regulations promulgated by OMB relied on by MDE, 2 C.F.R. §§ 200.339(a) and 200.342, authorized MDE to take the actions it sought to undertake. *See* Ex. F; *see also* Ex. E at 6–8.

86.    On May 17, 2022, the MDE Appeal Panel reversed MDE's action taken in the January 20 Letter and January 31 Letter as legally inappropriate. Ex. G.

87.    Specifically, the MDE Appeal Panel noted that while MDE invoked 2 C.F.R. § 200.339, which allows agencies administering federal programs to "[i]nitiate suspension . . . proceedings," the "CACFP federal regulations under Chapter 226 provides for a set of procedural requirements for proposed suspension of participation," requiring that MDE "issue a notice" containing specified criteria and "appoint a suspension review official to investigate and issue a suspension review decision." *Id.* at 10.

88.     Because the administrative record reflected neither of these things, the MDE

Appeal Panel found that MDE "either cited an incorrect federal regulatory provision for its

action of "withholding" payments, or did not conduct a suspension proceeding in a manner

consistent with 7 C.F.R. § 226.6(c)(5)(ii)(B)." *Id.* at 11.

89.     Further, the MDE Appeal Panel found that MDE failed to establish it had

provided sufficient notice concerning its allegations articulated in its January 31 Letter. *Id.*

at 12.   It concluded that MDE "has not fully discharged its duties to provide PIQC

Appellants with due notice and an opportunity to correct the serious deficiencies before

moving forward with their disqualification and PIQC's termination." *Id.* at 12.

90.     The MDE Appeal Panel mandated that MDE must "re-assess the matter and

carry out MDE-FNS's duties in a manner consistent with the applicable federal regulations

and procedural rules." *Id.* at 12.   It also stated: "If MDE-FNS believed these serious

deficiencies had occurred, it should have followed the regulatory provisions for providing

notice and an opportunity to take corrective action by consistently citing to all of the

relevant subparts that constitute MDE-FNS's grounds for proposed termination and

disqualification." *Id.* at 12.   It further instructed that MDE's substantive allegations

"should be re-evaluated by MDE-FNS when it discharges its regulatory duties on remand

in a manner consistent with the procedural requirements for its agency actions." *Id.* at 12–

13 n.6.

91.     The MDE Appeal Panel's written decision rejected MDE's attempt to

circumvent the regulatory requirements of applicable federal law.

92.     Neither before nor after MDE actions taken on January 20 and 31, 2022, did MDE ever issue PIQC a "serious deficiency" notice pertaining to the federal fraud investigation events cited as giving rise to MDE's adverse regulatory action.

## MDE Denies Claims for Reimbursement to Hundreds of CACFP Sites Based on Its Illegal January 20 and January 31, 2022 Actions

93.     Relying on its actions taken on January 20 and January 31, 2022, MDE has separately also denied hundreds of claims so far in 2022 that PIQC submitted for reimbursement for meals served in November and December 2021.

94.     On March 25, 2022, MDE sent a communication to PIQC stating that MDE was denying payment for seventy-eight (78) claims for reimbursement for meals and snacks served in November 2021. On April 22 and April 26, 2022, MDE denied another one hundred eighty-one (181) claims for reimbursement for meals and snacks served in December 2021.

95.     In each action and for both months, MDE denied nearly every single claim for reimbursement submitted by any site for which PIQC is the sponsor.

96.     MDE stated in each communication of denial of reimbursement that each action was taken "in response to the suspension of payments action by the Minnesota Department of Education issued on January 20, 2022 and the meal documentation instructions provided on February 2, 2022."

97.     Ordinarily, a claim denial under the CACFP is its own singular, independent agency action. That is, the MDE's denial of any one claim—or portion or any one claim—

is itself its own appealable action which may be litigated through the administrative review process and then, if warranted, to the Minnesota state appellate courts.

98. To obstruct PIQC's meaningful ability to respond to and appeal the denial of any one claim for reimbursement, MDE has instead combined hundreds of individual claim denials (representing one whole months' worth of claims) into one singular action.

99. PIQC challenged MDE's "wholesale" claims denials for the months of November and December 2021 first to the MDE Appeal Panel, but that MDE Appeal Panel rejected PIQC's arguments. By a writ of certiorari, the MDE's final regulatory actions wholesale denying Partners' November and December claims are presently on appeal before the Minnesota Court of Appeals. Until the state court appellate review process is completed, many millions of dollars in claimed reimbursements for PIQC-sponsored sites remain denied or otherwise withheld by MDE. That is money that does not go out to PIQC or to the dozens of sites it previously sponsored.

**MDE Purports to Immediately Terminate PIQC From CACFP Participation and Withhold All Funds, Denying Reimbursement _In Toto_**

100. After MDE's January 20 and January 31 actions attempting to unlawfully suspending, terminating, and disqualifying PIQC from CACFP participation was temporarily blocked by the MDE Appeal Panel, the agency attempted a different end-run around federal regulatory requirements to achieve the same result: prevent PIQC from participating as a CACFP sponsoring organization.

101. On May 27, 2022, Defendant Emily Honer sent a letter to PIQC ("May 27 Letter") purporting to immediately "terminate" PIQC from CACFP participation and

withhold all funds from the organization's past or future claims for reimbursement submitted on behalf of its sites. Ex. H. The communication stated: "[MDE] is terminating Partner in Nutrition dba Partner in Quality Care's (PIQC) [sic] permanent agreement and all pending site applications." Ex. H. MDE's May 27 Letter also informed PIQC that "MDE will also withhold all payments in response to the ongoing noncompliance based on the new information released." *Id.*

102.   MDE's May 27 Letter stated it was taking this action "due to affidavits unsealed by the United States District Court for the District of Minnesota as part of the federal investigation into the scheme to defraud the federal government using the Child Nutrition Programs in Minnesota and the arrest of two targets of the federal investigation for fraudulently obtaining a passport from the U.S. State Department." *Id.* at 1–2.

103.   It also claimed: "[t]his action is taken based on MDE's determination that the role of PIQC in the federal food aid fraud, as demonstrated by the federal affidavits, cannot be corrected by imposing additional conditions found in 2 CFR 200.208." *Id.* MDE claimed that "[t]hese actions are being taken with the authority under 2 CFR 200 [sic]." *Id.*

104.   MDE's May 27 Letter purports to rely on generic regulations promulgated by the Office of Management and Budget ("OMB"), not specific regulations governing the required procedures in the administration of CACFP, promulgated by USDA. This is the same tactic that the MDE Appeal Panel had rejected on May 17, 2022, when it reversed MDE's prior agency action.

105. On June 17, 2022, MDE sent another letter to PIQC informing it that MDE was denying the then-pending site applications for 213 sites whose applications for participation in CACFP were under the sponsorship of PIQC ("June 17 Letter"). Ex. I. MDE's June 17, 2022 Letter stated this additional agency denial was taken "[i]n response to the termination of [PIQC]'s CACFP permanent agreement with the Minnesota Department of Education effective May 27, 2022," and "stems from the immediate termination taken under 2 CFR 200.339 [sic] and the appeal of these site denials are linked directly to the immediate termination." *Id.*

106. MDE never issued PIQC a "serious deficiency" notice pertaining to the events giving rise to this new regulatory action set forth in the June 17 Letter.

107. On July 25, 2022, MDE sent yet another letter denying "all pending claims" for reimbursement for meals, including those claims remanded by the Appeal Panel for meals served in November and December 2021, as well as claims for meals served in January through May 2022 ("July 25 Letter"). Ex. J. The July 25 Letter stated MDE was taking this action "[a]s a result of MDE-NPS' May 27, 2022 immediate termination and withholding of payments to PIQC." *Id.*

108. These claim denials – covering most, but not all PIQC-submitted claims in the period from January to May 2022 – rely on largely the same reasons for denial as do MDE's denial of claims for reimbursement for meals served in November and December 2021. The five months of reimbursements that PIQC and its sponsored sites have been denied in 2022 based on the MDE's July 27 Letter totals many millions of dollars that are

needed by PIQC-sponsored sites – including reimbursement claims that have been withheld but not been denied by MDE.

109.    As yet another unlawful roadblock to PIQC's participation in CACFP, MDE has combined hundreds of these individual agency actions (claim denials) into one single "agency action" which PIQC must attempt to challenge all at once.

110.    To-date, MDE has provided PIQC with no documentary evidence supporting or explaining its determination "that the role of PIQC in the federal food aid fraud, as demonstrated by the federal affidavits, cannot be corrected by imposing additional conditions." *Cf.* Ex. H (May 27 Letter).

111.    To-date, MDE has not provided PIQC with any documentary evidence that PIQC "knowingly submitted a false or fraudulent claim," as USDA regulations would require before either suspending or proposing the termination of an institution from CACFP participation.   *See* 7 C.F.R. § 226.6(c)(5)(ii) (emphasis added); *see also id.* § 226.6(c)(3).

112.    To-date, PIQC has never been convicted of fraud. To-date, to the best of PIQC's knowledge, it has never been charged with fraud in a criminal court or identified as the target of a criminal investigation into fraudulent conduct.

113.    Upon information and belief, Defendants Herrera, Honer, and Johnson-Reed, are state actors who are all responsible for the decision to pursue the above-described regulatory action against PIQC.

**PIQC Temporarily Suspends CACFP Operations After the Latest MDE Warning**

114.    On August 10, 2022, Defendant Monica Herrera sent a letter "reminding" PIQC that it was "terminated" from CACFP participation ("August 10 Letter"). Ex. K.

115.    The August 10 Letter places PIQC in a Hobson's choice: acquiesce to MDE's illegal administrative actions and discontinue (or terminate all) CACFP operations, or abandon its charitable mission of helping to feed needy and underprivileged communities in Minnesota. If PIQC does not acquiesce to the MDE's May 27 Letter, June 17 Letter, July 25 Letter and August 10 Letter, possible future regulatory action that MDE or USDA could seek includes permanent disqualification and placement on the national disqualification list. *See* 7 C.F.R. § 226.6.

116.    PIQC has challenged the MDE's May 27 Letter by submitting a notice of administrative appeal and written statement and materials in support. A hearing before the MDE Appeal Panel has been delayed due to numerous scheduling conflicts. Nevertheless, based on past experience with MDE, this administrative litigation will be prolonged, as it generally takes several more weeks after submission for the MDE Appeal Panel to issue a written decision, and it will take many more months if PIQC has to seek further review and relief from the Minnesota Court of Appeals to correct the MDE's persistent legal errors and disregard for the MDE's own procedures.

117.    If not immediately prohibited, the threat of the MDE's actions described above irreparably harms PIQC. In the face of MDE's roadblock-after-roadblock approach, the risk was too great for PIQC to continue its operations in good faith. Due to PIQC's temporary cessation of CACFP operations, many of its sites are unable to access federal

funding to reimburse their expenses for serving healthy and nutritious meals in accordance with Section 17 of the National School Lunch Act.

118.    In fact, once MDE sent its August 10 Letter, PIQC was forced to temporarily suspend all CACFP-related operations.  This also adversely affects the remaining PIQC employees whose jobs depend on CACFP program operations.  This also adversely affects the 64 individual sites who have worked with and depended upon PIQC to guide them a sponsoring organization.  Whether set forth in the MDE's own transfer forms or in emails PIQC has received from multiple sites, there is ample evidence citing MDE's reimbursement denials and disqualification of PIQC as a reason that they are no longer willing to be sponsored by PIQC.

119.    The cumulative effect on PIQC's operations in 2022 is palpable.  In January, PIQC had 14 staff members and that number is currently down to 8.  In January, PIQC had 44 Adult Care Centers, and now it has 34.  In January PIQC had 45 Childcare Centers and now it is down to 30.  In January, PIQC had 319 At Risk After School Programs, and now it has zero.

120.    The MDE's illegal treatment directly and adversely affects PIQC's ability to get a fair consideration from MDE for re-certification in PIQC's pending application for the 2022-23 fiscal year.

# CLAIMS FOR RELIEF

## COUNT I
### Violation of Section 17 of the National School Lunch Act
### and Title 7, Chapter 226 of the Federal Code of Regulations

121. PIQC realleges and incorporates by reference paragraphs 1 through 120 above as if set forth wholly herein.

122. Congress has mandated that any termination or suspension of an organization participating in CACFP "shall" occur only "in accordance with" the "procedures" and "standards" promulgated by USDA. 42 U.S.C. § 1766(d)(1)(E)(iii), (5). 7 C.F.R. § 226.6 constitutes those procedures. Any procedure (or lack thereof) existing in the OMB Regulations is preempted or superseded by Section 17 of the Nation School Lunch Act insofar as it relates to MDE's administration of CACFP in the State of Minnesota.

123. Moreover, the OMB regulations upon which the Defendants rely expressly require adherence to USDA's specific CACFP procedure.

124. Under the federal regulations promulgated by USDA governing the administration of CACFP by State agencies, MDE cannot immediately terminate PIQC from CACFP participation prior to issuing a serious deficiency notice and proposing the action which it seeks to undertake.

125. 28 U.S.C. § 2201 provides:

In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

126.    Pursuant to Rule 57 of the Federal Rules of Civil Procedure, this Court "may order a speedy hearing of a declaratory-judgment action."

127.    MDE's May 27, 2022 Letter, purporting to immediately terminate PIQC from CACFP participation and withhold payment of all funds violates federal law in that it fails to follow the mandatory procedures in CACFP regulations for the suspension or proposed termination of a sponsoring organization.  Specifically, MDE's May 27, 2022 Letter fails to follow the mandatory procedures in Title 7, Chapter 226 of the Code of Federal Regulations for the suspension or proposed termination of a sponsoring organization.

128.    MDE's May 27, 2022 Letter conflicts with and is preempted by the procedural requirements mandated by Section 17 of the National School Lunch Act and promulgated by USDA.

## COUNT II
### Violation of the Due Process Clause of the
### 14th Amendment to the United States Constitution

129.    PIQC realleges and incorporates by reference paragraphs 1 through 129 above as if set forth wholly herein.

130.    As an organization participating in federal programming like the CACFP, PIQC as a sponsor has a property interest in receiving claims for reimbursement on behalf of the sites under its sponsorship that are dependent on that programming.

131.    As organizations participating in federal programming, the sites operating within the CACFP under PIQC's sponsorship have a property interest in receiving claims for reimbursement for monies spent in reliance of those program funds.

132.    Due to the nature of its role as a "sponsor," PIQC holds third party standing to assert the rights of the sites operating under its sponsorship on their behalf.

133.    MDE's May 27 Letter constitutes an unconstitutional deprivation of PIQC's property rights without a pre-deprivation hearing, notice and process.

134.    In ignoring federal law and purporting to terminate PIQC's participation in CACFP and withhold all program funds without a pre-deprivation hearing, MDE's May 27 Letter violates PIQC's right to Due Process under the Fourteenth Amendment to the United States Constitution.

## COUNT III
### Violation of the Due Process Clause of the
### 14th Amendment to the United States Constitution

135.    PIQC realleges and incorporates by reference paragraphs 1 through 134 above as if set forth wholly herein.

136.    Title 7, Chapter 226 of the Code of Federal Regulations requires that officials conducting administrative review over actions taken by a State agency must be "independent and impartial."  7 C.F.R. § 226.6(k)(5)(vii).

137.    Although federal regulations permit the officials to consist of "employee[s] of the State agency," due process of law requires that they be individuals not subject to the same political and administrative pressures as the division of the agency ultimately responsible for the agency action under review.

138.    The MDE appeal procedure, under which a panel of MDE officials purport to objectively review the lawfulness of MDE's own action, violates PIQC's constitutional

rights under the Due Process Clause of the 14th Amendment to the United States Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff, Partners in Nutrition d/b/a Partners in Quality Care, prays this Court for entry of a judgment against the Defendants, Minnesota Department of Education, Monica Herrera, Emily Honer, and Jeanette Johnson-Reed:

(a) declaring that MDE's May 27, 2022 letter violates Section 17 of the National School Lunch Act and federal regulations governing the administration of CACFP in the State of Minnesota, namely, 7 C.F.R. § 226.6;

(b) declaring that MDE's May 27, 2022 letter violates the Due Process Clause of the 14th Amendment to the United States Constitution;

(c) declaring that MDE's appeal procedure violates the Due Process Clause of the 14th Amendment to the United States Constitution;

(d) declaring that MDE has no authority to unilaterally "terminate" or otherwise affect PIQC's CACFP participation without strictly following the procedures laid out in 7 C.F.R. § 226.6;

(e) granting a temporary restraining order and/or preliminary injunction, followed by a permanent injunction, enjoining the Defendants from enforcing MDE's May 27, 2022 Letter;

(f) Preliminarily and permanently enjoining the Defendants from taking further action toward Plaintiff that is inconsistent with Section 17 of the National School Lunch Act and Title 7, Chapter 226 of the Code of Federal Regulations;

(g)     Awarding the Plaintiff costs of this action, including reasonable attorneys' fees; and

(h)     Granting any and all other such legal or equitable relief as the Court finds appropriate.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on any and all issues deemed to be so triable.

Dated this 8th day of September, 2022.

STINSON LLP

BY: */s/  Kevin D. Conneely*
Kevin D. Conneely  (#0192703)
Emily Asp  (#0399965)
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone:  (612) 335-1500
kevin.conneely@stinson.com
emily.asp@stinson.com

AND

THE WEINHARDT LAW FIRM

Mark E. Weinhardt*
2600 Grand Avenue, Suite 450
Des Moines, IA  50312
Telephone:  (515) 244-3100
E-mail:  meweinhardt@weinhardtlaw.com

  *pro hac vice forthcoming

ATTORNEYS FOR PLAINTIFF PARTNERS
IN NUTRITION d/b/a PARTNERS IN
QUALITY CARE