IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| PARTNERS IN NUTRITION d/b/a PARTNERS IN QUALITY CARE, <br><br>     Plaintiff, <br><br> v. <br><br> MINNESOTA DEPARTMENT OF EDUCATION; MONICA HERRERA, in her individual capacity and official capacity as Director of Nutrition Program Services; EMILY HONER, in her individual capacity and official capacity as Program Integrity Work Manager and JEANETTE JOHNSON-REED, in her individual capacity and official capacity as Supervisor of Compliance, <br><br>     Defendants. | Case No. 0:22-cv-02195-JRT-JFD <br><br> **PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER** |

## INTRODUCTION

Plaintiff, Partners in Nutrition, d/b/a Partners in Quality Care ("Partners" or "PIQC"), seeks an immediate, temporary restraining order from this Court to enjoin Defendant Minnesota Department of Education ("MDE") from enforcing its unlawful May 27th letter. That termination letter, which purports to terminate PIQC from the Child and Adult Care Food Program ("CACFP"), runs afoul of the clear statutory and regulatory framework governing the program. PIQC has attempted to challenge MDE's unlawful actions through the administrative process laid out by the federal CACFP regulations, and, meanwhile, for many weeks MDE itself did not follow through by taking steps to treat Partners as "terminated." In a subsequent letter sent on August 10, 2022, however, MDE

has barred PIQC from continuing to operate as the process continues, and has forced it into an untenable situation. This temporary suspension of PIQC's CACFP operations has not only adversely affected the remaining PIQC staff, whose jobs depend on staying in operation, but also the 64 individual remaining PIQC-sponsored sites who have worked with and depended upon PIQC to guide them in the CACFP reimbursement process.

As another example for the need to preserve the status quo and suspend the May 27th purported determination, PIQC should not have that same cloud of suspicion hanging over its pending request for renewal as a CACFP sponsor. PIQC submitted its application on September 9, 2022 to be considered for annual renewal as a sponsoring organization, effective October 1, 2022–September 30, 2023.   As MDE must consider PIQC's application within a month, and the appeals of MDE's actions are far from a final resolution, PIQC cannot wait for relief. Without a temporary restraining order, MDE will continue to base its decisions on unsupported legal grounds, PIQC will be forced to lay off much of its remaining staff, and the sites relying on PIQC's sponsorship will be required to look elsewhere for assistance and support.

## STATEMENT OF FACTS

### I.    CACFP and PIQC's Role.

This lawsuit concerns the administration of the federal Child and Adult Care Food Program ("CACFP"), which is run through the United States Department of Agriculture ("USDA") and which is regulated by 7 C.F.R. Part 226.  CACFP "is intended to provide aid to child and adult participants and family or group day care homes for provision of nutritious foods that contribute to the wellness, healthy growth, and development of young

CORE/3525880.0003/176993440.1

children, and the health and wellness of older adults and chronically impaired persons." 7 C.F.R. § 226.1. A variety of different organizations, or sites, operate under CACFP, including childcare centers, at-risk afterschool care centers, outside-school-hours care centers, emergency shelters, and adult day care centers. *See* 7 C.F.R. § 226.2 (defining "Institution").

CACFP allows "sponsoring organizations" to assist one or more sites in the administration of the CACFP program. *See* 7 C.F.R. § 226.2. Sponsoring organizations act as third-party intermediaries between the state agency administering the program and the sites that provide food to underserved and under privileged children and adults. *Id.* These sponsors serve a vital role in the administration of CACFP because compliance with program requirements is complex and costly; sponsors provide consulting, training, compliance monitoring, and additional resources to help programs succeed in feeding nutritious meals to children and adults. Tousignant Decl. Par. 8.[1]

PIQC became a CACFP sponsoring organization in 2016. Tousignant Decl. Par. 5. It was founded in 2015 by Christine Twait and Aimee Bock, after they both left another well-known sponsoring organization, Providers Choice, Inc. ("Providers Choice").[2] Tousignant Decl. Par. 4.

---

[1] All references to the record are either to the Complaint "[ECF. No.1 at Par. ___]" or other filed pleadings and exhibits of record "[ECF No. ___ at ___]" or to the supporting declarations and their exhibits of: Plaintiff's interim Executive Director "Tousignant Decl. Par. ___; Ex. ___" or to Plaintiff's undersigned counsel "Asp Decl. Par. ___; Ex. ___." Those declarations are filed with Plaintiff's motion.

[2] Ms. Bock left PIQC in June 2018 to operate a separate (and competing) sponsoring entity in Minnesota called Feeding Our Future. Tousignant Decl. Par. 6. Since her departure, Ms. Bock has had no involvement whatsoever—formal or informal—with PIQC. *Id.*

CORE/3525880.0003/176993440.1

PIQC's participation in CACFP is governed by the regulations and guidance promulgated by USDA. *See generally* 7 C.F.R. § 226.1 ("This part announces the regulations under which the Secretary of Agriculture will carry out the Child and Adult Care Food Program."). As the state agency administering the program in the State of Minnesota, MDE is required to follow the regulations promulgated by USDA for administering the CACFP program. 7 CFR § 226.3 (c) ("Each State agency desiring to take part in the Program shall enter into a written agreement with the Department for the administration of the Program in the State in accordance with the provisions of this part.")

## II.    The Regulations Governing CACFP.

CACFP is governed by regulations promulgated by USDA and found in Title 7, Chapter 226 of the Code of Federal Regulations. These regulations impose a variety of recordkeeping and monitoring requirements on sponsoring organizations. *See generally* 7 C.F.R. §§ 226.15(e) (recordkeeping and requirement to maintain and collect documentation regarding site participation, daily attendance, and other administrative records), .16(d), (e) (supervisory and operational management and monitoring of program facilities; recordkeeping). The regulations also impose monitoring and review requirements on state agencies, like MDE. *See generally* 7 C.F.R. § 226.7 (State agency responsibilities for financial management).

To effectuate the Act's mandate and provide fair and effective oversight of the Program, Congress ordered that USDA "shall establish procedures for the termination of participation by institutions and family or group day care homes under the program [CACFP]." 42 U.S.C. § 1766(d)(5)(A). These procedures "shall include standards for

terminating the participation of an institution or family or group day care home that . . .
engages in unlawful practices [or] falsifies information provided to the State agency." *Id.*
§ 1766(d)(5)(B).  Congress mandated that any termination of an institution participating in
CACFP "shall" occur "in accordance with" these "procedures" and "standards"
promulgated by USDA.  42 U.S.C. § 1766(d)(1)(E)(iii), (5).  In addition to other
regulations governing the suspension of a sponsoring organization, a State agency cannot
immediately terminate a sponsoring organization's participation in CACFP.  Instead, it
must first propose termination by notifying the organization "that the State agency is
proposing to terminate the institution's agreement." 7 C.F.R. § 226.6(c)(3).  If a State
agency proposes to terminate a sponsor's participation, it must also formally propose that
organization's disqualification from future participation. 7 C.F.R. § 226.6(c)(3).
Moreover, the State agency must provide the sponsoring organization notice of the serious
deficiencies in the organization's performance and an opportunity to correct those serious
deficiencies. 7 C.F.R. § 226.6(c)(iii).  Only if the sponsoring agency fails to correct the
serious deficiencies may the State agency *propose* termination of the sponsoring
organization. 7 C.F.R. § 226.6(c)(iii)(C).  That is an action subject to administrative appeal
rights. 7 C.F.R. § 226.6(k)(2)(iii).  *See also* 7 C.F.R. § 226.6(c)(iii)(C)(4).  During the time
of all these proceedings, the sponsoring organization "may continue to participate in the
[CACFP] Program and receive Program reimbursements for eligible meals served and
allowable administrative costs incurred until its administrative review is completed."  7
C.F.R. § 226.6(c)(iii)(C)(5).  That last right under the regulations is exactly the opposite of
what MDE has done here.

### III.    PIQC's Growth as a Sponsor of Minnesota Sites.

PIQC's role as a sponsoring organization grew each year from 2016 forward. Tousignant Decl. Par. 8.  PIQC's role as a sponsor includes the submission, processing and tracking of claims from sites to the MDE for reimbursement of meal costs.  After five years, by January 2022, PIQC had 44 Adult Care Centers, 45 Childcare Centers, and 319 At Risk after school Programs. [ECF No. 1 at Par. 119.]. Tousignant Decl. Pars. 25–27.

### IV.    A Federal Investigation into CACFP Fraud.

On January 20, 2022, the United States Department of Justice ("DOJ") unsealed three search warrants, as well as the affidavits supporting probable cause to obtain those search warrants, directed to the homes and businesses of several individuals involved in providing CACFP-governed food service in Minnesota. [ECF 1, at Par. 55.] Those affidavits allege certain individuals and entities participating in CACFP in Minnesota had submitted claims for reimbursement for millions of dollars that were never used to provide needy and underprivileged children with meals. [*Id.*]  PIQC is not alleged to have done anything wrong in these three affidavits. [ECF 1, at Par. 58, 62–63.]

The first search warrant and supporting affidavit were directed to Aimee Bock, the President of Feeding Our Future.  [ECF 1, at Par. 56.] There is no corporate or legal affiliation between Feeding Our Future and PIQC. [*Id.*]  The first affidavit alleges that a series of entities received millions of dollars of CACFP money under the sponsorship of Feeding Our Future and funneled the money into various "shell companies" instead of using the funds to provide meals to underprivileged youth. [*Id.* at Par. 57.]  It further noted that a $310,000 cashier's check from one of the entities under investigation was sent to Ms.

- 6 -

Bock and deposited in her personal account, reflecting a suspected "kickback." [*Id.*] It also alleges that Feeding Our Future managed its own sites that participated in CACFP under its sponsorship and alleged that Feeding Our Future itself used these sites to obtain federal money through reimbursement claims that were never used to serve meals. [*Id.* at Par. 58.] Finally, it accuses specific individuals at Feeding Our Future (including Ms. Bock) of stealing CACFP funds through the use of their own shell companies and receiving kickbacks from other CACFP sites. [*Id.*] PIQC is not alleged to have done anything illegal in this first affidavit. Tousignant Decl. Par. 12.

The second search warrant and supporting affidavit were directed to the individuals involved in the ownership and operations of two sites: (i) ThinkTechAct Foundation a/k/a Mind Foundry Learning Foundation ("ThinkTechAct" or "Mind Foundry") and (ii) Empire Cuisine & Market, LLC ("Empire Cuisine"). [ECF 1, at Par. 59.] ThinkTechAct was formerly a CACFP site operating under the sponsorship of Feeding Our Future, and under the sponsorship of PIQC as Mind Foundry. [*Id.* at Par. 60.] Empire Cuisine was a vendor in the Summer Food Service Program that operated, for a time, under the sponsorship of PIQC. [*Id.* at Par. 61.] In June 2021, however, Ms. Bock made a request to MDE that it transfer Empire Cuisine's sponsorship to Feeding Our Future. [*Id.*] The second affidavit alleges Mind Foundry and Empire Cuisine acted in concert to fraudulently claim reimbursement for CACFP funds. [*Id.* at Par. 62.] PIQC is not alleged to have done anything illegal in this second affidavit. Tousignant Decl. Par. 12.

The third search warrant and supporting affidavit were directed to S&S Catering, Inc., an entity operating as both a vendor and site under the sponsorships of both PIQC and

Feeding Our Future. [ECF 1, at Par. 63.]   This affidavit alleges S&S Catering also fraudulently obtained CACFP funds by submitting false claims for reimbursement in addition to receiving such funds from relate entities participating in CACFP.  [*Id.*]  PIQC is not alleged to have done anything illegal in this third affidavit. Tousignant Decl. Par. 13.

Since the criminal investigation has been made public, two of its targets have been caught attempting to flee the country.  [ECF 1, at Par. 64.]  They have each been charged with one count of violating 18 U.S.C. § 1542 for giving a false statement in a passport application.  [*Id.*]  A pre-indictment complaint charging one of those individuals, Abdiaziz Shafii Farah, owner and co-founder of Empire Cuisine and board member of ThinkTechAct, was filed on May 20, 2022.  [*Id.* at Par. 65.]  That complaint is accompanied by an affidavit in which a small number of the 106 paragraphs provide information about an individual identified only as "J.S."—Julius Scarver—who was until recently a member of PIQC's Board of Directors.  [*Id.*]

Contrary to the allegations in the May 20 complaint, Mr. Scarver never served in the capacity as employee and board member of PIQC at the same time.  [ECF 1, at Par. 68.]  He did not join the Board of Directors of PIQC until August 2021. [*Id.*]  As a board member, Mr. Scarver had no ability or authority whatsoever to approve claims for reimbursement, nor was he individually involved in or specifically authorized to exercise any control over PIQC's finances or claims approval processes. [*Id.*]  Moreover, Mr. Scarver's involvement with the entity associated with him in the affidavit, Free Minded Institute was fully disclosed to MDE by PIQC in conformance with applicable regulations. [*Id.*, at Par. 69.]  Relying on Mr. Scarver's representations to PIQC, PIQC informed MDE

of its understanding: Mr. Scarver did not receive improper remuneration associated with his role at Free Minded Institute. [*Id.*]

PIQC has never been formally accused of wrongdoing by any federal authorities. Tousignant Decl. Par. 12. Nor has it been identified as a target of the federal criminal investigation described above. *Id.* Nor has MDE ever made any specific findings of fact that PIQC has engaged in any fraudulent conduct in its CACFP-related operations. Tousignant Decl. Par. 13.

## V.   MDE Pursues Aggressive, Unwarranted, and Unlawful Regulatory Action Against PIQC.

The same day that the three search warrants described above were unsealed (January 20, 2022), MDE sent a communication to PIQC (January 20 Letter). The January 20 Letter stated, "MDE is suspending all payments to Partners in Nutrition dba Partners in Quality Care." [ECF 1-1.] MDE's communication stated that its action to suspend all payments was "being taken in response to the federal investigation of organizations participating in the USDA Child Nutrition programs for mail fraud, wire fraud, conspiracy and money laundering" and referenced "warrants and affidavits" documenting "CACFP site operators and organizations," "[a] number of" which "are connected to sites sponsored by [PIQC]." [*Id.*]

On January 31, 2022, MDE sent another communication to PIQC, proposing PIQC's termination from CACFP participation and disqualification from future CACFP participation (the "January 31 Letter"). [ECF 1-2.] Like its earlier communication, MDE's January 31 Letter also stated that MDE's action was "[b]ased on the evidence in the

warrants and affidavits" from the "federal investigation of organizations participating in the USDA Child Nutrition programs for mail fraud, wire fraud, conspiracy and money laundering." [*Id.*]

On February 2, 2022, MDE next transmitted to PIQC by email a document titled "Meal Claim Instructions" ("Meal Claim Instructions"). [ECF 1-3.]  This document purports to be a list of documentation MDE was now requiring PIQC to submit during the suspension period initiated, without prior warning, against PIQC in MDE's January 20 Letter.  [*Id.*] ("All claims must be entered in the Cyber-Linked Interactive Child Nutrition System (CLiCS). MDE will then require the following documentation be uploaded to the SharePoint CACFP Centers site of your organization. … All documentation must be submitted to the Serious Deficiency Corrective Action folder set up in your organizations SharePoint site.").

In response to the January 20 Letter, the January 31 Letter, and the Meal Claim Instructions, PIQC appealed to the MDE Appeal Panel in a consolidated proceeding. [ECF 1-5.] There, PIQC argued that MDE was attempting to not only suspend PIQC, but also to propose termination and disqualification of PIQC based on an unrelated—and previously resolved—"serious deficiency" that had been noticed to PIQC in early 2021.  [*See* ECF 1-6; *see also* ECF 1-5, at 9–10.]  On May 17, 2022, the MDE Appeal Panel reversed MDE's action taken in the January 20 Letter and January 31 Letter as legally inappropriate.  [ECF 1-7.]  Specifically, the MDE Appeal Panel noted that while MDE invoked 2 C.F.R. § 200.339, which allows agencies administering federal programs to "[i]nitiate suspension . . . proceedings," the "CACFP federal regulations under Chapter 226 provides for a set of

procedural requirements for proposed suspension of participation," requiring that MDE "issue a notice" containing specified criteria and "appoint a suspension review official to investigate and issue a suspension review decision." [*Id.* at 10.] Because the administrative record reflected that neither of these things (appointing a review official and issuing a review determination) had occurred, the MDE Appeal Panel found that MDE "either cited an incorrect federal regulatory provision for its action of 'withholding' payments, or did not conduct a suspension proceeding in a manner consistent with 7 C.F.R. § 226.6(c)(5)(ii)(B)." [*Id.* at 11.] The MDE Appeal Panel mandated that MDE must "re-assess the matter and carry out MDE-FNS's duties in a manner consistent with the applicable federal regulations and procedural rules." [*Id.* at 12.] It also stated: "If MDE-FNS believed these serious deficiencies had occurred, it should have followed the regulatory provisions for providing notice and an opportunity to take corrective action by consistently citing to all of the relevant subparts that constitute MDE-FNS's grounds for proposed termination and disqualification." [*Id.*]

On May 27, 2022, Defendant Emily Honer sent to PIQC the letter that is the main subject of PIQC's averments in the Complaint ("May 27 Letter"). On that date, MDE purported to immediately "terminate" PIQC from CACFP participation and withhold all funds from the organization's past or future claims for reimbursement submitted on behalf of its sites. [ECF 1-8.] The communication stated: "[MDE] is terminating Partner in Nutrition dba Partner in Quality Care's (PIQC) [sic] permanent agreement and all pending site applications." [*Id.* at 2.] MDE's May 27 Letter also informed PIQC that "MDE will also withhold all payments in response to the ongoing noncompliance based on the new

- 11 -

information released." [*Id.* at 3.]  MDE's May 27 Letter stated it was taking this action "due to affidavits unsealed by the United States District Court for the District of Minnesota as part of the federal investigation into the scheme to defraud the federal government using the Child Nutrition Programs in Minnesota and the arrest of two targets of the federal investigation for fraudulently obtaining a passport from the U.S. State Department." [*Id.* at 2–3.]

The May 27 Letter also claimed: "This action is taken based on MDE's determination that the role of PIQC in the federal food aid fraud, as demonstrated by the federal affidavits, cannot be corrected by imposing additional conditions found in 2 CFR 200.208." [*Id.*] MDE claimed that "[t]hese actions are being taken with the authority under 2 CFR 200 [sic]." [*Id.* at 3.]  MDE's May 27 Letter purports to rely on generic regulations promulgated by the Office of Management and Budget ("OMB"), not specific regulations governing the required procedures in the administration of CACFP, promulgated by USDA. This is the same tactic that the MDE Appeal Panel had rejected on May 17, 2022, when it reversed MDE's prior agency action. [ECF 1-7, at 11–12.]

On June 17, 2022, MDE sent another letter to PIQC informing it that MDE was denying the then-pending site applications for 213 sites whose applications for participation in CACFP were submitted under PIQC's sponsorship ("June 17 Letter"). [ECF 1-9.]  MDE's June 17 Letter stated this additional agency denial was taken "[i]n response to <u>the termination of [PIQC]'s CACFP permanent agreement with the Minnesota Department of Education effective May 27, 2022</u>," and "stems from the immediate termination taken under 2 CFR 200.339 [sic] and <u>the appeal of these site denials are linked</u>

directly to the immediate termination." [*Id.* (emphasis added).] MDE never issued to PIQC any "serious deficiency" notice pertaining to the events giving rise to this new regulatory action set forth in the June 17 Letter.

On July 25, 2022, MDE sent yet another letter denying "all pending claims" for reimbursement for meals, including those claims remanded by the MDE Appeal Panel for meals served in November and December 2021, as well as all claims for meals served in January through May 2022 ("July 25 Letter"). [ECF 1-10.] The July 25 Letter stated MDE was taking this action "[a]s a result of MDE-NPS' May 27, 2022 immediate termination and withholding of payments to PIQC." [*Id.*]

These claim denials – covering most, but not all, PIQC-submitted claims in the period from January to May 2022 – rely on largely the same reasons for denial as do MDE's denial of claims for reimbursement for meals served in November and December 2021. The five months of reimbursements that PIQC and its sponsored sites have been denied in 2022 based on the MDE's July 27 Letter totals many millions of dollars. Tousignant Decl. Par. 21. These blanket reimbursement denials represent millions of dollars that are, in turn, needed by PIQC-sponsored sites. *Id.* at Par. 20–21. These blanket reimbursement denials include reimbursement claims that are valid but have been withheld without ever being outright denied by MDE. *Id.* at Par. 19.

To-date, MDE has provided PIQC with no documentary evidence supporting or explaining its determination "that the role of PIQC in the federal food aid fraud, as demonstrated by the federal affidavits, cannot be corrected by imposing additional conditions." [*Cf.* ECF 1-8 at 3.]

- 13 -

To-date, MDE has not provided PIQC with any documentary evidence that PIQC "knowingly submitted a false or fraudulent claim," as USDA regulations would require before either suspending or proposing the termination of an institution from CACFP participation.  *See* 7 C.F.R. § 226.6(c)(5)(ii) (emphasis added); *see also id.* § 226.6(c)(3).

On August 10, 2022, Defendant Monica Herrera sent a letter "reminding" PIQC that it was "terminated" from CACFP participation ("August 10 Letter").  [ECF 1-11.] The August 10 Letter places PIQC in a Hobson's choice: acquiesce to MDE's illegal administrative actions and discontinue (or terminate all) CACFP operations, or abandon its charitable mission of helping to feed needy and underprivileged communities in Minnesota.  If PIQC does not acquiesce to the MDE's May 27 Letter, June 17 Letter, July 25 Letter, and August 10 Letter, possible future regulatory action that MDE or USDA could seek includes permanent disqualification and placement on the national disqualification list.  *See* 7 C.F.R. § 226.6.

MDE's conduct since the May 27 Letter has not been entirely consistent with PIQC being "terminated."  MDE has not initiated a post-termination audit, nor has MDE sent PIQC any information on how PIQC is supposed to wind-down its sponsorship. Nor has MDE shut off access to the on-line portal called CLiCS, by which claims for reimbursement and other materials get submitted to MDE. Tousignant Decl. Par. 15.

PIQC has timely challenged the MDE's May 27 Letter by submitting a notice of administrative appeal and written statement and materials in support.  Asp Decl. Par. 3; Ex. A. A hearing before the MDE Appeal Panel took place on September 12, days after this action was filed, but the Appeal Panel has over a month, to October 14, to issue a decision.

It will take many more months if PIQC has to seek further review and relief from the Minnesota Court of Appeals to correct the MDE's persistent legal errors and disregard for the MDE's own procedures.

In fact, once MDE sent its August 10 Letter, PIQC was forced to temporarily suspend all CACFP-related operations.  Tousignant Decl. Par. 18. This directly impacted the remaining PIQC employees whose jobs depend on CACFP program operations. Tousignant Decl. Pars. 20, 22. This also adversely affects the 64 individual sites who had worked with and depended upon PIQC to guide them a sponsoring organization. Tousignant Decl. Par. 24.  Whether set forth in the MDE's own transfer forms or in emails PIQC has received from multiple sites, there is ample evidence citing MDE's reimbursement denials and the disputed disqualification of PIQC as a reason that these sites are no longer willing to be sponsored by PIQC.  Tousignant Decl. Pars. 30–31; Exs. 1 and 2.

## VI.    The Effect of MDE's May 27 Letter On PIQC.

The cumulative effect on PIQC's operations in 2022 is palpable.  In January, PIQC had 14 staff members and that number is currently down to 8.  Tousignant Decl. Par. 22. In January, PIQC had 44 Adult Care Centers, and now it has 34.  Tousignant Decl. Par. 25. In January PIQC had 45 Childcare Centers and now it is down to 30.  Tousignant Decl. Par. 26. In January, PIQC had 319 At Risk After School Programs, and now it has zero. Tousignant Decl. Par. 27.

The MDE's illegal treatment directly and adversely affects PIQC's ability to get a fair consideration from MDE for re-certification in PIQC's pending application for the 2022-23 fiscal year, which begins October 1, 2022.

## ARGUMENT

## I.    STANDARD FOR RELIEF

A temporary restraining order should be granted when the rights of the moving party will be immediately and irreparably injured before a full trial on the merits may be held. Fed. R. Civ. P. 65(b).  A district court considers four factors when evaluating whether a temporary restraining order is warranted: (1) the threat of irreparable harm to the movant, (2) the balance between this harm and the injury that the injunction will inflict on other parties, (3) the probability that the movant will succeed on the merits, and (4) the public interest.  *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).[3] The likelihood of success on the merits is "[t]he most important of the *Dataphase* factors." *Shrink Mo. Gov't PAC v. Adams*, 151 F.3d 763, 764 (8th Cir. 1998).

## II.    PIQC IS ENTITLED TO A TEMPORARY RESTRAINING ORDER.

### A.    Likelihood of Success on the Merits.

PIQC is likely to succeed on the merits because this issue is ripe for review and the letter sent by MDE on May 27, 2022 violated the laws and regulations controlling the CACFP program. The May 27 Letter cites to and relies on two generic regulations from

---

[3] The same legal standard applies to both a request for a temporary restraining order and a request for a preliminary injunction.  *See S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project*, 877 F.2d 707, 708 (8th Cir. 1989).

the Uniform Administrative Requirements, Cost Principle, and Audit Requirements for Federal Awards promulgated by the Office of Management and Budget ("OMB"), rather than the regulations promulgated by the Department of Agriculture that specifically govern CACFP, to justify taking action to immediately terminate PIQC from CACFP participation and withholding payment for all claims and reimbursements. ECF 1-8. This action constitutes a clear violation of the law for four reasons. First, the OMB regulations do not apply because the USDA, through authorization from Congress, was required to establish procedures specifically for the CACFP program. The USDA did so, but MDE refused to recognize them. Second, the OMB regulations require adherence to the specific procedures promulgated by the USDA. Third, the MDE's actions failed to follow the CACFP's mandatory procedures required for the suspension or proposed termination of a sponsoring entity. Finally, MDE's conduct violates constitutional provisions of Due Process.

### 1.     PIQC's Claim is Ripe for Review.

PIQC's Claim is ripe for review. Ripeness exists when there is a live controversy such that plaintiff will sustain immediate injury from the challenged action and that the injury will be redressed by the requested relief. *Emps. Ass'n, Inc. v. United Steelworkers of Am., AFL-CIO-CLC*, 32 F.3d 1297, 1299 (8th Cir. 1994). The ripeness doctrine is designed to prevent courts "through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Advance Mach. Co. v.*

*Consumer Prod. Safety Comm'n*, 510 F. Supp. 360, 362 (D. Minn. 1981) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148 (1967).

This case is ripe for review because MDE's actions demonstrate a purely legal question, MDE's action has been formalized, and its effects are being felt in a concrete way by PIQC. Whether MDE's authority stems from the OMB regulations, as MDE claims, or the CACFP-specific regulations, demonstrates a legal question that does not require further development via administrative channels. *See Nebraska Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1038 (8th Cir. 2000) (question is fit for judicial decision when issue is largely legal and can be resolved without further factual development). While PIQC continues to pursue relief through the review process provided by CACFP regulations, MDE has already made its determination that PIQC can no longer participate in CACFP and that it cannot request any additional reimbursement funds.

PIQC will experience significant harms if this issue is not resolved. As will be explained further below, PIQC is subjected now to concrete harms from MDE's action. If MDE was following the prescribed regulations as it is required to do, PIQC would have received the timely opportunity to challenge administratively MDE's proposed "termination" action before it was taken. PIQC would have also been able to continue to

CORE/3525880.0003/176993440.1

request reimbursements in the meantime on behalf of the sites it sponsors. Because of MDE's illegal and arbitrary actions, PIQC can currently do neither of those things.

### 2. MDE's Action is Preempted by, and is in Conflict with, the Statute Governing CACFP.

By failing to adhere to the statutory requirements governing CACFP, MDE's May 27, 2022 letter violated the law. The statute governing CACFP requires the USDA to "establish procedures for the termination of participation by institutions and family or group day care homes under [CACFP]." 42 U.S.C. § 1766(d)(5)(A). These procedures "shall include standards for terminating the participation of an institution or family or group day care home that . . . engages in unlawful practices [or] falsifies information provided to the State agency." *Id.* § 1766(d)(5)(B). *See also* 42 U.S.C. § 1766(d)(1)(E)(iii), (5) (termination of institutions participating in CACFP "shall" occur "in accordance with" these "procedures" and "standards".) These procedures are laid out in 7 C.F.R. § 226.6, and constitute the specific procedures that a State agency is required to follow for terminating institutions from participating in CACFP.

Rather than follow the procedures required by statute, MDE based its decision on general OMB Regulations. ECF. 1-8. Any procedure (or lack thereof) existing in the OMB Regulations is preempted or superseded by the specific provisions creating and

- 19 -

governing CACFP insofar as it relates to MDE's administration of CACFP in the State of Minnesota.  By following OMB procedures, MDE violated the law.

### 3. OMB regulations expressly require adherence to the USDA-specific CACFP Procedure.

The OMB regulations, codified in Title 2, themselves require MDE to adhere to the specific procedures governing CACFP, codified in Title 7.  The relevant section from OMB's Title 2 provides: "in any circumstances where the provisions of Federal statutes or regulations differ from the provisions of this part, the provision of the Federal statutes or regulations govern." 2 C.F.R. § 200.101(d).  Both provisions of the generic OMB Regulations that MDE relied on in its May 27 Letter "differ" from the CACFP-specific regulations laid out in 7 C.F.R. § 226.6.

The first general provision cited by MDE states that a "Federal award may be terminated in whole or in part . . . [b]y the Federal awarding agency or pass-through entity, if a non-Federal entity fails to comply with the terms and conditions of a Federal award." 2 C.F.R. § 200.340(a)(1). This Title 2 provision stands in stark contrast to the regulation governing termination of a participating institution in Title 7's CACFP, which requires MDE to first issue a serious deficiency notice with the opportunity to take corrective action and then, only if corrective action does not successfully resolve the serious deficiency, propose (Not just declare) termination. 7 C.F.R. § 226.6(c)(3). Indeed, "[i]f the State agency determines that a participating institution has committed one or more serious deficiency … the State agency *must* use the following procedures to provide the institution … notice of the serious deficiency(ies) and an opportunity to take

corrective action." *Id.* § 226.6(c)(3)(iii) (emphasis added). The only immediate action MDE may take is to "suspend the institution's participation," but even that must be "in accordance with paragraph (c)(5)(ii)." *Id.* Because the general OMB provision differs from the specific CACFP provision, the CACFP provision governs the termination process. MDE clearly flouted this specific-controls-the-general rule of construction.

Second, MDE cites the more general section—2 C.F.R. § 200.339(e)—as authority to withhold CACFP funds. That regulation generically provides:

> If a non-Federal entity fails to comply with the U.S. Constitution, Federal statutes, regulations or the terms and conditions of a Federal award, the Federal awarding agency or pass-through entity may impose additional conditions . . . . If the Federal awarding agency or pass-through entity determines that noncompliance cannot be remedied by imposing additional conditions, the Federal awarding agency or pass-through entity may take one or more of the following actions, as appropriate in the circumstances:
>
> (e) Withhold further Federal awards for the project or program.

2 2 C.F.R. § 200.339(e). This general provision also stands in contrast to the CACFP-specific regulations. To suspend a participating institution from CACFP reimbursement in this context, the State agency must first "determine that an institution has *knowingly* submitted a false or fraudulent claim." 7 C.F.R. § 226.6(c)(5)(ii)(A) (emphasis added). Further, the suspension cannot be immediate—the suspension's "effective date . . . may be no earlier than 10 days after the institution receives the suspension notice." 7 C.F.R. § 226.6(c)(5)(ii)(B)(3). And, upon request by the institution, the suspension must be reviewed and "heard by a suspension review official." *Id.* § 226.6(c)(5)(ii)(C). These

procedures are *required*. Indeed, "[a] State agency is prohibited from suspending an institution's participation (including all Program payments) except for the reasons set forth in this paragraph (c)(5)." 7 C.F.R. § 226.6(c)(5). The process for withholding funds and for terminating an institution from a government program under general OMB regulation plainly conflicts with the CACFP-specific regulations. And in the OMB regulations, Congress had made plain its intent that the CACFP regulation controls. 2 C.F.R. § 200.101(d). The actions taken by MDE in its May 27 Letter therefore violate federal regulations.

4.     **MDE's May 27 Letter failed to follow mandatory procedures in CACFP Regulations for the Suspension or Proposed Termination of a Sponsoring Entity.**

MDE's May 27 Letter claiming termination failed to follow any of the procedures the USDA has prescribed in Title 7. First, under the regulations governing CACFP, after a state agency determines that a participating institution has committed a serious deficiency, it "*must* use the following procedures to provide the institution and the responsible principals and responsible individuals notice of the serious deficiency(ies) and an opportunity to take corrective action." 7 C.F.R. § 226.6(c)(3)(iii) (emphasis added). In this instance, MDE failed to issue a notice of serious deficiency identifying the alleged "serious deficiency(ies)" in PIQC's program operations, and providing PIQC with the opportunity to take corrective action. 7 C.F.R. § 226.6(c)(3)(iii)(A). Additionally, MDE failed to offer the opportunity for PIQC to submit a corrective action plan. 7 C.F.R. § 226.6(c)(3)(iii)(B).

Second, if the institution does not successfully take "corrective action" to "fully and permanently correct the serious deficiency(ies)," the State agency "must notify" the institution's leadership "that the State agency is *proposing* to terminate the institution's agreement and to disqualify the institution." 7 C.F.R. § 226.6(c)(3)(iii)(C). MDE failed to issue a notice of proposed termination and proposed disqualification based on the issuance of a notice of serious deficiency prior to removing it from the program. Instead, MDE outright terminated PIQC and removed it from the program.

Third, if the suspension is based on the State agency's determination that the serious deficiency at issue "is the submission of a false or fraudulent claim," MDE must follow the procedural requirements as stated in the regulation, which includes notice of suspension and an opportunity to request a review of the suspension. 7 C.F.R. § 226.6(c)(5)(ii)(C). MDE failed to issue a notice of proposed suspension of participation at the same time the issuance of a serious deficiency notice. It also failed to offer PIQC a suspension review.

Finally, while an institution is in this suspension period, MDE is required to ensure that sponsored facilities continue to receive reimbursement for eligible meals served during this period. 7 C.F.R. § 226.6(c)(5)(ii)(E). MDE not only failed to do this, but it did the exact opposite by denying PIQC's requests to receive reimbursement. ECF 1-10.

### 5.    MDE's Conduct Violates Due Process.

In addition to violating clear statutory and regulatory requirements, MDE's actions have violated PIQC's right to due process. "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably

- 23 -

calculated, under all the circumstances, *to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.*" *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950) (emphasis added). This principle is found the civil justice system, as a party initiating legal action "must plead facts sufficient to show that her claim has substantive plausibility." *Johnson v. City of Shelby,* 135 S. Ct. 346, 347 (2014). This principle is universally accepted in instances where parties are required, under law, to respond to actions taken based on factual allegations.

The federal regulations governing CACFP contemplate notice in a manner consistent with the ruling in *Mullane.* The regulations require that notice provided by the State agency specify the action being proposed or taken, and the basis for the action. 7 C.F.R. § 226.2. Before proposing to terminate a participating institution, the State agency must issue a notice of serious deficiency that, at a minimum, identifies: "[t]he serious deficiency(ies)"; "[t]he actions to be taken to correct the serious deficiency(ies)"; and "[t]he time allotted to correct the serious deficiency(ies)." 7 C.F.R. § 226.6(c)(3)(iii)(A). This requirement is mirrored in 7 C.F.R. § 226.6(k)(5)(i), which also states that notice must be given of "*the action being taken*" and "*the basis for the action*" (emphasis added). Similarly, the MDE's own appeals procedures incorporate the same standard, stating that MDE will provide "notice of the action" which "describes the action being taken or proposed" and "the basis for the action." Asp Dec. Par. 4; Ex. B.

The May 27 Letter falls short of this notice requirement. The letter indicates the action being taken, but it does not provide a meaningful factual basis for the action,

thereby making a meaningful response impossible. ECF 1-8. The May 27 Letter states MDE's action is taken "due to affidavits unsealed by the United States District Court for the District of Minnesota as part of the federal investigation into the scheme to defraud the federal government using the Child Nutrition Programs in Minnesota and the arrest of two targets of the federal investigation for fraudulently obtaining a passport from the U.S. State Department." [ECF 1-8, at 2–3.] It vaguely references "noncompliance based on the new information released." [*Id.* at 3.] And it alludes to—but does not specify any evidence of—"MDE's determination" of "the role of PIQC in the [alleged] federal food aid fraud, as demonstrated by the federal affidavits." [*Id.*]  These statements fail to give PIQC notice of what facts the MDE deems relevant and that form the basis of its claim, and requires PIQC to guess at how to respond in defense. MDE has, in short, made an assumption, that PIQC is guilty of fraud because others are being investigated for fraud. Because MDE's letter does not provide sufficient notice as to the reasons for PIQC's termination from CACFP, the letter violates PIQC's right to due process.

Additionally, MDE's May 27 Letter unconstitutionally circumvents the pre-deprivation process and procedure required by statute, in violation of PIQC's right to due process. *See Mathews v. Eldridge,* 424 U.S. 319, 331-339 (1976); *cf. C.O. v. Doe,* 757 N.W.2d 343, 350 (Minn. 2008); *Schulte v. Transportation Unlimited, Inc.,* 354 N.W.2d 830, 834-33 (Minn. 1984). As a contracted participant in the CACFP program, PIQC has the right to receive federal funds for food service payments pursuant to the CACFP regulations and the provisions in the contract it signed with MDE. [ECF 1-4, at 4.]  Under the CACFP regulations, MDE is obligated to provide a certain level of

- 25 -

due process before it can terminate PIQC's participation in CACFP. By failing to follow the procedures it is required to follow, MDE violated PIQC's right to Due Process.

### B.    PIQC Will Suffer Irreparable Harm Without Injunctive Relief.

PIQC will suffer irreparable harm without injunctive relief. The loss of an entire business or organization is quintessentially irreparable harm. *Ryko Mfg. Co. v. Eden Servs.*, 759 F.2d 671, 673 (8th Cir. 1985) (irreparable harm exists when a party would be "possibly forced out of business" without action); *Mainstream Fashions Franchising, Inc. v. All These Things, LLC*, 453 F. Supp. 3d 1167, 1205 (D. Minn. 2020) ("the forced shutdown of one's business is itself an irreparable harm."); *see also Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) (irreparable harm exists when party would suffer "substantial loss of business and perhaps even bankruptcy" absent preliminary relief).   Because of MDE's illegal actions, PIQC has been unable to receive the funding via reimbursements that it is entitled to under its contract with MDE. Tousignant Decl. Par. 19. MDE is holding onto millions of dollars dating back many months.  Tousignant Decl. Par. 21.  PIQC cannot keep its staff or make payroll for the skeleton crew remaining without this funding. Tousignant Decl. Par. 21–22. Because of the slow, steady effort to starve PIQC via administrative denials, PIQC will go out of business without some form of relief.  Tousignant Decl. Par. 23.

PIQC has also suffered significant reputational harm from the MDE's illegal actions.  The reputation of PIQC as a sponsor has been burned to a crisp among its former sites.   Tousignant Decl. Par. 34; Ex. 3. There are sites who are transferring their

- 26 -

sponsorship, applying directly to MDE for self-sponsorship, or no longer receive CACFP funding because of MDE's illegal labeling PIQC as a "terminated" sponsor.  Tousignant Decl. Par. 29.

PIQC also faces irreparable harm from being prevented from participating in the CACFP program after participating for many years. Where a government-sponsored program that ran agricultural activities and contests for minors banned a previously successful entrant from any further participation based solely on allegations of cheating, the loss of participation carried with it sufficient harm to be found irreparable. *Kroupa v. Nielsen*, 731 F.3d 813, 820-821 (8th Cir. 2018).   The threat of further sanctions was specifically made by MDE on August 10: "To the extent that [PIQC intends to provide meal claims and validations for sites], it is reminded that its CACFP agreement with MDE was terminated at the end of May. As such, neither PIQC nor its sites should be operating currently or have any claims for those months." MDE's August 10 warning was clear: any continuing effort by PIQC as a "terminated" sponsor to act as a sponsoring agency or to spend funds earmarked for CACFP purposes could result, according to MDE, in possible future regulatory action by MDE or USDA, including permanent disqualification and placement on the national disqualification list. See 7 C.F.R. § 226.6.  [ECF 1-11.]  In the words of its own interim executive director, "PIQC cannot recover its payments due, pay its own remaining employees, serve its remaining sites, or count on renewal for next year." Tousignant Decl. at Par. 20.

An organization faces irreparable harm when it faces the choice between breaking the law and providing appropriate services to its constituents. *Brandt v. Rutledge*, 551 F.

CORE/3525880.0003/176993440.1

Supp. 3d 882, 892 (E.D. Ark. 2021) ("Physician Plaintiffs face the irreparable harm of *choosing between breaking the law and providing appropriate guidance and interventions* for their transgender patients (emphasis added).").  PIQC has been faced with the kind of same untenable choice as the physicians in *Brandt.* Without both interim and permanent relief from this reviewing court, PIQC must acquiesce to MDE's illegal administrative actions and accept a forced shut-down of CACFP operations.  To move forward with a protective injunction against MDE, PIQC risks risk more censure and penalties for pursuing its charitable mission of helping to feed needy and underprivileged communities.

### C.    The Balance of Harms Favors PIQC.

The balance of hardships certainly favors PIQC, not MDE. That is especially true in the weeks during which the Court is deciding on a preliminary injunction basis whether MDE's conduct met applicable federal law, its own state-level procedures, and Due Process.   After all, it was MDE's actions – not PIQC's – that have forced PIQC to essentially stop providing its services as a sponsor.  There is no harm to MDE, which can still defend its conduct in administrative and judicial forums and continue to use its regulatory tools to monitor all sponsor organizations and sites under CACFP.  It is not burdened at all if one of its sponsors (PIQC) remains in the CACFP program for another several months.

MDE experiences no burden by being required to abide by the laws and regulations they have already agreed to follow. When Minnesota decided to participate in the CACFP program, it agreed to abide by the rules and regulations as provided by the USDA. 7 C.F.R. § 226.3 (c) ("Each State agency desiring to take part in the Program shall enter into a

written agreement with the Department for the administration of the Program in the State in accordance with the provisions of this part."). In order to participate in the program, the State of Minnesota is required to administer the program according to the regulations promulgated by the USDA. Requiring a state to abide by the laws it is already required to follow does not impose a burden, but instead "seeks to prevent [the state] from shirking [its] responsibilities under it." *Haskins v. Stanton*, 794 F.2d 1273, 1277 (7th Cir. 1986) (granting preliminary injunction requiring state to comply with Food Stamp Act requirements); *White v. Martin*, No. 02-4154-CV-C-NKL, 2002 WL 32596017, at *8 (W.D. Mo. Oct. 3, 2002) ("Compliance with the law does not pose a burden on a defendant."). Because MDE is already required to comply with the regulations governing the CACFP program, MDE will experience no significant burden by being required to abide by the governing regulations.

As laid out in Section B, above, however, the slow, regulatory strangulation of PIQC will end in its demise if it has to await the outcome of many appeals at many levels to right the wrongs of MDE.  Most directly and imminently, after being "terminated," after being denied millions in dollars of claimed reimbursements for over nine months, and after having over 300 of PIQC's former sites not-renewed in July, PIQC's last breath would be if MDE is allowed to not renew PIQC for the next year (starting October 1, 2022) using

the very same challenged bases set forth in MDE's May 27 letter: unfounded and misdirected assumptions of criminal fraud.

### D.   Public Policy Supports Issuance of a Temporary Restraining Order.

Because PIQC is seeking to enforce federal law, it satisfies the requirement that the temporary restraining order is in the public interest. The Supreme Court has stated that the balancing of harms factor and public interest factor are merged into one. *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009) ("When the government is a party, these last two factors merge."). The Eighth Circuit has held that enforcing laws passed by Congress is in the public interest, as the public has a strong interest in ensuring that such laws are followed. *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 372 (8th Cir. 1991) (noting that there is a strong public interest in ensuring lawful bidding process and fair collective bargaining in city building project); *Heather K. by Anita K. v. City of Mallard, Iowa*, 887 F. Supp. 1249, 1267 (N.D. Iowa 1995) (public interest served by enforcing anti-discrimination provisions of the ADA). Procedures such as those provided in the CACFP regulations were implemented based on a statute passed by Congress. The laws passed by Congress, and the regulations set up by the USDA to implement those laws, were designed to ensure that the CACFP program is administrated in a fair and organized way. It is in the public's interest that such procedures are followed, and this factor tips in favor of the granting of a TRO.

Other factors also support the granting of a TRO. "It is always in the public interest to prevent the violation of a party's constitutional rights." *Goyette v. City of Minneapolis*, 338 F.R.D. 109, 120 (D. Minn. 2021). MDE has violated PIQC's constitutional right to

- 30 -

Due Process through its actions. The public interest is served by protecting these rights. In addition to benefitting PIQC, granting a TRO would benefit nonparties who rely on the government, namely the sites who depend on PIQC's sponsorship and their ability to be reimbursed through the CACFP program. Finally, enforcing a TRO under these circumstances will require neither judicial intervention nor oversight.

## III.   A SECURITY BOND IS NOT WARRANTED UNDER THESE CIRCUMSTANCES.

The Federal Rules of Civil Procedure provide that a court may issue a temporary restraining order "if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  It is well within the Court's discretion to determine the amount of, or waive entirely, the requirement for movant to post a bond. *Fantasysrus 2, L.L.C. v. City of East Grand Forks, Minn.*, 881 F. Supp. 2d 1024, 1033 (D. Minn. 2012) (granting request to waive security requirement); *Olson v. Robbinsdale Area Schs.*, No. Civ. 04-2707 (RHK/AJB), 2004 WL 1212081, at *5 n.6 (D. Minn. May 28, 2004) (waiving security as "within the sound discretion of the district judge" and holding that "[u]nder appropriate circumstances" when considering the strength of plaintiff's case and absence of harm to defendant, "bond may be excused notwithstanding the literal language" of the rule.)  Here, Defendant will not suffer any demonstrable harm (monetary or otherwise) if the requested TRO is ordered; therefore waiver of the security requirement is appropriate.

CORE/3525880.0003/176993440.1

# CONCLUSION

For all the foregoing reasons, and based on the record before the Court, Plaintiff respectfully requests that the Court enter a Temporary Restraining Order in substantially the form and including at least the scope and types of interim relief set forth in the Proposed Order submitted with Plaintiff's Motion.

Dated this 20th day of September, 2022.

STINSON LLP

BY: */s/  Kevin D. Conneely*
Kevin D. Conneely  (#0192703)
Emily Asp (#0399965)
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 335-1500
kevin.conneely@stinson.com
emily.asp@stinson.com

AND

THE WEINHARDT LAW FIRM

Mark E. Weinhardt*
2600 Grand Avenue, Suite 450
Des Moines, IA  50312
Telephone:  (515) 244-3100
E-mail:  meweinhardt@weinhardtlaw.com

   *admitted pro hac vice

ATTORNEYS  FOR  PLAINTIFF  PARTNERS IN  NUTRITION  d/b/a  PARTNERS  IN QUALITY CARE