# **<u>EXHIBIT A</u>**

MINNESOTA DEPARTMENT OF EDUCATION APPEAL PANEL

| | | |
|---|---|---|
| PARTNERS IN NUTRITION, d/b/a PARTNERS IN QUALITY CARE, | ) ) ) | CLiCS Sponsor ID #2000010186 |
| Appellant, | ) ) ) | |
| v. | ) ) | **NOTICE OF APPEAL** |
| MINNESOTA DEPARTMENT OF EDUCATION, | ) ) ) | |
| Appellee. | ) ) ) | |

Partners in Nutrition, d/b/a Partners in Quality Care ("PIQC"), by and through its attorneys, hereby submits this written Notice of Appeal to the Minnesota Department of Education ("MDE") Appeal Panel.  In this appeal, PIQC challenges the decisions contained in MDE's May 27, 2022 letter purporting to (1) immediately terminate PIQC's permanent agreement and all pending site applications under the Child and Adult Care Food Program ("CACFP") and (2) withhold all payments to PIQC and its sites for claims for reimbursement.  PIQC submits that the decisions stated in the two letters were in fact a single action by MDE for appeal purposes.  PIQC respectfully requests a hearing before the Appeal Panel.

### <u>The Parties</u>

<u>Appellant</u>

>Partners in Nutrition d/b/a Partners in Quality Care
>Robyn Tousignant, Interim Executive Director
>1035 West 7th Street
>St. Paul, MN 55102-3827
>robyn@partnersinqualitycare.org
>(651) 332-9174

{02091485.DOCX}

<u>Appellee</u>

Director of Food and Nutrition Service
Minnesota Department of Education
1500 Highway 36 West, Roseville, MN 55113

## **Grounds for Appeal**

1. The May 27, 2022 letter is arbitrary and capricious, founded on errors of law, and made upon unlawful procedure in that it fails to follow mandatory federal procedural requirements contained in 7 C.F.R. § 226.6.

   a. The May 27, 2022 letter improperly relies on generic regulations applicable when federal agencies make federal awards to non-federal agencies. Where there are specific federal statutes and regulations applicable to the matter at hand, however, those specific statutes and regulations govern and supersede the generic regulations relied upon in the May 27, 2022 letter. *See, e.g.*, 2 C.F.R. § 200.101(d). As described below, the failure of the May 27, 2022 letter to follow the specific statutes and regulations governing the CACFP program is error.

   b. The May 27, 2022 letter violates Congress's express requirement of the procedures by which CACFP suspension and termination are to occur. *See* 42 U.S.C. §§ 1757(c); 1766(d); *see generally* 7 C.F.R. § 226.6.

   c. The May 27, 2022 letter fails to follow the mandatory procedure for suspension of program funds or proposed termination of CACFP participation upon a determination of fraud, in violation of 7 C.F.R. §§ 226.6(c)(3)(iii), (5)(ii). The suspension letter's deficiencies include, but are not limited to, MDE's failure to issue PIQC a serious deficiency notice specifying serious deficiency(ies), along with action(s) to be taken to correct the serious deficiency(ies) and a time by which to do so.

   d. The May 27, 2022 letter failed to follow the mandatory procedure for payment of all valid claims, in violation of 7 C.F.R. §§ 226.7 and 226.14. *See also* 7 C.F.R. § 226.6(k)(10)(iii).

   e. The information upon which the May 27, 2022 letter was based has not been made fully available to PIQC for inspection and review, in violation of 7 C.F.R. § 226.6(k)(5)(v).

   f. The Appeals Panel is not truly an independent arbiter as required by federal regulations, in violation of 7 C.F.R. § 226.6(k)(5)(vii).

2. The May 27, 2022 letter is arbitrary and capricious, founded on errors of law, and made upon unlawful procedure in that it constitutes a breach of the CACFP Agreement between PIQC and MDE in that it fails to follow applicable federal procedural requirements contained in 7 C.F.R. § 226.6.

3. The May 27, 2022 letter is arbitrary and capricious and not supported by substantial evidence in determining PIQC knowingly submitted false or fraudulent claims for reimbursement or engaged in unlawful acts with respect to CACFP operations.

4. The May 27, 2022 letter is arbitrary and capricious and not supported by substantial evidence in determining PIQC's operations are noncompliant in unspecified ways with respect to CACFP requirements.

5. The May 27, 2022 letter is arbitrary and capricious and not supported by substantial evidence in determining former PIQC Board Secretary Christine Twait knowingly submitted a false or misleading statement to MDE.

6. The May 27, 2022 letter is arbitrary and capricious, founded on errors of law, and made upon unlawful procedure in that it fails to follow state administrative guidance on appeals from MDE action making the information upon which the suspension letter was based fully available to PIQC for inspection and review.

7. The MDE appeals procedure and actions taken in this matter violate the PIQC's right to due process of law under the 14th Amendment of the United States Constitution and Article I, Sections 2 and 7 of the Minnesota Constitution.

   a. The May 27, 2022 letter engaged in adverse agency action affecting PIQC's ability to participate in federal programming without proper notice or hearing, and otherwise without due process of law.

   b. The May 27, 2022 letter circumvents federal law governing the established statutory and regulatory procedure directed by Congress to enable a pre-deprivation hearing and process. *See* 42 U.S.C. §§ 1757(c); 1766(d); *see generally* 7 C.F.R. § 226.6.

   c. The May 27, 2022 letter relies primarily, if not exclusively, on untested and unproven allegations containing only peripheral reference to PIQC that are insufficient to sustain MDE's agency action.

   d. The Appeals Panel, presiding over an intra-agency appeal and comprised of employees within the same state agency undertaking the appealed action, is not a truly independent arbiter of agency action taken by MDE.

_____     10 - 10 - 2022
Robyn Tousignant, Interim Executive Director     Date
Partners in Nutrition d/b/a Partners in Quality Care


_____     _____
Nathan Converse (admitted in Minnesota)     Date
Mark Weinhardt
The Weinhardt Law Firm
2600 Grand Avenue, Suite 450
Des Moines, IA 50312
Telephone: (515) 244-3100
Email: nconverse@weinhardtlaw.com
        mweinhardt@weinhardtlaw.com

MINNESOTA DEPARTMENT OF EDUCATION APPEAL PANEL

| | |
|---|---|
| PARTNERS IN NUTRITION, d/b/a PARTNERS IN QUALITY CARE,<br><br>    Appellant,<br><br>v.<br><br>MINNESOTA DEPARTMENT OF EDUCATION,<br><br>    Appellee. | CLiCS Sponsor ID #2000010186<br><br>**APPELLANT'S SUPPORTING STATEMENT AND MATERIALS FOR APPEAL OF MAY 27, 2022 NOTICE OF IMMEDIATE TERMINATION AND WITHHOLDING OF FUNDS** |

      The Appellant, Partners in Nutrition, d/b/a Partners in Quality Care ("PIQC"), submits this written statement and accompanying materials in support of its appeal of the notice of immediate termination of PIQC's participation in Child and Adult Care Food Program ("CACFP") and withholding of funds for claims for reimbursement by the Minnesota Department of Education ("MDE") dated May 27, 2022. The supporting materials, consisting of Exhibits referenced herein, have been transmitted contemporaneously with the filing of this statement via Dropbox link to the Appeal Coordinator.

## **INTRODUCTION**

     1.     In this proceeding, MDE once again seeks to shut down PIQC's operations by any means necessary, without adequate process or sufficient legal and factual support. What the Appeal Panel has expressly held (and MDE has tacitly acknowledged) that MDE cannot do under governing CACFP procedure, the state agency now attempts to do by invoking broader, more general regulations. MDE's attempt to end-run around federal law, and to evade this Panel's previous holding, should be emphatically rejected.

     2.     Like the state agency's unlawful attempts to suspend PIQC (January 20, 2022) and propose its termination and disqualification from CACFP participation (January 31, 2022), MDE's

May 27, 2022 notice of action is misconceived on numerous fronts.  MDE again procedurally errs by violating the rules that govern the manner in which MDE may take action against a CACFP sponsor like PIQC.  Substantively, MDE fails to provide any evidence—let alone *substantial* evidence—in support of its agency action.  And in its rush to take adverse action against PIQC without the facts or law on its side, MDE has committed reversable error in issuing its May 27, 2022 notice of immediate termination and withholding of payments.

3.      The Appeal Panel has already rejected MDE's improper attempts to skirt governing law once before, and it should do so again.  Indeed, this Panel previously chastised MDE for failing to follow federal and state regulations governing the specific procedure by which to manage CACFP in the State of Minnesota.  That is, if MDE seeks to take action barring PIQC from participating in CACFP in Minnesota, it must *at a minimum* issue a serious deficiency notice, afford PIQC an opportunity to take corrective action, and, failing that (and *only* if failing that), *propose* PIQC's termination—not unilaterally declare PIQC terminated.  Simply put, MDE lacks the authority to do what it has done in its May 27, 2022 action in nearly every way possible.

4.      By now, MDE surely knows the legal basis it must establish and procedural rules it must follow to terminate PIQC from CACFP.  That it does not attempt to do so—and instead insists on repeatedly taking unlawful actions—speaks volumes to the strength of its arguments and the weight of its "evidence."  To the contrary, PIQC has worked diligently and passionately with its sites throughout the Covid-19 pandemic to provide desperately-needed meals to underprivileged children during a time in which conditions have dramatically increased those children's dependence on community-based nourishment.  At all times PIQC has endeavored to operate within the confines of CACFP protocols as modified by USDA's waivers and guidance for a Covid world, and MDE has failed to present any evidence to the contrary.

5.      Simply put, MDE's action is factually unfounded and legally baseless.  The actions taken by virtue of MDE's May 27, 2022 letter must be reversed.

### FACTUAL AND PROCEDURAL BACKGROUND

6.      This appeal concerns the Child and Adult Care Food Program ("CACFP"), which is run through the United States Department of Agriculture ("USDA") and regulated by 7 C.F.R. Part 226.  "The [CACFP] is intended to provide aid to child and adult participants and family or group day care homes for provision of nutritious foods that contribute to the wellness, healthy growth, and development of young children, and the health and wellness of older adults and chronically impaired persons." 7 C.F.R. § 226.1.  This proceeding is the fifth appeal pursued by PIQC in response to unlawful action taken by MDE in its administration of CACFP in Minnesota.

7.      As provided in 7 C.F.R. § 226.3(b), "[w]ithin the States, responsibility for the administration of the [CACFP] shall be in the State agency" and "State agency" is defined in 7 C.F.R. § 226.2 as "the State educational agency or any other State agency that has been designated by the Governor or other appropriate executive, or by the legislative authority of the State, and has been approved by the [United Stated Department of Agriculture] to administer the [CACFP] within the State . . . ."  MDE meets this definition of "State agency" and is responsible for the administration of CACFP in the State of Minnesota.  MDE's administration of CACFP in the State of Minnesota is therefore bound by the regulations and guidance promulgated by USDA.

8.      As provided in 7 C.F.R. § 226.2, a "sponsoring organization" includes a "nonprofit private organization that is entirely responsible for the administration of the [CACFP] in . . . [a]ny combination of childcare centers, emergency shelters, at-risk afterschool care centers, outside-school-hours care centers, adult day care centers, and day care homes."  PIQC meets the definition of "sponsoring organization" under 7 C.F.R. § 226.2.  PIQC's participation in CACFP is likewise governed by the regulations and guidance promulgated by USDA. *See generally*

7 C.F.R. § 226.1 ("This part announces the regulations under which the Secretary of Agriculture will carry out the Child and Adult Care Food Program.").

9.      Following a series of separate actions to suspend, propose termination and disqualification, and deny claims for reimbursement very nearly in their entirety, MDE issued a letter to PIQC on May 27, 2022 purporting to immediately terminate its participation in CACFP and withhold all funds for claims for reimbursement. Exhibit A.

<u>The Covid-19 Pandemic Drastically Changes the Nature of CACFP Participation</u>

10.     The CACFP regulations generally impose various monitoring requirements on sponsors (like PIQC). *See generally* 7 C.F.R. §§ 226.15(e) (recordkeeping), .16(d), (e) (supervisory and operational management and monitoring of program facilities; recordkeeping). As provided in 7 C.F.R. § 226.15(e), PIQC is required to "establish procedures to collect and maintain all program records required under this part, as well as any records required by the State agency." "At a minimum," the regulations require PIQC to collect and maintain, among other items: copies of all applications and supporting documents; site participant enrollment documentation; daily attendance records and meal counts; daily meal records; copies of invoices, receipts, and other records to document administrative and operating costs; copies of all claims for reimbursement; receipts for all program payments; menus and other food service records; information on training sessions provided to sites; and records documenting attendance of sponsor staff training on monitoring responsibilities. As provided in 7 C.F.R. § 226.16(d)(4), PIQC is required to provide sites under its sponsorship with program assistance, including review and reconciliation of sites' reimbursement documentation, as well as three facility reviews per year (at least two of which must be unannounced and one of those two unannounced reviews must include observation of a meal service).

11.     The CACFP regulations also impose various monitoring and review requirements on state agencies (like MDE). *See generally* 7 C.F.R. § 226.7 (State agency responsibilities for financial management). As provided in 7 C.F.R. § 226.7(b), MDE "shall maintain an acceptable financial management system, adhere to financial management standards" and "shall also have a system in place for reviewing the institutions' documentation of their nonprofit status to ensure that all Program reimbursement funds are used (1) [s]olely for the conduct of the food service operation; or (2) [t]o improve such food service operations, principally for the benefit of the participants." As provided in 7 C.F.R. § 226.7(k), MDE "shall establish procedures for institutions to properly submit claims for reimbursement. Such procedures must include State agency edit checks, including but not limited to ensuring that payments are made only for approved meal types and that the number of meals for which reimbursement is provided does not exceed the product of the total enrollment times operating days times approved meal types."

12.     Standard CACFP meal requirements are found in 7 C.F.R. § 226.20. Typically, CACFP sites are required to serve meals (defined in 7 C.F.R. § 226.2 as "food which is served to enrolled participants at an institution, child care facility or adult day care facility and which meets the nutritional requirements set forth in this part"), and cannot merely provide ingredients. These meals are also typically required to be served on-site. Participating institutions "may use their own procedures for procurement with Program funds" so long as they comply with general federal contracting regulations. *See* 7 C.F.R. § 226.22(c).

13.     However, on March 20, 2020, USDA released Policy Memo #2, "Nationwide Waiver to Allow Non-congregate Feeding in the Child Nutrition Programs," which waived the

typical requirement to serve congregate meals.  Exhibit B-1.[1]  This waiver was extended three

times for CACFP programs and expired June 30, 2021.  A similar memo titled "Nationwide Waiver

to Allow Non-Congregate Meal Service for SY 2021–2022" (USDA Policy Memo #87) began on

July 1, 2021, and remains in effect through June 30, 2022.  Exhibit B-2.[2]

      14.     That same day, the USDA also released Policy Memo #1, "Nationwide Waiver to

Allow Meal Service Time Flexibility in the Child Nutrition Programs," which allowed meals to be

served at any time.  Exhibit B-3.[3]  This waiver was extended twice for CACFP programs and

expired June 30, 2021.  A similar memo titled "Nationwide Waiver to Allow Meal Service Time

Flexibility for SY 2021–2022" (USDA Policy Memo #88) began on July 1, 2021, and remains in

effect through June 30, 2022.  Exhibit B-4.[4]

      15.     Similarly, on March 25, 2020, USDA released Policy Memo #5, "Nationwide

Waiver to Allow Parents and Guardians to Pick Up Meals for Children," which waived the

requirement that meals be served directly to children and, instead, allowed multiple meals for

children to be sent home with a parent/guardian.  Exhibit B-5.[5]  This waiver was extended three

times and expired June 30, 2021.  A similar memo titled "Nationwide Waiver to Allow Parents

---

[1]    *Available at* https://fns-prod.azureedge.us/sites/default/files/resource-files/covid-19-child-nutrition-response-2.pdf.

[2]    *Available at* https://fns-prod.azureedge.us/sites/default/files/resource-files/covid-19-child-nutrition-response-87.pdf.

[3]    *Available at* https://fns-prod.azureedge.us/sites/default/files/resource-files/covid-19-child-nutrition-response-1.pdf.

[4]    *Available at* https://fns-prod.azureedge.us/sites/default/files/resource-files/covid-19-child-nutrition-response-88.pdf.

[5]    *Available at* https://fns-prod.azureedge.us/sites/default/files/resource-files/covid-19-child-nutrition-response-5.pdf; https://www.fns.usda.gov/cn/covid-19-child-nutrition-response-91.

and Guardians to Pick Up Meals for Children for SY 2021–2022" (USDA Policy Memo #89) began on July 1, 2021, and remains in effect through June 30, 2022. Exhibit B-6.[6]

16.     To clarify the impacts of these three memos combined (i.e., non-congregate meal service, meal times waivers, and parent pick-up), USDA released the guidance document, "Child and Adult Care Food Program: Providing Multiple Meals at a Time During the Coronavirus (COVID-19) Pandemic," which, among other things, provides examples of meals and types of food that meet federal requirements. Exhibit D.[7] Specifically, this memo allowed sites to begin providing food in "bulk" packages, which are defined as "[f]ood packaging containing an amount of food that is more than what is required at a single meal under the CACFP meal patterns. A bulk food item may provide food to be eaten at more than one meal or snack."

17.     In response to these changes, on April 18, 2021, PIQC made a technical assistance request of MDE to discuss what food items met the modified federal regulations, per recent USDA guidance. Exhibit C-1. MDE responded to this request on April 28, 2021, and provided PIQC with guidance on its menus. Exhibit C-2. Within 48 hours of MDE's response to PIQC's request for technical assistance, PIQC alerted all of its sites of the rules put forth by MDE. Exhibit C-3. PIQC has complied with the waivers by USDA and directives from MDE since those changes to the CACFP went into effect.

18.     Further clarification on this issue has recently been provided by USDA at the National CACFP Sponsor Association Annual Conference on April 20, 2022. At that event,

---

[6]      *Available at* https://fns-prod.azureedge.us/sites/default/files/resource-files/covid-19-child-nutrition-response-89.pdf; https://www.fns.usda.gov/cn/covid-19-child-nutrition-response-89.

[7]      *Available at* https://fns-prod.azureedge.us/sites/default/files/resource-files/CFP_BulkFoods.pdf.

USDA stated: "[Monitoring waivers] allow you to operate meal pickup and delivery models, flex

the meal pattern requirements to respond to food shortages, serve foods in multi-day packages and

help and access to nutritious meals to more children in need." Exhibit E.  It later stated:

> [S]tate agencies and sponsoring organizations should exercise discretion when
> determining whether CACFP operators should be found seriously deficient again,
> when meals fall short of meeting meal pattern requirements due to this COVID-19
> related supply chain disruptions during this fiscal year federal fiscal year 22.  This
> applies to institutions under a state agency and facilities under a sponsoring
> organization, including daycare homes.   State agencies and sponsoring
> organizations should work to identify solutions again on a case-by-case basis
> looking at local circumstances.

*Id.*

19.     The bottom line is that the USDA waivers and accompanying guidance made it

easier for sites to distribute meals to underprivileged children.  But documentation requirements

to support claims for reimbursement remained unchanged.  And sponsor monitoring requirements

were not altered.  This created an environment in which the program was ripe for abuse.

<u>The Federal Investigation Into Covid-19 Fraud</u>

20.     On January 20, 2022, the United States Department of Justice ("DOJ") caused to

be unsealed in the U.S. District Court for the District of Minnesota three (3) search warrants

directed to the homes and businesses of several individuals involved in CACFP in Minnesota.  The

affidavits of federal agents supporting those search warrants allege certain individuals and entities

participating in CACFP in Minnesota had submitted claims for reimbursement for millions of

dollars which were never used to provide needy and underprivileged children with meals.

21.     The first search warrant affidavit was directed to Aimee Bock, the President of

Feeding Our Future.  *See* Exhibit F-1.  Feeding Our Future is another sponsoring organization

operating under CACFP in the Greater Minnesota area.  The affidavit alleges a series of entities

received millions of dollars of CACFP money under the sponsorship of Feeding Our Future that

funneled the money into various "shell companies" instead of using the funds to provide meals to underprivileged youth. *See id.* ¶¶ 112, 117. It further noted that a $310,000 cashier's check from one of the entities under investigation was sent to Ms. Bock and deposited in her personal account, reflecting a suspected "kickback." *Id.* ¶¶ 122–126. The affidavit alleges that Feeding Our Future managed its own sites that participated in CACFP under its sponsorship and alleged that Feeding Our Future itself used these sites to obtain federal money through reimbursement claims that were never used to serve meals. *Id.* ¶¶ 127–148. Finally, it accuses specific individuals at Feeding Our Future (Ms. Bock, Hadith Yusuf Ahmed, and Abdikerm Abdelahi Eidleh) of stealing CACFP funds through the use of their own shell companies, *see id.* ¶¶ 149–163, and that Hadith Yusuf Ahmed and Abdikerm Abdelahi Eidleh solicited and received kickbacks of their own from other CACFP sites, *see* ¶¶ 164–172.

22.     The second affidavit was directed to the individuals involved in the ownership and operations of ThinkTechAct Foundation a/k/a Mind Foundry Learning Foundation ("ThinkTechAct" or "Mind Foundry") and Empire Cuisine & Market, LLC ("Empire Cuisine"). *See* Exhibit F-2. The former was a site operating under the sponsorship of Feeding Our Future as ThinkTechAct and under the sponsorship of PIQC as Mind Foundry. *See id.* ¶¶ 42–44. The latter was a vendor in the Summer Food Service Program that operated, for a time, under the sponsorship of PIQC; in June 2021, Ms. Bock requested that MDE transfer Empire Cuisine's sponsorship from PIQC to Feeding Our Future. *Id.* ¶¶ 54, 56. The affidavit alleges Mind Foundry and Empire Cuisine acted in concert to fraudulently claim reimbursement for CACFP funds. *See id.* ¶¶ 68–85.

23.     The third affidavit was directed to S&S Catering, Inc., an entity operating as both a vendor and site under the sponsorships of both PIQC and Feeding Our Future. *See* Exhibit F-3 ¶ 81. It alleges S&S Catering also fraudulently obtained CACFP funds by submitting false claims

for reimbursement in addition to receiving such funds from relate entities participating in CACFP. *See id.* ¶¶ 51–85.

24.    Since the investigation has been made public, two of its targets have been caught attempting to flee the country. They have each been charged with one count of violating 18 U.S.C. § 1542 for giving a false statement in a passport application. Exhibits F-4 and F-5. A pre-indictment complaint charging one of those individuals, Abdiaziz Shafii Farah, owner and co-founder of Empire Cuisine and board member of ThinkTechAct, was filed on May 20, 2022. That complaint is accompanied by an affidavit in which 12 out of its 106 numbered paragraphs provide information about an individual identified only as "J.S."—Julius Scarver—who was until recently a member of PIQC's Board of Directors. *See generally* Exhibit F-5 ¶¶ 36–47. According to the affidavit, Mr. Scarver formed an entity called The Free Minded Institute in late July 2021, which briefly participated in CACFP as a site under the sponsorship of PIQC and received federal funding through the submission of claims for reimbursement. *Id.* ¶¶ 37, 40–42. It also alleged The Free Minded Institute sent the majority of this money to Empire Cuisine. *See id.* ¶ 41. The only legal conclusion made in the affidavit is found at paragraph 106: "[T]here is probable cause to believe that Abdiaziz Shafii Farah has violated 18 U.S.C. § 1542 (false statement in passport application)."

25.    Mr. Scarver worked as site support at PIQC from September 5, 2017, to May 28, 2021, when he left the employ of PIQC. *See* Exhibit G-3. He joined the Board of Directors of PIQC in August 2021. Exhibits G-4 and G-5. Contrary to the allegations in paragraph 38 of the affidavit, Mr. Scarver never served in the capacity as employee and board member at the same time. As a board member, Mr. Scarver had no ability or authority whatsoever to approve claims for reimbursement, nor was he authorized to exercise any control over PIQC's finances or claims

approval processes. *See* Exhibit G-3. Relying on Mr. Scarver's representations to PIQC, PIQC informed MDE of its understanding that Mr. Scarver did not receive remuneration associated with his role at Free Minded Institute. *See* Exhibit G-1. Mr. Scarver's involvement with Free Minded Institute was fully disclosed to MDE by PIQC based on the information known to PIQC, in conformance with applicable regulations. Exhibit G-2.

<u>MDE Takes Aggressive and Premature Regulatory Action Against PIQC</u>

26.     Also on January 20, 2022, MDE sent a communication to PIQC stating, "MDE is suspending all payments to Partners in Nutrition dba Partners in Quality Care." Exhibit H-1. MDE's communication stated that its action was "being taken in response to the federal investigation of organizations participating in the USDA Child Nutrition programs for mail fraud, wire fraud, conspiracy and money laundering" and referenced "warrants and affidavits" documenting "CACFP site operators and organizations," "[a] number of" which "are connected to sites sponsored by [PIQC]." *Id.*

27.     On January 31, 2022, MDE sent another communication to PIQC which proposed PIQC's termination from CACFP participation and disqualification from future CACFP participation. Exhibit H-2. MDE's communication also stated that its action was "[b]ased on the evidence in the warrants and affidavits from the "federal investigation of organizations participating in the USDA Child Nutrition programs for mail fraud, wire fraud, conspiracy and money laundering."

28.     Notably, in neither communication did MDE mention: (1) the federal entities involved in the investigation; (2) the target(s) of the investigation; (3) any citation to, description of, or copies of the search warrants and affidavits referenced; (4) the names, number of, or description of any "operators" relevant to the MDE's decision; (5) the names, number of, or

description of any "organizations" relevant to the MDE's decision; (6) the names, number of, or description of any "site operators" relevant to the MDE's decision; (7) the nature of the relationship(s) between PIQC and any "operators", "organizations", or "site operators" relevant to the MDE's decision; or (8) any time frame where actions took place that resulted in the MDE's decision.

29.     PIQC appealed both actions in a consolidated proceeding and on May 17, 2022, the Appeal Panel reversed MDE's January 20 and January 31 actions as "legally inappropriate." Exhibit H-3 at 10, 12.  The Appeal Panel mandated that MDE must "re-assess the matter and carry out MDE-FNS's duties in a manner consistent with the applicable federal regulations and procedural rules." *Id.* at 12.  It further instructed that MDE's substantive allegations "should be re-evaluated by MDE-FNS when it discharges its regulatory duties on remand in a manner consistent with the procedural requirements for its agency actions." *Id.* at 13 n.6.

30.     MDE has also denied claims submitted for reimbursement for meals served in November and December 2021.  On March 25, 2022, MDE sent a communication to PIQC stating that MDE was denying payment for seventy-eight (78) claims for reimbursement for meals and snacks served in November 2021.  Exhibit H-4.  On April 22 and April 26, 2022, MDE denied another one hundred eighty-one (181) claims for reimbursement for meals and snacks served in December 2021.  Exhibits H-5 and H-6.

31.     On May 27, 2022, MDE sent a communication to PIQC stating, "[MDE] is terminating Partners in Nutrition dba Partners in Quality Care's (PIQC) [sic] permanent agreement and all pending site applications."  Exhibit I-1.  MDE's May 27 letter stated it was taking this action "due to affidavits unsealed by the United States District Court for the District of Minnesota as part of the federal investigation into the scheme to defraud the federal government using the

Child Nutrition Programs in Minnesota and the arrest of two targets of the federal investigation for fraudulently obtaining a passport from the U.S. State Department." *Id.* at 1–2. It also informed PIQC that "MDE will also withhold all payments in response to the ongoing noncompliance based on the new information released." *Id.* It stated "[t]his action is taken based on MDE's determination that the role of PIQC in the federal food aid fraud, as demonstrated by the federal affidavits, cannot be corrected by imposing additional conditions found in 2 CFR 200.208." *Id.* MDE claimed that "[t]hese actions are being taken with the authority under 2 CFR 200 [sic]." *Id.*

32.     On June 17, 2022, MDE sent another letter to PIQC informing it that MDE was denying the site applications for 213 sites whose applications for participation in CACFP under the sponsorship of PIQC had been pending. Exhibit I-2. MDE's June 17, 2022 letter stated this additional act was taken "[i]n response to the termination of [PIQC]'s CACFP permanent agreement with the Minnesota Department of Education effective May 27, 2022," and "stems from the immediate termination taken under 2 CFR 200.339 [sic] and the appeal of these site denials are linked directly to the immediate termination." *Id.*

33.     As of June 27, 2022, MDE has provided PIQC with no written document supporting or explaining its "determination that the role of PIQC in the federal food aid fraud, as demonstrated by the federal affidavits, cannot be corrected by imposing additional conditions." *Cf.* Exhibit I-1. Nor has MDE ever provided PIQC with any written documentation or evidence that PIQC "*knowingly* submitted a false or fraudulent claim," as USDA regulations require before suspending or proposing the termination of an institution from CACFP participation. *See* 7 C.F.R. § 226.6(c)(5)(ii) (emphasis added); *see also id.* § 226.6(c)(3). As of June 27, 2022, and to the best of PIQC's knowledge, neither PIQC, its employees, nor its board members have ever been

convicted of fraud, charged with fraud in a criminal court, or identified as the target of a criminal investigation into fraudulent conduct.

34.    As provided in 7 C.F.R. § 226.6(k)(2), a number "[a]ctions [of the State agency are] subject to administrative review."  Two of the actions subject to administrative review are "[s]uspension of an institution's participation" and "[p]roposed termination of an institution's agreement." 7 C.F.R. § 226.6(k)(2)(iii).  Another is: "[d]enial of an application submitted by a sponsoring organization on behalf of a facility."  7 C.F.R. § 226.6(k)(2)(ii).  Another is: "Denial of all or a part of an institution's claim for reimbursement."  7 C.F.R. § 226.6(k)(2)(ix).  Finally, a catch-all provision provides for administrative review of "[a]ny other action of the State agency affecting an institution's participation or its claim for reimbursement." 7 C.F.R. § 226.6(k)(2)(xii); *see also* 42 U.S.C. § 1766(e)(1) ("[E]ach State agency shall provide, in accordance with regulations promulgated by the Secretary, an opportunity for a fair hearing and a prompt determination to any institution aggrieved by any action of the State agency that affects the participation of the institution in the program authorized by this section; or the participation of the institution in the program authorized by this section.").

35.    Pursuant to these provisions, PIQC submitted two notices of appeal and requests for administrative review: a notice of appeal of MDE's May 27, 2022 immediate termination and withholding of funds, on June 10, 2022; and a notice of appeal of MDE's June 17, 2022 site application denial and motion to consolidate, on June 27, 2022.  Exhibits I-3 and I-4.  Because MDE's June 17, 2022 site application denial is premised on its unlawful May 27, 2022 notice of immediate termination, consolidation of both hearings will streamline the administrative process; avoid needless repetition of argument and questioning; and greatly reduce costs for both MDE and PIQC.  As such, PIQC respectfully requests the same.

36.     MDE acknowledged receipt of PIQC's request for appeal of the May 27 action in a letter dated June 17, 2022.  Notably, the MDE's acknowledgment letter contained no additional factual basis or legal support for its original decision.  Further, at that date, the SharePoint file shared with PIQC did not contain a single document in support of MDE's action.  Documents were finally uploaded by MDE on June 24, 2022—the Friday before PIQC's Monday, June 27, 2022 submission deadline in this matter.  Exhibits J-1, J-2, J-3, J-4, and J-5.  *Contra* 7 C.F.R. § 226.6(k)(5)(iv) (requiring MDE to provide any and all "information upon which [MDE]'s action was based" to PIQC "from the date of receipt of the appeal request."); MDE CACFP Appeal Procedure § 4 ("Information on which MDE's action was based must be available to each appellant from the date of receipt of the appeal request.").[8]

37.     MDE did not provide any additional information upon PIQC's submission of its notice of appeal or MDE's appeal acknowledgement letter.  MDE's evidence relied on is therefore strictly constrained to the information it has provided to PIQC in its May 27, 2022 letter.

---

[8]     MDE's repeated failure to provide PIQC with the information upon which its action is taken violates both federal and state CACFP appeal procedure and PIQC's constitutional right to due process.  This Panel has repeatedly chastised MDE for its refusal to timely disclose the basis for its actions in a timely manner.  *See, e.g.*, Exhibits L-2 at 4 n.5 and H-3 at 10.  To the extent this prejudices PIQC's ability to respond to MDE's allegations, MDE's practice violates due process and constitutes an independent ground for reversal.  PIQC was entitled to the material upon which its immediate termination and withholding of funds is based no later than June 10, 2022—the date of PIQC's notice of appeal.  At a minimum, MDE should have made those documents available to PIQC on June 17, 2022—the date MDE acknowledged receipt of PIQC appeal request and shared with it the SharePoint folder constituting the administrative record.  Noted above, MDE did not share its documents in that folder until June 24, 2022.  The untimely documents submitted by MDE must be disregarded and stricken from the administrative record for the reasons stated in PIQC's earlier administrative appeal of MDE's attempted suspension and proposed termination, all of which are incorporated herein.  Exhibit L-4 at 2–5.

## LEGAL ARGUMENT

**I.    The May 27, 2022 Letter Violates Federal Law.**

38.    In its May 27 letter, just as in its January 20 and January 31 suspension and proposed termination actions, MDE improperly relies on two generic regulations from the Uniform Administrative Requirements, Cost Principle, and Audit Requirements for Federal Awards promulgated by the Office of Management and Budget ("OMB"), instead of those regulations promulgated by the Department of Agriculture that specifically govern CACFP, to justify taking action to immediately terminate PIQC from CACFP participation and withhold payment for all claims for reimbursement.  MDE specifically relies on two federal regulations from Title 2, Part 200 of the Code of Federal Regulations (the "OMB Regulations") to justify its actions without prior notice or pre-deprivation process—2 C.F.R. § 200.339 and 2 C.F.R. § 200.340.  For numerous reasons, neither provides MDE any authority to do so.

**A.    MDE's Action Is Preempted by and in Conflict With Section 17 of the National School Lunch Act.**

39.    MDE's May 27, 2022 action violates Section 17 of the National School Lunch Act, as amended (the "Act").  The OMB Regulations upon which MDE instead relies, located in 2 C.F.R. Part 200, apply to "all administrative requirements, program manuals, handbooks and other non-regulatory materials" of the implementing agency "that are inconsistent with the requirements of this part" except "to the extent [other regulations] are required by statute or authorized in accordance with the provisions of § 200.102." 2 C.F.R. § 200.105. *See also id.* 200.106 (requiring adoption of "subparts C through F . . . unless different provisions are required by Federal statute.").

40.    Under the Act, Congress established CACFP with its purpose being "to provide aid to child and adult care institutions and family or group day care homes for the provision of

nutritious foods that contribute to the wellness, healthy growth, and development of young children, and the health and wellness of older adults and chronically impaired disabled persons." 42 U.S.C. § 1766(a)(1)(A)(ii).  To carry out this purpose, Congress authorized USDA to "carry out a program to assist States through grants-in-aid and other means to initiate and maintain nonprofit food service programs for children in institutions providing child care."  *Id.* § 1766(a)(1)(B).

41.     To effectuate this mandate under the Act, Congress ordered that USDA "shall establish procedures for the termination of participation by institutions and family or group day care homes under the program [CACFP]." 42 U.S.C. § 1766(d)(5)(A).  These procedures "shall include standards for terminating the participation of an institution or family or group day care home that . . . engages in unlawful practices [or] falsifies information provided to the State agency."  *Id.* § 1766(d)(5)(B).  Congress mandated that any termination of an institution participating in CACFP "shall" occur "in accordance with" these "procedures" and "standards" promulgated by USDA. 42 U.S.C. § 1766(d)(1)(E)(iii), (5).

42.     The Act requires that any institution participating in CACFP "shall be provided a fair hearing in accordance with subsection (e)(1) *prior to any determination to terminate participation.*" *Id.* § 1766(d)(5)(D)(i) (emphasis added).  It allows for suspension of a participating institution with a post-suspension review hearing only "[i]f a State agency determines that an institution has *knowingly* submitted a false or fraudulent claim for reimbursement."  *Id.* § 1766(d)(5)(D)(ii)(I) (emphasis added).

43.     Based on the foregoing, Congress has mandated that any termination or suspension of an organization participating in CACFP "shall" occur only "in accordance with" the "procedures" and "standards" promulgated by USDA.  42 U.S.C. § 1766(d)(1)(E)(iii), (5).

7 C.F.R. § 226.6 constitutes those procedures.  Any procedure (or lack thereof) existing in the

OMB Regulations is preempted or superseded by Section 17 of the Nation School Lunch Act

insofar as it relates to MDE's administration of CACFP in the State of Minnesota.

> **B.    The OMB Regulations Themselves Expressly Require Adherence to USDA's Specific CACFP Procedure.**

44.    Moreover, MDE ignores the provisions inconvenient to it in the generic OMB

Regulations upon which it relies.  2 C.F.R. § 200.101(d) provides: "[I]n any circumstances where

the provisions of Federal statutes or regulations differ from the provisions of this part, the provision

of the Federal statutes or regulations govern."  Both provisions of the generic OMB Regulations

relied on by MDE in its May 27, 2022 letter "differ" from the specific CACFP regulations in

7 C.F.R. § 226.6.

45.    First, MDE cites 2 C.F.R. § 200.340(a)(1) as authority to terminate PIQC from

CACFP participation.    That regulation generically provides: "The Federal award may be

terminated in whole or in part . . . [b]y the Federal awarding agency or pass-through entity, if a

non-Federal entity fails to comply with the terms and conditions of a Federal award."

46.    By contrast, to terminate a participating institution like PIQC from participation in

CACFP, 7 C.F.R. § 226.6(c)(3) requires MDE to first issue a serious deficiency notice with the

opportunity to take corrective action and then, only if corrective action does not successfully

resolve the serious deficiency, *propose* termination.  Indeed, "[i]f the State agency determines that

a participating institution has committed one or more serious deficiency listed in paragraph

(c)(3)(ii) of this section, the State agency *must use the following procedures* to provide the

institution and the responsible principals and responsible individuals notice of the serious

deficiency(ies) and an opportunity to take corrective action." *Id.* § 226.6(c)(3)(iii) (emphasis

added).  The only immediate action MDE may take is to "suspend the institution's participation," but even that must be "in accordance with paragraph (c)(5)(ii)." *Id.*

47.     Second, MDE cites 2 C.F.R. § 200.339(e) as authority to withhold CACFP funds. That regulation generically provides:

> If a non–Federal entity fails to comply with the U.S. Constitution, Federal statutes, regulations or the terms and conditions of a Federal award, the Federal awarding agency or pass-through entity may impose additional conditions . . . . If the Federal awarding agency or pass-through entity determines that noncompliance cannot be remedied by imposing additional conditions, the Federal awarding agency or pass-through entity may take one or more of the following actions, as appropriate in the circumstances:
>
> \*        \*        \*
>
> (e) Withhold further Federal awards for the project or program.

Here, MDE claims to base its action on its unsupported claim that the allegations contained in the unsealed affidavits "tie PIQC's operation to the fraud being investigated by the Federal Bureau of Investigation."  Exhibit I-1 at 2.

48.     By contrast, to suspend a participating institution like PIQC from CACFP reimbursement in this context, 7 C.F.R. § 226.6(c)(5)(ii)(A) requires MDE to first "determine that an institution has *knowingly* submitted a false or fraudulent claim." (emphasis added).  Further, the suspension cannot be immediate—the suspension's "effective date . . . may be no earlier than 10 days after the institution receives the suspension notice." 7 C.F.R. § 226.6(c)(5)(ii)(B)(3). And upon request by the institution, the suspension must be reviewed and "heard by a suspension review official." *Id.* § 226.6(c)(5)(ii)(C).  These procedures are required.  Indeed, "[a] State agency is prohibited from suspending an institution's participation (including all Program payments) except for the reasons set forth in this paragraph (c)(5)." 7 C.F.R. § 226.6(c)(5).

49.     The differences between the generic OMB Regulations and the specific CACFP procedural rules at issue here are self-evident.  Because "the provisions of [the CACFP

Regulations, 7 C.F.R. § 226.6(c)] differ from the provisions of [the OMB Regulations, 2 C.F.R. §§ 339(e), .340(a)(1)], the provision of [the CACFP Regulations] govern." 2 C.F.R. § 200.101(d).

**C.      MDE's May 27, 2022 Action Fails to Follow Mandatory Procedures in CACFP Regulations for the Suspension or Proposed Termination of a Sponsoring Entity**

50.      Described above, MDE's May 27, 2022 letter purporting to immediately terminate PIQC from participation in CACFP and withhold all funds failed to follow a single procedure prescribed by USDA in 7 C.F.R. § 226.6.

51.      7 C.F.R. § 226.6(c)(3)(iii) states: "If the State agency determines that a participating institution has committed one or more serious deficiency listed in paragraph (c)(3)(ii) of this section, the State agency *must* use the following procedures to provide the institution and the responsible principals and responsible individuals notice of the serious deficiency(ies) and an opportunity to take corrective action." (emphasis added). If the institution does successfully take "corrective action" to "fully and permanently correct the serious deficiency(ies)," the State agency "must notify" the institution's leadership "that the State agency is *proposing* to terminate the institution's agreement and to disqualify the institution." 7 C.F.R. § 226.6(c)(3)(iii)(C).

52.      7 C.F.R. § 226.6(c)(3)(iii) further provides: "[I]f the serious deficiency is the submission of a false or fraudulent claim, in addition to the procedures below, the State agency may suspend the institution's participation *in accordance with paragraph (c)(5)(ii) of this section.*" (emphasis added).

53.      The general rule with respect to suspension is that a "State agency is prohibited from suspending an institution's participation (including all Program payments)." 7 C.F.R. § 226.6(c)(5).

54.      There are two exceptions to this general rule: An institution may be suspended (1) pursuant to 7 C.F.R. § 226.6(c)(5)(i) in circumstances where "State or local health or licensing

officials have cited an institution for serious health or safety violations;" and (2) pursuant to 7 C.F.R. § 226.6(c)(5)(ii) in circumstances where "the State agency determines that an institution has *knowingly* submitted a false or fraudulent claim." (emphasis added).

55.     When a State agency "determines that an institution has knowingly submitted a false or fraudulent claim," a number of procedural requirements are triggered that do not occur in other instances. Those requirements are set forth in 7 C.F.R. § 226.6(c)(5)(ii). These include, but are not limited to:

a.     "The State agency may initiate action to suspend the institution's participation," and if it does so, it must do the following:

i.     The State Agency "must use the following procedures to issue the notice of proposed suspension of participation at the same time it issues the serious deficiency notice, which must include the information described in paragraph (c)(3)(iii)(A) of this section" (emphasis added). As part of this process, the State Agency must allow the institution to take corrective action and must continue payments to sponsored facilities. *See* 7 C.F.R. § 226.6(c)(5)(ii)(E).

ii.     The State agency "must notify the institution's executive director and chairman of the board of directors that the State agency intends to suspend the institution's participation (including all Program payments) unless the institution requests a review of the proposed suspension." 7 C.F.R. § 226.6(c)(5)(ii)(B).

iii.     The notice must include, inter alia, "[t]hat if the institution wishes to have a suspension review, it must request a review and submit to the suspension

review official written documentation opposing the proposed suspension within 10 days of the institution's receipt of the notice." 7 C.F.R. § 226.6(c)(5)(ii)(B)(5).

b.      The institution must be notified of a suspension review process which includes notice of the process, ten days to request a suspension review, an "independent and impartial person other than, and not accountable to, any person involved in the decision to initiate suspension proceedings," and additional requirements of what takes place after a suspension review decision is issued. 7 C.F.R. § 226.6(c)(5)(ii)(C).

56.      In this instance, MDE failed to issue a notice of serious deficiency identifying the alleged "serious deficiency(ies)" in PIQC's program operations, and providing PIQC with the opportunity to take corrective action. 7 C.F.R. § 226.6(c)(3)(iii)(A).

57.      In this instance, MDE failed to offer the opportunity for PIQC to submit a corrective action plan. 7 C.F.R. § 226.6(c)(3)(iii)(B).

58.      In this instance, MDE failed to issue a notice of proposed termination and proposed disqualification based on the issuance of a notice of serious deficiency prior to removing it from the program. 7 C.F.R. § 226.6(c)(3)(iii)(C).

59.      In this instance, MDE failed to issue a notice of proposed suspension of participation at the same time the issuance of a serious deficiency notice. 7 C.F.R. § 226.6(c)(5)(ii)(A).

60.      In this instance, MDE failed to offer Partners in Quality Care a suspension review pursuant to 7 C.F.R. § 226.6(c)(5)(ii)(B) and defined in 7 C.F.R. § 226.2 as "the review provided, upon the institution's request, to an institution that has been given a notice of intent to suspend

participation (including Program payments), based on a determination that the institution has knowingly submitted a false or fraudulent claim."

61.   In this instance, MDE failed to identify a suspension review official pursuant to 7 C.F.R. § 226.6(c)(5)(ii)(C), which is defined in 7 C.F.R. § 226.2 as "the independent and impartial official who conducts the suspension review."

62.   And, in this instance, MDE failed to ensure that sponsored facilities continue to receive reimbursement for eligible meals served during the suspension period. 7 C.F.R. § 226.6(c)(5)(ii)(E). It did the opposite.

63.   The Appeal Panel has already chastised MDE for taking similar action. In its May 17, 2022 written decision reversing MDE's January 20, 2022 and January 31, 2022 letters suspending and proposing termination of PIQC and its members, the Appeal Panel instructed MDE that the proper procedure for pursuing the relief it seeks here would be to issue a serious deficiency notice and proceed according to CACFP regulations in 7 C.F.R. § 226.6. Exhibit H-3 at 11, 12–13 n.6. Because MDE's May 27, 2022 immediate termination and withholding of funds suffers from the very same defects by failing to comply with the processes required under federal law, specifically 7 C.F.R. § 226.6(c)(3)(iii) and (5)(ii), that action must be reversed.

**D.   MDE's Conduct Violates Due Process.**

64.   In *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950), the United States Supreme Court held, "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, *to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.*" *Id.* at 314 (emphasis added).

65.   This principle is found throughout the civil justice system. For instance, in *Johnson v. City of Shelby*, 135 S. Ct. 346 (2014), the United States Supreme Court reinforced the importance

of clear pleadings that can be responded to by the opposing party.  In *Johnson*, the Supreme Court reaffirmed that a party initiating legal action "must plead facts sufficient to show that her claim has substantive plausibility."  *Id.* at 347.  This principle is universally accepted in instances where parties are required, under law, to respond to actions taken based on factual allegations.

66.     Federal regulations contemplate notice in a manner consistent with the ruling in *Mullane* finding that notice is an "elementary and fundamental requirement of due process," which is why 7 C.F.R. § 226.2 states that "*notice must specify the action being proposed or taken and the basis for the action.*" (emphasis added).  Before proposing to terminate a participating institution, the State agency must issue a notice of serious deficiency that, at a minimum, identifies: "[t]he serious deficiency(ies)"; "[t]he actions to be taken to correct the serious deficiency(ies)"; and "[t]he time allotted to correct the serious deficiency(ies)."  7 C.F.R. § 226.6(c)(3)(iii)(A).  This requirement is mirrored in 7 C.F.R. § 226.6(k)(5)(i), which also states that notice must be given of "*the action being taken*" and "*the basis for the action*" (emphasis added).  Similarly, the MDE's own appeals procedures incorporate the same standard, stating that notice must "describe[] the action being taken or proposed, *the basis for the action*, and includes the CACFP Appeal Procedure.*" (emphasis added).

67.     While the MDE's notice in this case clearly indicated "the action being taken or proposed," it failed to provide a meaningful factual "basis for the action" taken and, in failing to do so, it makes a meaningful response by PIQC impossible.  A review of the language in the termination/withholding notice that purported to justify the MDE's "basis for action" clearly demonstrates the May 27, 2022 letter fails to comply with the governing regulations and violates Due Process.

68.     For instance, the May 27, 2022 letter states MDE's action is taken "due to affidavits

unsealed by the United States District Court for the District of Minnesota as part of the federal

investigation into the scheme to defraud the federal government using the Child Nutrition

Programs in Minnesota and the arrest of two targets of the federal investigation for fraudulently

obtaining a passport from the U.S. State Department." Exhibit I-1 at 1–2. It vaguely references

"noncompliance based on then new information released." *Id.* at 2. And it alludes to—but does

not specify any evidence of—"MDE's determination" of "the role of PIQC in the [alleged] federal

food aid fraud, as demonstrated by the federal affidavits." *Id.*

69.     The MDE's failures have forced PIQC into a Kafkaesque system in violation of

their rights to due process of law under the 14th Amendment of the United States Constitution and

Article I, Sections 2 and 7 of the Minnesota Constitution. The MDE's failures have also forced

PIQC to guess at *why* actions are being taken against them; guess at *what* facts the MDE deems

relevant and the basis of its claim; and guess at *how* to respond to defend themselves against

unceasing vagueness.

70.     Moreover, MDE's May 27, 2022 action unconstitutionally circumvents

pre-deprivation process and procedure required under Section 17 of the National School Lunch

Act, in violation of PIQC's right to due process. *See Mathews v. Eldridge*, 424 U.S. 319, 331–339

96 S. Ct. 893 (1976); *cf. C.O. v. Doe*, 757 N.W.2d 343, 350 (Minn. 2008); *Schulte v.

Transportation Unlimited, Inc.*, 354 N.W.2d 830, 834–33 (Minn. 1984).

## II.     MDE's Legal Interpretation of the Federal Regulations Is Otherwise Unprincipled and Untenable.

71.     Even if MDE's May 27, 2022 action did not run afoul of Congress's express

mandate, USDA's required procedures, and OMB's acknowledged limitations—let alone

fundamental principles of due process—MDE's attempt to skirt controlling federal law violates nearly every imaginable tenet used by governmental bodies to interpret legal texts.

      **A.**     **The OMB Regulations Provide Permissive, Not Mandatory Action.**

    72.    To begin, every action authorized by 2 C.F.R. Part 200 is permissive, not mandatory. Both OMB Regulations cited by MDE provide that a state agency like MDE "may" take the actions located in those sections. "May" is permissive word that does not prescribe rules. *See* 2 C.F.R. § 200.101(b)(1) ("Throughout this part when the word 'must' is used it indicates a requirement. Whereas, use of the word 'should' or 'may' indicates a best practice or recommended approach rather than a requirement and permits discretion."). Accordingly, to the extent either of the OMB regulations apply to the CACFP-specific procedures laid out in 7 C.F.R. § 226.6 for termination and suspension, the OMB Regulations *at most* supply only authority to take the action, not the manner in which they are required to be taken. In other words, they provide conditions that are *necessary* but not *sufficient*.

    73.    First, 2 C.F.R. § 200.340(a)(1) only authorizes that a federal award "*may* be terminated [by MDE] in whole or in part . . . if a non–Federal entity fails to comply with the terms and conditions of a Federal award." (emphasis added).

    74.    Second, 2 C.F.R. § 200.339(e) only authorizes that MDE "*may* . . . [w]ithhold further Federal awards for the project or program" in the event that a sponsoring organization "fails to comply with the U.S. Constitution, Federal statutes, regulations or the terms and conditions of a Federal award." (emphasis added).

    75.    At most, that regulation is simply permissive; to the extent not preempted by the CACFP Regulations, it is a substantive basis of authority upon which MDE could potentially rely. But it does not absolve MDE of the duty to follow the procedural requirements in the CACFP regulations. *See* 7 C.F.R. § 226.6(c)(3)(iii), (5)(ii). In fact, those same uniform regulations require

MDE to implement its actions administering CACFP in Minnesota *only in accordance with the regulatory procedure promulgated by USDA*. *See* 2 C.F.R. § 200.342 ("The Federal awarding agency or pass-through entity must comply with any requirements for hearings, appeals or other administrative proceedings to which the non-Federal entity is entitled under any statute or regulation applicable to the action involved."). That procedure is 7 C.F.R. § 226.6(c), which requires prior notice of the proposed suspension and termination, with an opportunity to be heard in opposition before the action is taken.

**B.    Specific Regulations Always Prevail Over General Regulations.**

76.    Every authority recognizes the uncontroversial principle that specific provisions of law control over general provisions of law. Many authorities—state and federal—support this proposition. *See, e.g.*, *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 171, 127 S. Ct. 2339 (2007); *Koehnen v. Flagship Marine Co.*, 947 N.W.2d 448, 454 (Minn. 2020) (noting Minnesota courts "have long held that when a conflict exists between two or more [legal] provisions, the specific provisions control").

77.    Here, the OMB Regulations only constitute general authorization for legal action. Those regulations authorize action under certain circumstances, but do not require it or spell out the manner in which those actions must be taken. They are controlled by the specific CACFP regulations in 7 C.F.R. § 226.6 that lay out the mandatory procedure by which those actions are to be taken. *See* 7 C.F.R. § 226.6(c)(3)(iii) (requiring that "the State agency *must* use the following procedures" when proposing termination of a institution in CACFP (emphasis added)), (c)(5)(ii)(A) ("If the State agency wishes to suspend the institution's participation, it *must* use the following procedures . . . ." (emphasis added)).

78.    Like every other federal agency, USDA has adopted "2 CFR part 200, subpart D and USDA implementing regulations 2 CFR part 400 and part 415." *See* 2 C.F.R. § 400.1. But in

addition to conflicting with the specific procedural requirements of 7 C.F.R. § 226.6, that adopted

language appears exactly four (4) times in § 226.6—twice regarding performance standards for

applying organizations and twice regarding "miscellaneous responsibilities" of the state

agency. None of the references are located in (or refer to) the procedural requirements for

suspension or proposed termination based on suspected fraud or unlawful activity. That is, nothing

about the generic OMB Regulations that are incorporated into 7 C.F.R. § 226.6 contradict or

override the *procedure* in that CACFP-specific section.

      **C.**      **MDE's Preferred Legal Interpretation Fails to Give Effect to All Applicable Regulations.**

      79.    Relatedly, courts and administrative bodies must give effect to all statutory and

regulatory enactments. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645,

132 S. Ct. 2065 (2012); *e.g.*, *State v. Henderson*, 907 N.W.2d 623, 625 (Minn. 2018) (stating that

Minnesota courts "read a statute as a whole and give effect to all of its provisions"); *Am. Family

Ins. Grp. v. Schroedl*, 616 N.W.2d 273, 277 (Minn. 2000) ("A statute should be interpreted,

whenever possible, to give effect to all of its provisions; no word, phrase, or sentence should be

deemed superfluous, void, or insignificant." (cleaned up)). The only way to do that here is to

observe that while the OMB Regulations authorize particular actions in certain circumstances, the

CACFP procedures exist to control the way by which those actions are taken. MDE's preferred

reading of the federal regulations renders the procedural provisions of 7 C.F.R. § 226.6 superfluous

and meaningless. That is not the result Congress, or USDA, enacted or intended.

      80.    Unlike other programs implemented by USDA, CACFP procedure is not governed

the general OMB Regulations. For instance, regulations governing the implementation of the

National School Lunch Program do allow MDE to withhold payments under that program in

accordance with the OMB Regulations. *See* 7 C.F.R. § 210.24. The regulations governing that

program also allow MDE to take action to suspend or terminate an institution's participation in compliance the OMB Regulations "[w]henever it is determined that a [school food authority] has materially failed to comply with the provisions of [Part 210]." 7 C.F.R. § 210.25; *see* 7 C.F.R. § 210.18(k)(2) (implementing § 210.25 for "program payments to a school food authority").

81.     The regulations governing CACFP, by contrast, do not. 7 C.F.R. § 226.6 provides for its own procedures by which a state agency like MDE must suspend or propose the termination of participating institutions from CACFP. Had USDA wished state agencies to conduct proceedings administering CACFP under the OMB Regulations, as it has directed for the National School Lunch Program, it would have expressly done so. It did not. Instead, USDA implemented very specific protocols that MDE must adhere to in order to pursue the actions its May 27, 2022 letter purports to take. Those procedures must be followed, and MDE's failure to do so compels reversal of that action.

### III.     MDE Supports Its Remaining Allegations with Speculation, Not Evidence.

82.     *Even if* the above legal defects did not thwart MDE's attempt to disregard federal law and make up its own rules (they do), none of the information cited and relied upon by MDE supply substantial evidence in support of MDE's May 27, 2022 immediate termination and withholding of funds. In its letter, MDE relies exclusively on the affidavits of law enforcement unsealed in the U.S. District Court for the District of Minnesota to justify its conclusion that PIQC failed to operate in compliance with federal regulations and somehow engaged in unlawful acts of its own. *See* MDE May 27, 2022 Letter at 2–3. The agency's justification suffers from several fundamental errors.

83.     First, MDE conflates the *existence* of alleged fraud by individual bad actors operating under CACFP with PIQC's *participation in* or *failure to monitor* it. Nothing appearing in the federal search warrant applications nor anything MDE has alleged suggests—let alone

demonstrates—that PIQC "*knowingly* submitted a *false or fraudulent* claim." *Cf.* 7 C.F.R. § 226.6(c)(5)(ii)(A). Nor do any of those materials suggest, let alone demonstrate, that PIQC "has engaged in unlawful acts with respect to Program operations." *Cf.* 7 C.F.R. § 226.10(f).[9] As supported by the volumes of documentation submitted in prior appeals, which are incorporated here by reference, PIQC did exactly what federal and state regulations required of it to verify claims and provide oversight during a time period in which CACFP requirements were greatly relaxed by USDA as a result of the Covid-19 pandemic—nothing more and nothing less is required of PIQC. Immediate termination and withholding of funds here unfairly punishes PIQC for other entities' alleged bad acts.

84.     Second, the sole factual basis asserted in MDE's May 27, 2022 letter rests on unspecified and unsubstantiated allegations in federal affidavits. None of the allegations have been tested by trial. None have been proven by the documents submitted by MDE in this proceeding. More specifically, the affidavits that are at the root of this proceeding do not explain what *PIQC—as opposed to others*—has done wrong. MDE does not even endeavor to make this distinction—it simply assumes guilt by association by pointing to allegations that the entities subject to the warrants received *some* of their money from PIQC. Basing MDE's agency actions on nothing more than peripheral and untested allegations against other actors fails to establish the requisite criteria for suspending, terminating, or disqualifying PIQC from present or future CACFP participation and effectively demands that PIQC prove its innocence, in contravention of federal regulations and PIQC's right to due process.

---

[9]     To "engage" in unlawful acts minimally contemplates *knowing* and *intentional* participation in illicit activity. In another statutory context, the Minnesota Supreme Court has held that the term "engages" means "*volitionally*, as opposed to accidentally." *State v. Jama*, 923 N.W.2d 632, 637 (Minn. 2019).

85.    Contrary to MDE's reckless and unsupported accusation, Christine Twait did not give a knowingly false or misleading statement when she represented to MDE that Julius Scarver did not receive remuneration from The Free Minded Institute while he was a member of the PIQC Board of Directors.  Ms. Twait put this very question to Mr. Scarver, who informed her that he did not.  Exhibit G-1.  Ms. Twait reasonably relied on Mr. Scarver's representation and relayed that understanding to MDE.  Nothing in MDE's libelous May 27, 2022 letter provides any foundation by which to conclude that statement was false, let alone that she *knew* it was false.

**IV.    MDE's May 27 Action Constitutes a Breach of its CACFP Agreement with PIQC.**

86.    In agreeing to administer CACFP on be half of USDA-FNS in the State of Minnesota, MDE agreed to "enter into a written agreement with the Department for the administration of the Program in the State in accordance with the provisions of this part." 7 C.F.R. § 226.3(c).  And it thereby agreed to administer CACFP in accordance with the rules and regulations set forth by USDA as they relate to CACFP.  *See generally* 7 C.F.R. § 226.6.

87.    Section 5, paragraph 2 of the CACFP Agreement between PIQC and MDE states that the Agreement may be terminated "in accordance with" CACFP "program statutes" and "program regulations."  Exhibit K at 3.  Discussed above, those statutes and regulations specifically applicable to administration of CACFP control over any other generic regulations upon which MDE relies.

88.    Because MDE followed neither the Act, 42 U.S.C. § 1766, nor the applicable CACFP Regulations, 7 C.F.R. § 226.6, its May 27, 2022 letter constitutes a material breach of contract.

**V.    MDE's Denial of Site Applications is Appealable and Must Be Summarily Reversed.**

89.    Finally, PIQC respectfully requests that the Appeal Panel acknowledge its notice of appeal from MDE's June 17, 2022 letter denying 213 site applications and consolidate that

{02091957.DOCX}                                                 31

matter into the present proceedings.  MDE's June 17, 2022 letter states that its action "stems from the immediate termination" action taken by MDE on May 27, 2022.  It gives no other reason for the denials.  Thus, the propriety of those denials is wholly bound up in the propriety of MDE's May 27, 2022 notice of immediate termination and withholding of funds at issue here. Consolidation would greatly streamline the issues before the Appeal Panel for an efficient resolution.

90.   MDE's letter wrongly states the June 17, 2022 letter is a non-appealable action. 7 C.F.R. § 226.6(k)(2)(ii) provides: "[T]he State agency *must* offer an administrative review for the following actions: . . . Denial of an application submitted by a sponsoring organization on behalf of a facility."  (emphasis added).  The CACFP Regulations also require administrative review for "[a]ny other action of the State agency affecting an institution's participation or its claim for reimbursement." 7 C.F.R. § 226.6(k)(2)(xii).

91.   MDE's June 17, 2022 site application denial letter is an appealable action and should be consolidated with this proceeding.

**PRAYER FOR RELIEF**

For the reasons stated above, PIQC respectfully requests that the Appeal Panel reverse and rescind (1)  MDE's May 27, 2022 notice purporting to immediately terminate PIQC's participation in CACFP and withhold all funds from claims for reimbursement and (2) MDE's June 17, 2022 letter denying 213 site applications.  PIQC further requests that the Appeal Panel order MDE to resume reimbursement payments under CACFP immediately.

_____          6.27.2022
Robyn Toussignant, Interim Executive Director    Date
Partners in Nutrition d/b/a Partners in Quality Care

_____     6/27/22
Mark Weinhardt                      _____
Nathan Converse (admitted in Minnesota)     Date
The Weinhardt Law Firm
2600 Grand Avenue, Suite 450
Des Moines, IA 50312
Telephone:  (515) 244-3100
Email:  nconverse@weinhardtlaw.com
        mweinhardt@weinhardtlaw.com