PARTNERS IN NUTRITION d/b/a
PARTNERS IN QUALITY CARE,

Case No. 0:22-cv-02195-JRT-JFD

Plaintiff,

vs.

MINNESOTA DEPARTMENT OF
EDUCATION; MONICA HERRERA, in
her individual capacity and official capacity
as Director of Nutrition Program Services;
EMILY HONER, in her individual capacity
and official capacity as Program Integrity
Work Manager and JEANETTE
JOHNSON-REED, in her individual
capacity and official capacity
as Supervisor of Compliance,

Defendants.

**DEFENDANT MINNESOTA
DEPARTMENT OF EDUCATION'S
MEMORANDUM OF LAW IN
OPPOSITION TO PLAINTIFF'S
MOTION FOR A TEMPORARY
RESTRAINING ORDER**

## INTRODUCTION

In response to the upheavals caused by the COVID-19 pandemic, the U.S. Department of

Agriculture ("USDA") expanded access to its hunger relief programs, including the Child and

Adult Care Food Program ("CACFP"). Federal investigators subsequently discovered an immense

fraud scheme to misappropriate and launder hundreds of millions of taxpayer dollars allocated to

hunger relief in Minnesota.

At the center of this fraudulent scheme lay two nonprofit organizations: Feeding Our

Future, and Plaintiff Partners in Nutrition, d/b/a Partner in Quality Care, a/k/a "Sponsor A" in

multiple federal indictments (hereinafter, "PIQC").[1] These nonprofits each funneled millions of

---

[1] At the administrative hearing related to the May 27, 2022 termination of PIQC held on September
12, 2022, PIQC's attorney Mark Weinhardt, stated "[t]o the degree that they say anything about

dollars to fraudulent site operators and vendors. The stolen federal food aid was laundered through a series of shell companies and used to buy real estate, vehicles, vacations, and other luxury items.

When the federal criminal investigation into this scheme was made public, Defendant Minnesota Department of Education ("MDE") responded by taking prompt action to halt the flow of funding to PIQC because the search warrant affidavits unsealed on January 20, 2022 detailed PIQC's ties to the fraud. MDE took additional steps to terminate PIQC's sponsorship on May 27, 2022 based on additional ties between PIQC's operations and the fraud that was made available on May 20, 2022 with the unsealing of a search warrant affidavit.

PIQC has appealed the termination action taken by MDE pursuant to the federal regulations applicable to the CACFP and the procedures established by MDE. That administrative appeal process is currently ongoing. PIQC, however, has asked this court to circumvent the state process by issuing a temporary restraining order against MDE related to the May 27 termination. While framed as a request for injunctive relief to "preserve the status quo," PIQC is in fact seeking to create a new status quo, one in which upends the regulatory scheme governing CACFP and requires MDE to "accept, process, and approve reimbursement claims" totaling millions of dollars without exhausting its administrative remedies. As detailed herein, PIQC has failed to justify its request for such extraordinary, drastic injunctive relief. The motion should be denied.

---

Partners in Quality Care, which we will agree is Sponsor A in two of the indictments, what they indicate is that Sponsor A was itself defrauded, was itself lied to by certain sites or vendors. And that is a very different situation than what is alleged against Feeding Our Future, or any of the individuals who have been indicted." (Declaration of Kristine Nogosek ("Nogosek Decl.") Ex. A at 9:12-19). Whether PIQC, or any of its principals or agents, acted criminally is beyond the scope of this inquiry. As detailed further herein, even in the absence of criminal intent, PIQC served as a pipeline for millions in misappropriated funds contrary to CACFP standards and rules.

**STATEMENT OF FACTS**

## I.    THE CACFP PROGRAM.

The CACFP is a federal hunger relief program that subsidizes food service for eligible children and adults enrolled for care at participating childcare centers, daycare homes, and adult day care centers. While the USDA Food and Nutrition Service promulgates regulations governing CACFP and distributes federal funds to state governments, administering the program resides with individual state agencies. 7 C.F.R. § 226.3. In Minnesota, the state agency responsible for overseeing CACFP is the Minnesota Department of Education.

Under the rules governing CACFP, the responsible state agency is required to "monitor program performance" and "ensure effective operation of the Program by participating institutions." 7 C.F.R. § 226.6(a). The state agency is expressly required to rely on its discretion in determining whether a participating institution meets the performance standards set by the USDA. 7 C.F.R. § 226.6(b)(2)(vii). Among the performance standards which a program participant must meet is "program accountability." Specifically, the state agency must confirm that the participant meets particular standards of fiscal accountability:

> (i) Fiscal integrity and accountability for all funds and property received, held, and disbursed;
> (ii) The integrity and accountability of all expenses incurred;
> (iii) That claims will be processed accurately, and in a timely manner;
> (iv) That funds and property are properly safeguarded and used, and expenses incurred, for authorized Program purposes; and
> (v) That a system of safeguards and controls is in place to prevent and detect improper financial activities by employees

7 C.F.R. § 226.6(b)(2)(vii)(C)(1-2).

A state agency is prohibited from accepting any participant "if the institution or any of its principals has been convicted of any activity that occurred during the past seven years and that indicated a lack of business integrity." 7 CFR § 226.6(b)(1)(xiv). Participants are also required to

"restrict other employment by employees that interferes with an employee's performance of Program-related duties and responsibilities, including outside employment that constitutes a real or apparent conflict of interest." 7 CFR § 226.6(b)(1)(xvi).

By statute, a program participant must enter a contract with the administering state agency. 42 U.S.C. § 1766(d)(1). Such an agreement, however, does not eliminate the need for participants to abide by the standards set forth above. 7 C.F.R. § 226.6(b)(4). Participants must re-apply to the program at regular intervals as determined by the state to confirm that they continue to meet the applicable standards. 7 C.F.R. § 226.6(b)(2)(vii). An operating agreement *must* be terminated for cause if the participant "(i) engages in unlawful practices, falsifies information provided to the State agency, or conceals a criminal background; or (ii) substantially fails to fulfill the terms of its agreement with the State agency." 42 U.S.C. § 1766(d)(1)(E)(iii) and 1766(d)(5)(B). Such an agreement *may* also be terminated "for convenience by the institution or State agency." 42 U.S.C. § 1766(d)(1)(E)(iii).

Independent of the termination provisions in the statute and regulations, a state agency may decline to pay out claims for reimbursement if "the results of audits, investigations, or other reviews" provide a "reason to believe that an institution, child or adult care facility, or food service management company has engaged in unlawful acts with respect to Program operations." 7 C.F.R. § 226.10(f).

Should a participant be aggrieved by an administrative decision, the federal regulations provide that each state is required to provide an appeal process. 7 C.F.R. § 226.6(k)(2)-(5). In Minnesota, that process involves an appeal before a panel of three independent and impartial MDE staff. (Declaration of Emily Asp ("Asp Decl.") Ex. B.)

## II. THE FEDERAL INVESTIGATION UNCOVERED THAT PIQC SERVED AS A PIPELINE FOR TENS OF MILLIONS OF DOLLARS OF MISAPPROPRIATED FUNDS.

On January 20, 2022, the Federal Bureau of Investigation executed multiple search warrants at various locations involved in the distribution of food to needy children under CACFP. The same day, the United States District Court for the District of Minnesota unsealed three affidavits connected to the federal investigation. Two additional affidavits were unsealed in connection with subsequent arrests of alleged conspirators: the fourth affidavit was unsealed on April 21, 2022 and the fifth affidavit, unsealed on May 20, 2022, indicates that a board member of PIQC, Julius Scarver (referred to in the affidavit as J.S.), had a direct role in the fraud scheme through his shell company, The Free Minded Institute.

On September 22, 2022, the U.S. Attorney for the District of Minnesota announced criminal charges against 47 individuals alleged to be part of the fraudulent scheme to misappropriate hunger relief funds. Two of the six indictment documents indicate involvement in the fraud scheme by PIQC. According to the indictments, PIQC is directly responsible for distributing more than $57.7 million in misappropriated funds.

The following summarizes for the Court the facts from the federal indictments and affidavits that layout PIQC's connection to the fraud.

### A. PIQC Provided More Than $57.7 Million in Stolen Funds to Entities Controlled by Individuals Who Have Been Indicted for Criminal Activity to Defraud the Federal Government.

Various warrants and indictments issued during the federal investigation collectively indicate that at least $57.7 million was funneled through PIQC to organizations operating to defraud MDE and the United States of hunger relief funds.

Two of the six indictments unsealed on September 20, 2022 (charging thirteen individuals) identify PIQC as "Sponsor A," "a Minnesota non-profit organization purportedly in the business

5

of helping community partners participate in the [CACFP]." The indictments indicates that "prior to the onset of the Covid-19 pandemic, [PIQC] was a small non-profit that sponsored the participation of daycares and after-school programs in [CACFP]." (Nogosek Decl., Ex. B ("Farah Ind.") at ¶ 16, and Ex. C ("Salad Ind.") at ¶ 16.)

In approximately April 2020, PIQC expanded dramatically. "The company went from receiving and disbursing approximately $5.6 million in federal funds to sites under its sponsorship in 2019 to more than $179 million in 2021. In 2021, sites under the sponsorship of [PIQC] claimed to have served more than 80 million meals to children in Minnesota. *Most* of the sites operating under the sponsorship of [PIQC] fraudulently inflated their claims in order to appear that they were providing more food to children than was true." (Farah Ind. ¶ 17, Salad Ind. ¶ 17) (emphasis added). The indictments allege the following misappropriation of CACFP funds provided by PIQC:

1) As set forth in more detail in Section II.B, *infra*, The Free Minded Institute, created and controlled by Julius Scarver, a board member of PIQC, received nearly $2.5 million in CACFP funds from PIQC from October 2021 to January 2022. (Farah Ind. ¶¶ 29, 38.)

2) Empire Cuisine and Market, operated by Abdiaziz S. Farah and Mohamed Ismael, participated as a meal vendor under the sponsorship of both Feeding Our Future and PIQC. Empire Cuisine received more than $28 million in CACFP funds from May 2020 to January 2022. (Farah. Ind. ¶ 18.)

3) ThinkTechAct Foundation, operated by Mahad Ibrahim with participation by Mr. Farah, participated as a meal vendor under the sponsorship of both Feeding Our Future and PIQC. The sites sponsored by PIQC operated under the name "Mind Foundry Learning Foundation." ThinkTechAct received more than $18 million in

CACFP funds from PIQC, as well as another $3.7 million from Feeding Our Future, between February 2021 to January 2022. (Farah Ind. ¶¶ 21-22.)

4) Haji's Kitchen, operated by Haji Osman Salad, participated as a meal vendor under the sponsorship of PIQC. Haji's Kitchen received more than $16 million in CACFP funds from PIQC from December 2020 to January 2022, of which more than $11.3 million was provided directly by PIQC. (Salad Ind. ¶ 18.)

5) The Produce LLC, operated by Farad Nur, participated as a meal vendor under the sponsorship of both Feeding Our Future and PIQC. The Produce received more than more than $9.9 million in CACFP funds from March 2021 to January 2022. (Salad Ind. ¶¶ 20, 37.)

6) Multiple Community Services, operated by Anab A. Awad, participated as a meal vendor under the sponsorship of PIQC. Multiple Community Services received more than $11 million in CACFP funds from September 2020 to January 2022. (Salad Ind. ¶ 21.)

7) Minnesota's Somali Community, operated by Sharmarke Issa, participated as a meal vendor under the sponsorship of both Feeding Our Future and PIQC. Minnesota's Somali Community received more than $7.4 million in CACFP funds from November 2020 to January 2022, of which approximately $5 million was paid by PIQC. (Salad Ind. ¶ 22.)

Altogether, PIQC paid out approximately $57.7 million to the companies and individuals listed above.[2] Employees of PIQC are stated to have "solicited and accepted bribes and

---

[2] This amount does not include any of the $28 million received by Empire Cuisine, since the indictments and affidavits do not separate the amounts received from Feeding Our Future from

kickbacks…in exchange for sponsoring their fraudulent participation in [CACFP]." (Farah Ind. ¶ 138.)

### B. PIQC Provided Approximately $2.5 Million in Misappropriated Funds to The Free Minded Institute, a Nonprofit Founded by a Member of the Board of PIQC, Julius Scarver.

The scheme to defraud taxpayers of millions of dollars of pandemic hunger relief funds directly and personally involved a member of the PIQC board, Julius Scarver. Mr. Scarver was first identified in the arrest warrant for Abdiaziz S. Farah.[3] Mr. Scarver "created and controlled" a nonprofit named The Free Minded Institute. (Nogosek Decl., Ex. D ("Farah Aff.") at ¶ 36, Farah Ind. ¶ 29.)

PIQC sponsored food sites operated by The Free Minded Institute. (Farah Aff. ¶ 36). Between October 2021 and January 2022, The Free Minded Institution received $2,496,989 in federal funds from PIQC. (Farah Aff. ¶ 40, Farah Ind. ¶ 29, 38). For his part in the fraud, Mr. Scarver obtained $13,400 in stolen CACFP funds drawn directly from The Free Minded Institute's bank account, spent additional money at restaurants, liquor stores, and an online food and alcohol delivery company, and received payments from companies controlled by Mr. Farah totaling $11,000. (Farah Aff. ¶¶ 43-44.)

The Farah Affidavit also details how for its October 2021 operations, Empire Cuisine & Market submitted an invoice on November 2, 2021 via email for $679,507 to the executive director of PIQC for 150,000 meals purportedly served at six sites operated by The Free Minded Institute. (Farah Aff. ¶ 45.) On that same day, Empire Cuisine & Market sent Mr. Scarver via email an invoice claiming that The Free Minded Institute owed Empire Cuisine & Market only $642,733.68

---

those received from PIQC. Thus, $57.7 million likely understates the CACFP funds defrauded through PIQC.
[3]  Affidavit unsealed on May 20, 2022 in Case No. 22-MJ-00432 ("Farah Aff.").

for those same 150,000 meals. (Farah Aff. ¶ 46.) This suggests, according to federal law enforcement, that Mr. Scarver was going to retain approximately 5% of CACFP funds that PIQC paid The Free Minded Institute for the same 150,000 meals. (Farah Aff. ¶ 47.)

The Farah Indictment further sets forth the activities of Mr. Scarver and The Free Minded Institute in laundering the misappropriated proceeds received from PIQC. (Farah Ind. ¶¶ 61-70). The indictment also indicates that Mr. Scarver received a $10,000 personal check from Mr. Farah in connection with the fraud. (Farah Ind. ¶ 146.)

## III.    The Termination of PIQC and Procedural Posture.

The flow of misappropriated funds was halted by the prompt actions of the MDE once PIQC's ties to the criminal investigation were made public with the unsealing of the Farah search warrant affidavit on May 20, 2022. But these actions were not the first administrative actions taken by MDE against PIQC.

In its ongoing effort to reign in PIQC, on March 31, 2021, MDE issued a Notice of Serious Deficiency to PIQC. (Honer Decl. Ex. C.) The Notice of Serious Deficiency states MDE determined that PIQC was seriously deficient due to PIQC's failure to operate in conformance with the CACFP's performance standards of financial viability and financial management, administrative capability, and program accountability. *Id*; 7 C.F.R. §§ 226.6(c)(3)(ii)(C), 226.6(c)(3)(iii)(A). The deficiencies identified related to PIQC's (i) internal financial controls and staffing levels to ensure program compliance in light of PIQC's exponential growth; (ii) ability to properly access sites for eligibility; (iii) approved budget, which was approximately $10 million less than PIQC's then-current CACFP reimbursement; and (iv) failure to sufficiently update its Management Plan. (Honer Decl. Ex. C.) The notice also referenced four complaints, received since January 1, 2021, reporting that some of the sites sponsored through PIQC were noncompliant with

the federal regulations. (*Id.*) PIQC provided its corrective action plan and documents to MDE, MDE issued the guidance it is regulatorily obliged to provide on to help PIQC correct remaining deficiencies, PIQC corrected the remaining deficiencies, and on June 16, 2021, MDE deferred the March 31, 2021 serious deficiencies. (Honer Decl. ¶ 6.) PIQC's corrective action plan included the implementation of policies and procedures to ensure PIQC had sufficient internal controls, staffing levels and training to manage its growing operations, an updated Management Plan, and an updated budget. (*Id.*)

(Honer Decl., ¶ 6.) *See also* 7 C.F.R. § 226.6(c)(3)(iii)(B). Despite these corrective actions, the federal affidavits and indictments showed fraud occurring within PIQC's operations.

On January 31, 2022, MDE sent another letter to PIQC relating to the prior Serious Deficiency Notice. MDE proposed to terminate and disqualify PIQC from CACFP under 7 C.F.R. § 226.6(c)(3)(ii)(U). The letter also informed PIQC of its right to appeal under the administrative appeal process. (Honer Decl. Ex. D.)

PIQC availed itself of the appeals process before and obtained a favorable ruling. On May 17, 2022, the MDE three-member panel issued a decision requiring MDE to re-assess the matter. (Honer Decl. Ex. E.) As noted above, three days later, on May 20, 2022, the U.S. Attorney's Office unsealed the Farah Affidavit, which directly tied PIQC and its board member J.S. to the now public, ongoing, fraud investigation. MDE continued to withhold payment from PIQC and has not made any payments since the initial search warrants were unsealed in January 2022.

On May 27, 2022, MDE issued the letter which PIQC acknowledges as "the main subject of PIQC's averments." PIQC Memo. at 11. This letter informed PIQC that MDE was terminating its agreement with PIQC effective immediately, pursuant to 2 C.F.R. §§ 200.339(e) and 200.340(a)(1), as well as 7 C.F.R. § 226. (Honer Decl. Ex. A.) Within the letter, MDE concluded

that PIQC submitted false and fraudulent claims and was incapable of operating in compliance with the federal regulations even with additional conditions being imposed, based on the information in the Farah Affidavit.

MDE also based its May 27, 2022 decision on PIQC's failure to accurately disclose Mr. Scarver's relationship to The Free Minded Institute. In a disclosure dated February 11, 2022, PIQC represented to MDE that Mr. Scarver was an unpaid member of The Free Minded Institute's board, as well as a member of PIQC's board. The Farah arrest warrant affidavit unsealed on May 20, 2022 reveals that Mr. Scarver was not just a member of The Free Minded Institute's board, but that he created and controlled the company and personally received tens of thousands of stolen federal food aid from the company. (Farah Aff. ¶¶ 36-48.)

MDE notified PIQC of its right to inspect the information upon which MDE based its decision. *See* 7 C.F.R. § 226.6(k)(5)(iv). PIQC timely appealed the May 27, 2022 decision within the time frame set forth in 7 C.F.R. § 226.6(k)(5)(ii). (Asp Decl. Ex. A.) The hearing was set for July 25, 2022, however, PIQC, via its counsel, requested that the date be moved to accommodate its counsel's schedule. (Honer Decl. Ex B at p. 2 (unnumbered).) MDE agreed, so long as the new date was amendable to the division as well. *Id.* A hearing on this appeal took place before the administrative appeal panel on September 12, 2022. The administrative appeal process is therefore currently underway, and a decision on PIQC's appeal is pending and due to be issued on or before October 14, 2022. (Honer Decl. Ex B at p. 6 (unnumbered.); ¶ 3.)[4]

---

[4] Notably, had PIQC not asked to move the hearing date, the panel's decision would have been due by August 9, 2022. (Honer Decl. Ex. B at p. 1 (unnumbered).)

**ARGUMENT**

**I.    Standard for Relief.**

A temporary restraining order is an "extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted) (emphasis in original).

This court must weigh four factors in determining whether to grant a temporary restraining order: (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties; (3) the probability that movant will succeed on the merits; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). Implicit in each of these principles is the further requirement that the movant substantiate the claim that irreparable injury is "likely" to occur. Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur. *Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986)

The Eighth Circuit further explains:

> In balancing the equities no single factor is determinative. The likelihood that plaintiff ultimately will prevail is meaningless in isolation. In every case, it must be examined in the context of the relative injuries to the parties and the public. If the chance of irreparable injury to the movant … is outweighed by the likely injury to other parties … the moving party faces a heavy burden of demonstrating that he is likely to prevail on the merits.

*Dataphase*, 640 F.2d at 113. "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.*

To begin with, PIQC does *not* wish to preserve the "status quo." The status quo since May 27, 2022 has been that PIQC's agreement with MDE has been terminated and that PIQC is

12

not eligible for reimbursement of claims for purported meals. PIQC is instead, months later, requesting a radical reorientation of the status quo.

PIQC requests that MDE be "enjoined and restrained from *continuing* to withhold funds from PIQC … and must, during the term of this temporary injunction, accept, process, and approve reimbursement claims generated after May 2022 from PIQC or PIQC-sponsored sites." Prop. Order ¶ ii (emphasis added). Implicit in the proposed language is the concession that the restraining order seeks not to freeze the status quo, but to return PIQC and MDE to the status quo that resulted in the fraudulent misappropriation of more than $57 million in hunger relief funds. Given what is now known about the scope of the fraud, it would be unwise to return to that prior state of affairs. Additionally, PIQC's requested relief interjects the Court into the regulatory framework that requires MDE to process and pay only valid claims. 7 C.F.R. § 226.7(k). PIQC's request for an Order from the Court to force MDE to pay PIQC's claims without them going through proper review, especially in light of the indictments outlining the fraud occurring within PIQC's operations, is astonishingly bold and must be rejected by the Court.

The status quo is further disrupted by PIQC's request that the Court to strip MDE of the discretion which federal regulations entrust to it in approving or denying renewal applications (7 C.F.R. § 226.6(b)(2)(vii)), requesting that MDE be "restrained from taking any steps to deny PIQC's pending sponsor application for the 2022-2023 renewal period (or imposing restrictions on renewal of PIQC for 2022-2023) that are based, in whole or in part, on the MDE's May 27 termination decision or on any stated reasons for the MDE's May 27 termination decision," which would presumably include the May 20, 2022 search warrant Affidavit that outlines PIQC's role in the fraud. This request is directly contrary to applicable federal regulations, which require MDE to ensure that CACFP participants meet the program performance standards and to "only approve

the applications of those renewing institutions that meet these performance standards, and … deny the applications of those that do not meet the standards." 7 CFR § 226.6(b)(2)(vii). Here again, the Court must reject PIQC's invitation to alter the status quo and allow MDE to review PIQC's eligibility to operate as a sponsor for the 2022-2023 program year and to issue its determination on that application, which is due on or before October 8. (Honer Decl. ¶ 6.)

## II. THE *DATAPHASE* FACTORS WEIGH AGAINST ISSUING EXTRAORDINARY INJUNCTIVE RELIEF.

### A. Threat of Irreparable Harm

"The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir.1999) (*quoting Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959)). When there is an adequate remedy at law, a preliminary injunction is not appropriate. "[F]ailure to show irreparable harm is an independently sufficient ground upon which to deny …relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 893 (8th Cir. 2013)

In this case, PIQC has not alleged any irreparable harm that would be cured or prevented by the issuance of the requested temporary restraining order. The primary harm which PIQC alleges is the loss of its organization because it has been unable to "receive the funding via reimbursements" to which it alleges it is entitled. This is a quintessentially *legal* claim, which can be effectively redressed by monetary damages should PIQC prevail and does not warrant the extraordinary *equitable* relief of a temporary restraining order. Furthermore, PIQC has an adequate remedy expressly provided for under the federal regulations governing CACFP: the administrative review process, which PIQC is currently pursuing. This court should decline to interfere with that process.

1. *PIQC does not aver any irreparable harm that would be repaired by the issuance of a temporary restraining order.*

PIQC alleges four forms of irreparable harm. None of these purported harms justify issuance of a temporary restraining order.

The first harm alleged by PIQC is "loss of an entire business or organization." This purported harm is merely a request for a monetary award masquerading as a request for injunctive relief. "Economic loss does not, in and of itself, constitute irreparable harm." *Packard*, 782 F.2d at 115. Mere "diverted resources" can be adequately compensated through money damages. *Berry v. Hennepin Cnty.*, No. 20-CV-2189 (WMW/LIB), 2020 WL 6337706, at *3 (D. Minn. Oct. 29, 2020).

While a few cases have found that the loss of an entire business has been found to constitute irreparable harm, the businesses involved in those cases were small businesses which had operated for decades and which comprised the sole livelihood of their owners. *See Mainstream Fashions Franchising, Inc. v. All These Things, LLC*, 453 F. Supp. 3d 1167, 1205 (D. Minn. 2020) (citing *Ryko Mfg. Co. v. Eden Services*, 759 F.2d 671, 673 (8th Cir. 1985)). There is no such allegation here. PIQC's own averments state that it was founded in only 2015; one of its founders, Aimee Bock (who is now under indictment for her role in the fraud perpetrated by Feeding Our Future) is no longer with the organization. PIQC Memo. at 3.

Furthermore, a nonprofit organization is fundamentally different from a business venture. For instance, nonprofits often use unpaid volunteer labor, are exempt from most taxation, and are not generally revenue-raising endeavors. *See Berry*, 2020 WL 6337706, at *3. Yet PIQC is seeking reimbursement for "millions of dollars," ostensibly to merely make "payroll for its small number of remaining employees." (Tousignant Decl. ¶ 21.) By any reasonable estimate the request is disproportionate.

The second form of irreparable harm claimed by PIQC relates to "significant reputational harm … because of MDE's … labelling PICQ as a 'terminated' sponsor." PIQC Memo. at 26-27. The supporting documentation submitted by PIQC does not support this contention.

One may fairly wonder if the reputational damage suffered by PIQC is due to the actions of MDE or is better attributed to PIQC being identified in multiple federal affidavits and indictments in connection with fraud. In light of the federal investigation, it seems that MDE's administrative determinations would have relatively little impact. Indeed, none of the evidence provided by PIQC gives any indication that MDE is the source of PIQC's woes.

The Tousignant Declaration attaches as Exhibit 1 emails purportedly from entities "ending their contracts or relationships with PIQC based on PIQC's termination from CACFP." (Tousignant Decl. ¶ 30.) This wildly overstates the case.

Exhibit 1 is comprised of four email threads, with identifying information about the senders redacted. The first, dated June 1, 2022, states that it is ending its contract with PIQC based on "today's news." The specific "news" in question is unspecified, but the most significant development during that time frame was not any action by MDE, but the release of the arrest warrant of Abdiaziz S. Farah, which set forth the involvement of Mr. Scarver, a member of the PIQC board, in the multimillion-dollar fraud scheme. While the arrest and the involvement of Mr. Scarver was widely reported in the media, to the best of MDE's knowledge, its administrative action terminating PIQC on May 27, 2022 received no media coverage.[5]

The remaining three emails comprising Exhibit 1 make no mention of PIQC's termination from CACFP or any action taken by MDE. The second email refers only to the sender "decid[ing]

---

[5] *See, e.g.*, *2nd man connected to federal child nutrition investigation charged with passport fraud*, KSTP Eyewitness News, May 23, 2022 (*available at* https://kstp.com/kstp-news/top-news/2nd-man-connected-to-federal-child-nutrition-investigation-charged-with-passport-fraud/)

to take a break from the food program" for unspecified reasons. The third does not appear to involve a termination whatsoever. The fourth indicates a "transfer to the Providers Choice" but again specifies no reason.

None of the available evidence, then, indicates that the actions of MDE had any impact on PIQC's reputation or the termination of its various contractual relationships.

PIQC also relies on Exhibit 3 to the Tousignant Declaration, which is a copy of a news article from April 20, 2022 concerning hearings in the Minnesota Senate relating to the actions taken by MDE with respect to *Feeding Our Future*. In the article, PIQC is mentioned only in passing. No reference is made in this article to any administrative action taken against it by MDE.

In short, PIQC has failed to establish that it has suffered reputational harm and has further failed to demonstrate that any reputational harm is due to the actions of MDE rather than those of its own employees and principals.

The third form of alleged irreparable harm is that of "being prevented from participating in the CACFP program after participating for many years." The authority cited—*Kroupa v. Nielsen*, 731 F.3d 813, 820-21 (8th Cir. 2013)—does not support the contention. Instead, the analysis in *Kroupa* centered on reputational harm, which is addressed above. To the extent that PIQC is contending that actual or potential administrative action constitutes irreparable harm, Congress has already provided a mechanism for any errors in the administrative process to be redressed through an appeals process defined by the state agency in question. 7 C.F.R. § 226.6(k), as discussed more thoroughly in Section II.A.2, *infra*.

The fourth and final purported irreparable harm is a "choice between breaking the law and providing appropriate services to its constituents." However, PIQC *has* no constituents. That is, PIQC has no inherent right to participate in CACFP and its participation in CACFP *must* be

terminated pursuant to 7 C.F.R. § 226 if it is found to have violated the program's operating standards. All of PIQC's litany of purported harms flow not from MDE, but from PIQC's remarkably poor stewardship of public funds. Injunctive relief sounds in equity, not law; to avail oneself of equitable relief, the party seeking a restraining order must have not engaged in wrongdoing. *See Keystone Driller Co. v. Gen. Excavator Co*., 290 U.S. 240, 245, 54 S. Ct. 146, 147, 78 L. Ed. 293 (1933) ("whenever a party who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him").

PIQC has failed to demonstrate any cognizable irreparable harms that cannot be addressed by monetary damages or the prescribed administrative review process. Furthermore, because the purported harms are the ordinary and necessary legal consequences of PIQC's misfeasance, PIQC is not entitled to the extraordinary equitable remedy of injunctive relief.

> 2. *PIQC has, and is actively pursuing, an adequate remedy to any alleged harm through the review process authorized by federal regulations.*

When there is an adequate remedy at law, a preliminary injunction is not appropriate. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). The primary form of relief sought by PIQC—funding—is the quintessential legal injury, which may be redressed by an award of damages should PIQC prevail on the merits.

Furthermore, a remedy to redress any potential error by MDE has already been supplied to PIQC: the administrative appeal process. The statute authorizing CACFP requires that termination of participation be subject to a review procedure and a fair hearing. 42 U.S.C. § 1766(d)(5)(D)(ii)(III). USDA regulations further specifies the circumstances under which administrative review must be allowed and defines the parameters for such a review process. 7 C.F.R. § 226.6(k); 2 C.F.R. § 200.342. MDE has indeed adopted an administrative review

procedure in compliance with these regulations. (Asp Decl. Ex. A.) PIQC has availed itself of the administrative review process related to the May 27, 2022 termination and withholding of payments. A hearing on the very issues before this court was conducted before a three-member panel on September 12, 2022, and the panel's decision is due to be issued by October 14, 2022. There will be no harm to PIQC if the administrative panel reverses the May 27 action terminating PIQC from operating as a CACFP sponsor. If the panel affirms, PIQC can appeal that quasi-judicial decision as a matter of right to the Minnesota Court of Appeals. *See* Minn. Stat. § 606.01. PIQC has an adequate remedy at law and if the appeal process results in a decision that MDE wrongly terminated and withheld payments, monetary damages can compensate PIQC for its losses.

PIQC does not allege that the administrative appeal process implemented by the federal regulations provides it an inadequate remedy, that it violates due process, or that it is unable to obtain appropriate relief from the appeal proceedings. Instead it simply seeks to bypass the process contemplated by the federal regulations and skip straight to once more receiving public funds without any intervention of MDE. PIQC should not be permitted to bypass the remedy prescribed by the federal regulations by means of a collateral attack in federal court.

**B. The Balance of Harms Favors MDE's Termination of PIQC's Participation.**

Once a moving party has established the possibility of irreparable harm, it must still meet its clear burden of persuasion that the harms it is likely to suffer outweigh the harms to the other parties to the litigation. *Dataphase*, 640 F.2d at 113. Thus, even if the court determines that PIQC has sufficiently proven irreparable harm, PIQC is not entitled to injunctive relief, because the balance of harms in this case favors MDE.

The reason is simple: PIQC is responsible for the loss, through misappropriation, of more than $57 million in federal hunger relief funds. The requested relief would open the door for a continuation of that fraud. The purported harms to PIQC pale in light of the fact that such a massive loss of public funds (and public *trust*) took place under PIQC's supervision and direction.

PIQC argues that the balance of harms tips in its favor, because MDE "can still defend its conduct in administrative and judicial forums and continue to use its regulatory tools to monitor all sponsor organizations and sites under CACFP." PIQC Memo. at 28. This rationale rings hollow, however, in the face of the requested relief. PIQC has specifically asked this court to dramatically curtail MDE's ability to use those very regulatory tools.

To begin with, PIQC seeks to enjoin MDE from "continuing to withhold funds from PIQC based on the May 27 termination decision and … accept, process, and approve reimbursement claims." (Prop. Order ¶ ii.) If MDE determines that a claim is fraudulent or ineligible, it does not enjoy the regulatory discretion under the proposed relief to prevent those funds from being distributed. If PIQC instead contends that it does *not* seek to deprive MDE of its statutory authority as a program administrator, then what does the proposed relief accomplish? MDE has made a determination, based on the results of a federal criminal investigation, that PIQC is unable to comply with program requirements. Only by divesting MDE of this Congressionally mandated role does the relief requested by PIQC have meaning.

Likewise, PIQC seeks to enjoin MDE from "taking any steps to deny PIQC's pending sponsor application for the 2022-2023 renewal period … based, in whole or in part, on the MDE's May 27 termination decision or on any stated reasons for the MDE's May 27 termination decision." The "stated reasons" in question concern PIQC's failure to exercise appropriate controls over millions of federal dollars. PIQC's proposed relief would constrain MDE from fulfilling its legal

duty to use its discretion to grant only those applications which conform to program standards and to deny those that do not.

PIQC's proposed relief would prevent MDE from fulfilling a Congressionally mandated duty and would open the door to continued fraud. Thus, the balance of harms favors denying PIQC's motion for injunctive relief.

**C. PIQC is Not Likely to Succeed on the Merits.**

With respect to success on the merits, MDE has followed the appropriate federal regulations in taking administrative action to terminate PIQC's participation in CACFP.

Even if MDE erred in its application of regulations, the federally mandated appeal procedure, administered by MDE, is the appropriate forum for redress. Thus, PIQC is not likely to succeed on the merits because even if its regulatory arguments are correct, federal abstention doctrines require that this court decline to grant any form of relief.

*1. MDE properly complied with the regulations governing CACFP at 7 C.F.R. § 226 and 2 C.F.R. § 200.*

PIQC argues that MDE is powerless to halt the flow of funds under CACFP despite the evidence apparent from the federal criminal investigation that misappropriated funds were funneled through PIQC to individuals who stole public funds allocated for hunger relief. This is not true. MDE has acted appropriately under applicable federal regulations in response to serious criminal allegations. PIQC cannot meet its burden of proving that the conclusions of MDE violate one or more of the provisions applicable on appeal. *Markwardt v. State, Water Res. Bd.*, 254 N.W.2d 371, 374 (Minn. 1977).

Federal regulations at 2 C.F.R. § 200.340 provides: "[t]he federal award may be terminated in whole or in part . . . [b]y the Federal awarding agency or pass-through entity, if a non-Federal entity fails to comply with the terms and conditions of a Federal award . . . ." 2 C.F.R.

§ 200.340(a)(1); see also 2 C.F.R. § 200.339(c) (allowing for the termination of a Federal award for non-compliance with program regulations). In the context of the CACFP, MDE is the pass-through entity for purposes of the Federal regulations. 2 C.F.R. § 200.1 (defining the term "[p]ass-through entity"). Regarding the withholding of payments, federal regulations at 2 C.F.R. § 200.339 provides: "[i]f the Federal awarding agency or pass-through entity determines that noncompliance cannot be remedied by imposing additional conditions, the Federal awarding agency or pass-through may . . . [w]ithhold further Federal awards for the project or program." 2 C.F.R. § 200.339(e); *see also* 7 C.F.R. 226.10(f) ("[i]f, based on the results of audits, investigations, or other reviews, a State agency has reason to believe that an institution has engaged in unlawful acts with respect to Program operations, the evidence is a basis for non-payment of claims for reimbursement.").[6] Federal regulations at 2 C.F.R. § 200.303 requires MDE-NPS to "[t]ake prompt action when instances of noncompliance are identified . . . ." 2 C.F.R. § 200.303(d).[7]

The federal affidavits reflect that these corrective actions were at best incapable of remedying the ongoing fraud and at worst a sham designed to conceal the ongoing fraud at Empire Cuisine & Market and ThinkTechAct sites, which began in around May 2020 and February 2021, respectively, and continued through January 2022. (Farah Aff. ¶¶ 10, 17.) Moreover, despite the corrective actions, PIQC allowed The Free Minded Institute—which was created and controlled by PIQC's board member, Julius Scarver—to begin its fraudulent operations under PIQC's sponsorship around October 2021. (Farah Aff. ¶ 40.)

---

[6] In the CACFP regulations, an "[i]nstitution" includes a "sponsoring organization." *See* 7 C.F.R. § 226.2's definition of "institutions."

[7] Note that 226.6(c)(3)(ii)(C) cross-references the performance standards set forth paragraphs (b)(1)(xviii) and (b)(2)(vii), which both incorporate subpart D of 2 C.F.R. § 200.

The fraud within PIQC's operations became came to light on January 20, 2022 with the unsealing of the search warrant affidavits, but became abundantly clear with the unsealing of the Farah Affidavit on May 20, 2022. The publicly available documents arising out of the federal investigation demonstrate that PIQC lacks internal controls to protect program funds from "fraud, abuse, and mismanagement." *See generally* Farah Aff., Farah Ind., and Salad Ind.); *see also* 7 C.F.R. §§ 226.1 (defining internal controls) and 226.6(c)(3)(ii)(C) (cross-referencing to Performance Standard 3, which requires the institution to have "internal controls and other management systems in effect to ensure financial accountability . . ."). These publicly available documents also show that PIQC submitted false and fraudulent claims exceeding $57 million in violation of its duties under 7 C.F.R. § 226.10(c). Based on the publicly available information—including importantly, the Farah Affidavit and the Farah Indictment, both of which identify a PIQC board member as a co-conspirator in the fraud—MDE took the correct action to immediately terminate PIQC's sponsorship and withhold payments under the authority granted to it under 2 C.F.R. §§ 200.303(d), 200.339(c) and (e), and 340(a)(1).

2. *Federal abstention doctrines require that the administrative appeal process be allowed to proceed without needless interference.*

As set forth in Section II.A.2, *supra*, the proper remedy for any alleged violation of the regulatory framework by MDE is the process created pursuant to 7 C.F.R. § 226.6(k). Even if MDE ultimately erred in its interpretation and application of federal regulations, Congress (by a grant of rulemaking authority to the USDA) has supplied an exclusive remedy in the form of a state-managed appeals process. Federal doctrines of abstention and exhaustion of remedies require the court to abstain from intervening in this process.

The U.S. Supreme Court has firmly held that the power of federal courts in equity to enjoin state officials is restricted by both express and implied statutory limitations. *Armstrong v.*

*Exceptional Child Center, Inc.*, 575 U.S. 320, 328 (2015). *Armstrong* concerned a state action alleged to violate Medicaid requirements. Congress, however, had supplied an administrative remedy via the Secretary of Health and Human Services, which the Court found to be exclusive. Thus, the Supreme Court held that the party seeking injunctive relief could not circumvent the remedy established by Congress for a state's failure to comply with the relevant provisions. "[T]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Id.* (citations omitted).

Important to this holding was the amount of discretion invested in the executive regulatory authority: the text of the statute was, to the Court, "judicially unadministrable," mandating "that state plans provide for payments that are 'consistent with efficiency, economy, and quality of care,' all the while 'safeguard[ing] against unnecessary utilization of ... care and services.'" *Id.* The Court explained that "[e]xplicitly conferring enforcement of this judgment-laden standard upon the Secretary alone establishes, we think, that Congress wanted to make the agency remedy that it provided exclusive." *Id.* (citations omitted). *See also Does v. Gillespie*, 867 F.3d 1034, 1046 (8th Cir. 2017) (holding that Medicaid Act's focus on state plans precluded other means of federal enforcement); *Clarinda Home Health v. Shalala*, 100 F.3d 526, 530 (8th Cir. 1996) (stating that suspension of payments during an ongoing fraud investigation is "nothing more than a temporary measure necessary to maintain the status quo while the necessary facts are gathered and evaluated.")

In the present case, Congress and the USDA have created a regulatory scheme that gives state agencies, in this case MDE, discretion in how to exercise its duties under the CACFP and the right of the regulated parties to seek redress of state regulatory actions through the administrative appeal process outlined in 7 C.F.R. § 226.6(k). In doing so, Congress intended the administrative

review process contained in the federal regulations to be an exclusive remedy, which this court should not circumvent.

### D. The Public Interest Strongly Weighs Against the Issuance of a Temporary Restraining Order.

The fourth and final factor to consider is the public interest. Here, the inquiry is simple: Is the public best served by dispensing additional millions of taxpayer dollars to an organization that is responsible for the fraudulent loss of at least $57 million intended for hunger relief, or would the public be better served if that organization was not further entrusted with public funds while it exhausts its administrative remedies?

The answer is rather obvious. At best, PIQC was hoodwinked by more than a dozen fraudulent claimants, including one of its own board members, in excess of $57 million; at worst it knowingly stole from hungry children and participated in a conspiracy to defraud the federal government.

PIQC argues that it is in the public interest for MDE to follow the laws and regulations of CACFP. MDE agrees; as discussed in Section II.C, *supra*, MDE believes that it has indeed followed these authorities. If MDE erred, the remedy for such an error is already in progress: redress via the administrative review process, and an appeal to the Minnesota Court of Appeals if needed. The public is *not* served by prematurely short-circuiting the federally mandated appeals process via injunctive relief in order to provide PIQC with additional millions of dollars in public funds.

### III. In the Event a Temporary Restraining Order Issues, PIQC Should be Required to Provide Security.

In an astounding argument, PIQC contends that no security bond is warranted under the circumstances should injunctive relief be granted. This is absurd, bordering on insulting—so much

so that it should call the sincerity of the entire motion into question. Perhaps PIQC stole more than $57 million, or perhaps that amount was stolen from PIQC. Either way, millions in public funds entrusted to PIQC were criminally misappropriated. PIQC failed in its duty to be financially accountable for those program funds.

If PIQC succeeds in renewing the flow of money into its coffers, MDE is highly invested in making sure that taxpayers are not *further* defrauded of hunger relief funds beyond the $57-million-plus that PIQC has already funneled to actors under indictment. Should the court issue a temporary restraining order, the court should impose a security requirement sufficient "to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained" as required by FRCP 65(c). In this case, MDE would request a dollar-for-dollar security: any funds reimbursed to PIQC (which PIQC has not specified an amount beyond "millions" (Tousignant Decl. ¶ 21)) must be guaranteed as returnable if it is later learned that the claims paid were part of the fraud or otherwise ineligible for reimbursement under the program regulations.

## CONCLUSION

For the above reasons, the Court should deny PIQC's motion for a temporary restraining order.

Dated:  September 28, 2022

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

s/ Christopher Stafford
_____
CHRISTOPHER STAFFORD
Assistant Attorney General
Atty. Reg. No. 0387971

KRISTINE K. NOGOSEK
Assistant Attorney General
Atty. Reg. No. 0304803

445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
(651) 757-1372 (Voice)
(651) 297-8265 (Fax)

kristine.nogosek@ag.state.mn.us
christopher.stafford@ag.state.mn.us

ATTORNEYS FOR DEFENDANTS

|#5331284-v1