

October 14, 2022

**Via Email and U.S. Mail**

mweinhardt@weinhardtlaw.com
kevin.conneely@stinson.com
robyn@partnersinqualitycare.org
aarontwait@hotmail.com

Mark Weinhardt, Esq.
The Weinhardt Law Firm
2600 Grand Avenue
Suite 450
Des Moines, IA 50312

Kevin D. Conneely
Stinson LLP
50 South Sixth Street
Suite 2600
Minneapolis, MN 55402

Robyn Tousignant, Interim Executive Director
Aaron Twait, President[1]
Partners in Nutrition d/b/a Partners in Quality Care
1035 West 7th Street
St. Paul, MN 55102-3827

---

[1] The CACFP Appeal Procedure Provides: "[w]hen an action is taken or proposed . . ., MDE provides notice of the action to the Institution's executive director, the Institution's chairman of the board of directors and, if applicable, responsible principals and responsible individuals." (CACFP Appeal Procedure, sec. 1, emphasis added.)

MDE-NPS addressed the May 27, 2022 Decision Letter to PIQC's then-executive director, Kara Lomen, and five then-board members listed below (*see* PIQC Ex. I-1, at 1.):

Kara Lomen, Executive Director
Jim Handrigan, Board President
Julius Scarver, Board Member
Jodie Luzum, Director of Operations
Dan Smeriglio, Claims Manager
Christine Twait, Board Secretary

Based on the latest Principal Identification Form in the appeal record (dated June 7, 2022), five of the named recipients (all except Jodie Luzum) are no longer on PIQC's board, and Aaron Twait is identified as a new board member with the title "President" (presumably equivalent to "chairman of the board of directors"). In addition, the actions taken in the May 27, 2022 affect only PIQC the intuition, not its individual principals or individuals, because it does not have a (proposed) disqualification component. Therefore, the Appeal Decision is addressed to PIQC and these two representatives instead.

**Re: Partners in Nutrition d/b/a Partners in Quality Care's Consolidated Appeals of MDE's May 27, 2022 Decision Terminating Agreement and Withholding Federal Award Payments, and the Related June 17, 2022 Site Applications Denial Decision, Child and Adult Care Food Program**

## BACKGROUND

The Child and Adult Care Food Program (CACFP) is administered in the state of Minnesota by the Minnesota Department of Education – Nutrition Program Services (MDE-NPS). On June 10, 2022, Partners in Nutrition d/b/a Partners in Quality Care (PIQC) appealed MDE-NPS's May 27, 2022 decision terminating PIQC's CACFP agreement and withholding all further federal award payments to PIQC. On June 27, 2022, PIQC appealed MDE-NPS's July 17, 2022 decision denying 213 site applications for CACFP Program Year ("PY") beginning October 2022.

MDE-NPS's May 27, 2022 letter states that the decision to terminate PIQC's CACFP agreement and withhold all federal award payments is "an appealable action." (PIQC Ex. A.) MDE-NPS's June 17, 2022 letter states that the June 17, 2022 decision is "not a separate appealable action" because it "stems from the immediate termination [decision] taken under 2 CFR 200.339." (PIQC Ex. I-2.) MDE provided PIQC with the appeal procedure document as attachments to its notices to PIQC and its counsel. PIQC requested that its appeal of the June 17, 2022 decision be consolidated with its appeal of the May 27, 2022 decision, which the Appeal Panel granted.

On July 7, 2022, MDE issued a hearing notice on the appeal setting the hearing for July 25, 2022 at 1 p.m. (*See* July 7, 2022 Notice of Appeal.) On July 14, 2022, PIQC's counsel requested that the hearing be rescheduled due to counsel's scheduling conflict with the understanding that the due date for the Appeal Panel to issue a decision in this matter be extended by the appropriate number of days necessary to accommodate counsel's rescheduling request.

On July 21, 2022, the MDE Appeal Panel issued a First Amended Notice of hearing, finding good cause to grant this request by rescheduling the hearing for August 3, 2022, at 3 p.m. and calculating the new decision issuance due date accordingly to fall on August 12, 2022. (*See* July 21, 2022 First Amended Notice of Appeal.) On July 26, 2022, MDE-NPS informed the MDE Appeal Panel that its representative Emily Honer would not be available during the week of August 1 including the rescheduled hearing date, and requested that a new hearing date be set for the week of August 8, 2022 or later. On July 27, 2022, the MDE Appeal Panel proposed two additional hearings dates.

On July 29, 2022, PIQC's counsel communicated to MDE-NPS Appeal Panel via email that he would be unavailable between August 5 and 24, 2022, and consented to any extension of the decision issuance due date as necessary to accommodate rescheduling of the hearing. MDE-NPS's counsel indicated that she would not be available August 25 through September 6, 2022. MDE Appeal Panel reached out to both sides with proposed scheduling options to determine a feasible date and time for the rescheduled hearing. By consensus via email correspondence, the final hearing date was set for September 12, 2022, at 3:30 p.m., and the Appeal Panel's decision is due on or before October 14, 2022. (*See* August 16, 2022 First Amended Notice of Appeal.)

Hearing on this appeal took place on Monday, September 12, 2022, at 3:30 p.m. At the hearing, Attorney Mark Weinhardt[2] appeared and spoke as counsel for PIQC. Emily Honer, Supervisor of Business Operations and Support Services, and Assistant Attorney General Kristine Nogosek, appeared and spoke on behalf of MDE-NPS. PIQC's Interim Executive Director, Robyn Tousignant; MDE's General Counsel, Eric Taubel; MDE's Director of Nutrition Programs, Monica Herrera; MDE-NPS's CACFP Supervisor, Jeanette Johnson-Reed; and MDE's Appeal Coordinator, Allison Loomis, also appeared at the hearing but did not make statements. Assistant Attorney General Kathleen Reitz appeared as counsel for MDE's Appeal Panel.

MDE's final determination follows.

## DOCUMENTS REVIEWED

The CACFP Appeal Procedure provides: "[i]n order to be considered, written documentation must be submitted not later than 30 days after receipt of the notice of action." MDE-NPS issued its termination of CACFP permanent agreement and withholding of federal award payments notice on May 27, 2022 ("May 27, 2022 Letter"). (*See* PIQC Ex. I-1.) On June 10, 2022, PIQC submitted its Notice of Appeal challenging the agency decision set forth in the May 27, 2022 Decision Letter. (*See* PIQC Ex. I-3.)

On June 17, 2022, MDE-NPS issued a notice denying all 213 pending site applications for CACFP PY2022 beginning October 2022 ("June 17, 2022 Decision Letter"), which action, the notice states, "stems from the immediate termination taken under 2 CFR 200.339 and the appeal of these site denials are linked directly to the immediate termination." (*See* PIQC Ex. I-2.) On June 27, 2022, PIQC submitted another Notice of Appeal for administrative appeal of the agency decision set forth in the Denial Letter. (*See* PIQC Ex. I-4.) PIQC requested that the appeals of the May 27, 2022 Decision Letter and the June 17, 2022 Decision Letter be consolidated and that a hearing be held thereon. (*Id*.)

After multiple efforts to reschedule and coordinate availability, MDE set the matter for a consolidated hearing for September 12, 2022, at 3:30 p.m. (*See supra*, at 2.)

The Appeal Panel considered both sides' pre-hearing written submissions in reaching this Panel Decision. Because of the volume of these submissions, they are listed at the end of this determination letter and are incorporated by reference.

## FINDINGS OF FACT

1. Responsibility for correctly implementing the CACFP is given to state agencies. In Minnesota, MDE-NPS is the division in the responsible state agency designated to implement CACFP programming.

2. Institutions, including sponsoring organizations ("sponsors"), sign agreements with the relevant state agency and are responsible for overseeing program operations. *See generally* 7 C.F.R. §§ 226.6(b), 226.15, 226.16. Sponsors receive federal reimbursement from the state agency to cover administrative and operating costs of preparing and serving meals to eligible children and adults. 7 C.F.R. § 226.4(a). Sponsors are subject to detailed regulatory requirements regarding operations and are assessed against

[2] Mr. Weinhardt retroactively updated his *pro hac vice* request with current information of substitute Minnesota liaison counsel.

three core performance standards: financial viability and financial management, administrative capability, and program accountability. 7 C.F.R. § 226.6(b)-(c) (cross-referencing standards).

3. PIQC and MDE entered into a CACFP permanent agreement ("agreement") on November 6, 2015. The agreement provides: "MDE will disallow any portion of a claim for reimbursement and recover any payment to [PIQC] that is not properly payable." (PIQC Ex. K, Agreement, sec. 6.) The agreement sets forth, *inter alia*, the following obligations of PIQC as a sponsor:

> *    *    *
>
> **(A) General Requirements**
>
> *    *    *
>
> Provide adequate supervisory and operational personnel for management and monitoring of the Program.
>
> *    *    *
>
> Operate a nonprofit food service using all of the income solely for the operation or improvement of the food service, except program income shall not be used to purchase land, to acquire or construct buildings, or to make alterations of existing buildings.
>
> *    *    *
>
> Comply with all regulations issued by USDA, all instructions and handbooks issued by USDA to clarify or explain existing regulations, and all instructions and handbooks issued by MDE.
>
> *    *    *
>
> Allow representatives of MDE, USDA and other federal or state officials to visit [PIQC] and sponsored sites . . . announced or unannounced. All program records must be available at [PIQC]'s office or site locations during these visits.
>
> *    *    *
>
> **(B) Meal Service**
>
> [PIQC] agrees to:
> - Provide to participants, including any infants enrolled for care, the daily meal services requested by Sponsoring Organization and approved by MDE.
> - Serve meals to participants that meet the applicable meal pattern requirements in 7 CFR[3] 226.20 and other Program requirements.
> - Meet health and sanitation standards for storing, preparing, and serving food.
> - Maintain necessary facilities for storing, preparing, and serving food.
>
> If meals claimed for CACFP reimbursement are provided under contract from a food service management (catering) company, . . . [PIQC] agrees to . . . [r]etain responsibility for ensuring that the food service operation conforms to this agreement.

[3] Where the citation format of "CFR" is used in direct or block quotes, they are not changed to "C.F.R."

* * *

**(D) Claims for Reimbursement**

* * *

[PIQC's c]laims for reimbursement must meet the following requirements: . . .
- Meals claimed have met Program requirements including meal pattern requirements in 7 CFR 226.20 as documented by menus and any other nutritional records required by MDE.
- Meals claimed for reimbursement were served at the meal services (breakfast, lunch, supper, snack) approved by MDE for the sites, and served to participants who are enrolled in and participating in the care program at the time of the meal service, except that the enrollment requirement does not apply to outside-school-hours care centers.
- At child care sites, meals were served to children 12 years of age or younger, or up to age 19 at at-risk after-school care programs, or migrant children up to 15 years of age, or children of any age with a disability. At adult care sites, meals were served to functionally impaired adults and adults 60 years of age and older.
- Staff counted and documented the number of reimbursable meals served to participants with actual time-of-service meal counts for each daily meal service, except for family child care homes, which may document the number of reimbursable meals by the end of the day on which the meals were served.
- The number of meals claimed for any one daily meal service does not exceed the site's authorized capacity.
- For meals served at a for-profit center, Sponsoring Organization has documented that at least 25 percent of participants enrolled at the site that month are from low-income households as defined by Program requirements for for-profit sites, before claiming reimbursement for the site.

[PIQC] acknowledges that:
- Failure to submit accurate claims will result in recovery of any overclaims by MDE and may result in the withholding of payments and suspension or termination from the Program.
- Program regulations provide for fines of up to $10,000 or imprisonment of up to five years, or both, for a person who embezzles, willfully misapplies, steals, or obtains by fraud, CACFP funds or a person who receives, conceals, or retains such funds to his use or gain knowing such funds to have been embezzled, willfully misapplied, stolen, or obtained by fraud.

**(E) Financial and Administrative Responsibility**

[PIQC] accepts final financial and administrative responsibility for management of a proper, efficient, and effective food service and agrees to:

* * *

- Expend and account for funds in accordance with 7 CFR 226, USDA-FNS Instruction 796-2 ("Financial Management in the Child and Adult Care Food Program"), and 7 CFR parts 3015, 3016, and 3019.
- Maintain appropriate and effective management practices to ensure that Program requirements are met, including having adequate supervisory and operational personnel for management and monitoring of the Program.
- Maintain internal controls and other management systems to ensure fiscal accountability . . .

* * *

**(F) Records**

[PIQC] agrees to establish recordkeeping procedures and to collect and maintain all required Program records. Failure to maintain such records shall be grounds for the denial of reimbursement for meals served during the period covered by the records in question and for the denial of reimbursement for costs associated with such records. . . .

* * *

**(N) Additional Requirements for Multi-Site Sponsoring Organizations**

* * *

[PIQC] accepts final administrative and financial responsibility for food service operations in all sponsored sites.

* * *

(*Id*. sec. 7.)

**I. PIQC's Earlier Instances of Incompliances from Administrative Reviews that Put MDE-NPS on Alert**

4. According to MDE-NPS, since it became a sponsor in November 2015, PIQC began sponsoring multiple sites in mid-2016. (*See* MDE-NPS Summary.) In April 2016, MDE began its first Administrative Review of PIQC's operation of the CACFP, which concluded in August 2016. (*Id*.) This Administrative Review resulted in findings of four areas needing corrective action, as follows (the actual findings extend over 4 pages; the below chart is a summary):

| **Program Areas** | Require Corrective Action | Potential Follow-up Review |
|---|---|---|
| Sponsoring Organization Provisions | X | |
| Supporting Documents and Training | X | |
| Menus/Meal Pattern Requirements | X | |
| Meal Service (observed) | X | |

(MDE-NPS Att. 18, at 2.)

5. In 2017, MDE conducted a follow-up Administrative Review. This review finished in June 2018 with 27 findings needing corrective action, some of which also required fiscal action. The findings included, for instance, failing to check sites and their operators against the National Disqualified List (NDL);

conducting sponsor-monitoring visits incorrectly; meal claim documentation not matching the claim or meals served; incorrect procurement of vended meal contracts, among others. (*See generally* MDE-NPS Att. 19.) The actual findings extend over 41 pages; the below chart is a summary:

| **Program Areas** | Require Corrective Action | Findings Require Fiscal Action, Appealable | Potential Follow-up Review |
|---|---|---|---|
| Household Income Statement Approval and Reporting Process | X | Finding 3 | X |
| Child Enrollment Forms | X | | X |
| Attendance and Meal Count Claim Verification | X | Finding 5 | X |
| Procurement | X | | X |
| Supporting Documents and Training | X | | X |
| Civil Rights | X | | X |
| For-Profit Program | X | | X |
| Adult Day Care Program | X | | X |
| Menus | X | Finding 16 | X |
| Food Quantity and Production | X | | X |
| Meal Service Observed | X | | X |
| Sanitation | X | | X |
| Multi-Site Sponsor Monitoring | X | | X |
| Multi-Site Sponsor Management Plan | X | | X |

(MDE-NPS Att. 19, at 3.)

6. MDE-NPS represents that PIQC submitted a corrective action plan, presumably in response to the Administrative Review, which MDE accepted in 2019. (*See* MDE-NSP Summary, at 1.) MDE-NPS states that PIQC was scheduled for another Administrative Review in 2020 when the global COVID-19 pandemic occurred. In response to the pandemic, the United States Department of Agriculture (USDA) issued a serious of waivers and guidance. (*Id.*)

7. Regarding these waivers and guidance, PIQC states:

> The bottom line is that the USDA waivers and accompanying guidance made it easier for sites to distribute meals to underprivileged children. But documentation requirements to support claims for reimbursement remained unchanged. And sponsor monitoring requirements were not altered. This created an environment in which the program was ripe for abuse.

(PIQC Appeal Statements, at para. 19.)

8. MDE-NPS states that, in late 2020, PIQC began submitting hundreds of new site ID requests in the Cyber-Linked Interactive Child Nutrition System (CLiCS) which is the MDE platform on which institutions apply for participation in and claim reimbursements from the federal Child Nutrition Programs. (*Id.*) according to MDE-NPS, the agency provided ample guidance and technical assistance through bulletins, emails and

webinars. (*Id*.) MDE-NPS states that PIQC also received significant targeted technical assistance from the agency not only through MDE-NPS's response to PIQC's particular questions but primarily through MDE-NPS's responses PIQC's hundreds of applications. (*Id*.)

9.  MDE-NPS states that PIQC ignored the agency's guidance and technical assistance and continued to submit defective applications under both CACFP and the Summer Food Service Program (SFSP). (*Id*.) MDE-NPS represents that, in December 2020, MDE denied 228 of PIQC's SFSP site applications on the ground that PIQC failed to follow SFSP federal regulations. (*Id*.)

10. On March 31, 2021, after reviewing PIQC's budget and applications, and various complaints against PIQC, MDE-NPS declared PIQC seriously deficient for failure to conform with CACFP's three performance standards ("Serious Deficiency Letter"). (MDE-NPS Att. 15.) The Serious Deficiency Letter also states that PIQC's meal claims would be held on "stop pay" until the claims can be validated by the agency, "which [would] be determined by [PIQC's] submission of [its] corrective action plan and meal validation documentation." (*Id*.)

11. On April 28, 2021, PIQC submitted a Corrective Action Plan (CAP) in an effort to obtain a deferral of the agency's serious deficiencies findings. (MDE-NPS Att. 20.)

12. On April 29, 2022, MDE-NPS denied PIQC's pending site applications, stating that it "cannot approve an application until successful corrective action corrects the Serious Deficiency." (MDE-NPS Att. 26.)

13. On June 16, 2021, MDE-NPS accepted PIQC's submitted CAP and temporarily deferred the March 31, 2021 serious deficiencies findings. (MDE-NPS Att. 16.) The deferral letter states, in relevant part:

> . . . if, in any subsequent review, any of these serious deficiencies have not been fully and permanently corrected, [MDE] will <u>immediately</u> propose to terminate [PIQC's] agreement and propose to disqualify Kara Lomen, Executive Director, and Jim Handrigan, Board President, <u>without any further opportunity for corrective action</u>.

(*Id*., at 2, emphasis added.)

14. MDE-NPS represents that, soon after the temporary deferral, PIQC began operating the SFSP for summer 2022, continued operating the CACFP, and began submitting new CACFP applications in October 2022. (*See* MDE-NPS Summary, at 2.) According to MDE-NPS, because the agency continued to have concerns, it conducted bi-weekly meetings with PIQC starting July 2021 to provide further targeted technical assistance, address concerns and request clarifying information or documentation. (*Id*.) MDE-NPS states that one of its "largest concerns" was the number of meal claims submitted by PIQC for reimbursement as the numbers seemed unrealistic given that PIQC claimed to be serving around 600,000 children when there are only approximately 850,000 children residing in the entire State of Minnesota. (*Id*.)

15. PIQC remains adamant that it was indeed serving that the many children and that the "enormous increases in the amount of money flowing around [at PIQC]" was due to "an absolutely exploding population need because you don't have kids going to school anymore in order to have their meals

supplied to them [during the pandemic.]" (Sept. 12, 2022 Hrg. Tr. 24:4–25:2.) During the hearing, the below exchange took place regarding PIQC's 2021 CAP and the reported activities reflected in the federal affidavits, where the Appeal Panel questioned PIQC's internal control, management, and monitoring, and in which PIQC represented to the Appeal Panel that, PIQC does not expressly deny that any of the reported fraud had taken place, but maintains that it can demonstrate PIQC was "not a knowing participant or a reckless participant in any fraud" if the matter were contested in court one day.

> **[Panel Member] MS. ANDERSON:** . . . In the June 16, 2021, MDE-NPS letter regarding serious deficiency deferment, it appears PIQC had a corrective action plan that included improved management plans and internal controls to address key issues previously identified in MDE -NPS's serious deficiency determination.
>
> What were those plans and if they were implemented properly, how did we end up here? In other words, how did PIQC fail to catch the fraudulent activities reflected in the FBI affidavits and claimant had no knowledge despite all the alleged corrective efforts?
>
> **[PIQC's Counsel] MR. WEINHARDT:** So there's a lot there. Let me start with this: <u>We vehemently disagree with the conclusions that are being drawn from the FBI affidavits.</u> They are the very beginning of a lengthy process in which the people who are accused in those affidavits are going to have a day in court and an ability to defend themselves, and none of that has happened yet.
>
> <u>And PIQC has never been accused of criminal or fraudulent action by anybody in any of those affidavits. And we believe that, were that to happen and were PIQC to have a day in court, it would demonstrate that it was not a knowing participant or a reckless participant in any fraud</u>. That's the first thing that I wanted to make clear about that.
>
> But in addition to that, there are a number of different things that were contained in the corrective action plan, but <u>the serious deficiencies and the corrective action plan dealt with different issues than are happening right now</u>, and one of the thing that's important about that is that, for a termination to be proposed based on a serious deficiency, it must be the same serious deficiency that was actually subject of a notice and subject of an opportunity for corrective action.
>
> One of the reasons this Panel reversed the January 31 decision was that it attempted to leverage previous corrective actions and previous deficiency notices that were different from what's being alleged here.
>
> The third thing that I will say is that—and I didn't personally, but I can say this on behalf of my clients -- one has to live through it to understand the

> cataclysmic changes that happened to the CACFP program and happened as a matter of desperate need as a result of the COVID pandemic.
>
> And so when we're talking about things that happened in 2021, that is still the second summer where the programmers and the sites and the sponsors and, frankly MDE itself, are all trying to get their legs underneath them to try to understand how to deal with an absolutely exploding population need because you don't have kids going to school anymore in order to have their meals supplied to them.
>
> That caused enormous increases in the amount of money flowing around, we think that that caused enormous increases in very legitimate expenditures, but also left marginal additional funds left over for some of these vendors, **like Empire Cuisine and so forth that people are now labeling as fraud**[4] when, in fact, they were legitimate expenditures under the program, but under very different economic conditions. That's what I would say in response to your question.

(Sept. 12, 2022 Hrg. Tr. 22:10–25:2, emphasis added.)

## II. The Ongoing Federal Investigation into Massive Fraud of the Child Nutrition Programs in Minnesota Where PIQC is Implicated

### *A. Federal Bureau of Investigation Affidavits Unsealed on January 20, 2022*

16. On January 20, 2022, the Federal Bureau of Investigation (FBI), the U.S. Marshalls, the United States Postal Service (USPS), and the Internal Revenue Service (IRS) made public their ongoing federal investigation into a massive fraud scheme surrounding the USDA Child Nutrition Programs in Minnesota. (MDE-NPS Summary, at 2.) Over 200 officers conducted searches based on two dozen search warrants. (*Id.*) Some of those search warrants and supporting affidavits that came to MDE-NPS's attention revealed five entities created for the purpose of defrauding the government have been actively transacting Child Nutrition Programs business with PIQC. (*Id.*; *see also* MDE-NPS Atts. 1, 2, 3.) The five entities suspected of fraud that appear to have ties with PIQC are:

- Empire Cuisine & Market LLC
- Safari Restaurant
- ThinkTechAct
- Mind Foundry
- S&S Catering

(MDE-NPS Summary, at 2.)

17. One of the three January 20, 2022 affidavits ("Brooklyn Park Affidavit") known to MDE-NPS and PIQC early on states that PIQC reportedly paid approximately $1.3 million in Child Nutrition Programs funds to

[4] *See infra*, Findings of Facts, at para. 19–22.

S&S catering in 2020 and 2021 in the fraud scheme involving Feeding Our Future and other organizations under investigation:

> 81. S & S Catering LLC participated in the Federal Child Nutrition Program under the sponsorship of both Feeding Our Future and Partners in Nutrition. S & S Catering is a for-profit company that participated in the Federal Child Nutrition Program both as a vendor that provided food to sites that claimed to be serving meals to underprivileged children and as a site that itself served meals to children.
>
> * * *
>
> A review of these accounts shows that in 2020 and 2021 S & S Catering received more than $3.2 million in Federal Child Nutrition Program funds directly from Feeding Our Future and another $1.3 million from Partners in Nutrition. As discussed above, bank records show that S & S Catering also received millions of dollars from other companies that participated in and received money from the Federal Child Nutrition Program, including Youth Inventor's Lab, Academy for Youth Excellence, Youth High Educational Achievement, and Advance Youth Athletic Development. In all, S & S Catering received more than $13.8 million in Federal Child Nutrition Programs funds in 2020 and 2021.

(MDE-NPS Att. 3, at paras. 79–85, emphasis added.)

18. Another January 20, 2022 affidavit ("Savage Affidavit") states that PIQC submitted SFSP applications in which Empire Cuisine and Market LLC ("Empire Cuisine & Market") is identified as the vendor and in which Kara Lomen, the former Executive Director of PIQC, signed the original contract with Empire Cuisine & Market. (MDE-NPS Att. 2, at para. 54.) From May 2020 to November 2021, PIQC paid Empire Cuisine and Market approximately $11,065,498 in reimbursement which was fraudulently obtained and then used for illegal porpoises. (*Id*., at para. 57.) The following excerpts give a glimpse of the scale of the reported fraud scheme where PIQC's name is mentioned multiple times:

> 22. On or about January 7, 2022, FBI surveillance teams observed an individual who appeared to be Abdiaziz Farah[5] leave Subject Premises 3 at approximately 10:00 am in a black GMC Sierra pick up truck, license plate GLX-951. Minnesota Department of Motor Vehicle records show that this truck is registered to Abdiaziz Farah. The truck proceeded to the multiple addresses, including the office of Partners In Quality Care, a sponsoring company from which Abdiaziz Farah's companies received Federal Child Nutrition Program funds.
>
> * * *

[5] *See infra*, MDE-NPS Att. 5, Farah Affidavit, in support of the arrest of Abdiaziz Farah.

47. ThinkTechAct Foundation participated in the Federal Child Nutrition Program via the sponsorship of both Feeding Our Future and, as Mind Foundry, under the sponsorship of Partners in Quality Care. . . .

* * *

49. . . . [ThinkTechAct] received approximately $14,292,507 from Partners in Quality Care and approximately $2,394,100 from Feeding Our Future. . . .

50. . . . bank records show that the funds were transferred to other accounts that appear to function essentially as shell companies designed to help launder fraudulently obtained and misappropriated Federal Child Nutrition Program funds. In all, approximately $11.6 million was transferred to companies owned or controlled by the owners of Empire [Cuisine and Market] or other co-conspirators.

78. A review of bank records shows that all of the money used to obtain this cashier's check was derived from fraudulently obtained Federal Child Nutrition Program funds received by ThinkTechAct Foundation or Empire Enterprises LLC.

> 79. This check was used to purchase two lakefront lots on Prior Lake. These lots are located in an upscale residential neighborhood on Prior Lake. According to Minnesota Department of Revenue records, Empire Enterprises LLC purchased these lots on or about July 26, 2021, for $1.1 million in cash.

(*See generally*, MDE-NPS Att. 2, underlined emphasis added, yellow highlight added to PIQC's name in the graphic illustration.)

19. A third affidavit ("Rosemount Affidavit") does not expressly mention PIQC, but details Empire Cuisine and Market's role in the reported federal Child Nutrition Programs fraud. The Brooklyn Park Affidavit and Rosemount Affidavit link Empire Cuisine and Market to PIQC. (*See* MDE-NPS Att. 1, *see also supra* Brooklyn Park Affidavit and Savage Affidavit.)

***B. Arrest Warrant Affidavits That Became Known to MDE-NPS on April 21 and May 20, 2022***

20. Then, on April 21 and May 20, 2022, two more incriminating affidavits came to light. These two affidavits were issued in support of the arrest warrants of Abdiaziz Farah and Mohamed Ismail of Empire Cuisine & Market, one of the five entities listed above. (MDE-NPS Atts. 4[6], 5.) For instance, the May 20, 2022 affidavit ("Farah Affidavit") states:

> 36. . . . As explained below, The Free Minded Institute was created and controlled by Individual J.S.[7], who is a member of the board of directors of Partners in Quality Care, d/b/a Partners in Nutrition, the entity that sponsored Empire Cuisine & Market's participation in the Federal Child Nutrition Program.
>
> *   *   *
>
> 40. Approximately two months after being formed, The Free Minded Institute began receiving Federal Child Nutrition Program funds from Partners in Nutrition. Bank records show that The Free Minded Institute received approximately $2,496,989 in Federal Child Nutrition Program funds from Partners in Nutrition between approximately October 2021 and January 2022. All of the money deposited into The Free Minded Institute's bank account was Federal Child Nutrition Program funds from Partners in Nutrition.
>
> 41. Bank records show that The Free Minded Institute sent almost all of the Federal Child Nutrition Program funds it received from Partners in Nutrition to Empire Cuisine & Market or its owner, FARAH. . . .
>
> *   *   *

[6] *See infra*, Conclusions of Law, Subsection V.

[7] PIQC acknowledges that J.S. refers to Julius Scarver, who was a member of PIQC's board of directors until June 7, 2022. (PIQC Appeal Statements, at para. 24.)

> 43. For his part, Individual J.S. withdrew approximately $13,400 in cash from The Free Minded Institute's account between November 2021 and February 2022. He also spent approximately $3,500 on restaurants and meals, more than $900 on GoPuff.com, an online food and alcohol delivery company, and more than $ 1,000 at liquor stores
>
> *     *     *
>
> 47. [Two different invoices for the reimbursement same 150,000 meals where the second invoice] represented approximately 5 percent less than the invoice that The Free Minded Institute submitted to Partners in Nutrition, suggesting that Individual J.S. was going to be keeping approximately 5 percent of the Federal Child Nutrition Programs received from Partners in Nutrition.

(MDE-NPS Att. 5, at paras. 36–47.)

21. PIQC denies the statement in paragraph 38 of the Farah Affidavit where it states Scarver served as an employee and a board member of PIQC at the same time (*see* PIQC Appeal Statements, at para. 25), but has not denied the more critical aspects of the sworn statements describing that Scarver reportedly receiving apparent kickbacks and was involved in causing millions of federal funds to flow through PIQC to shell companies such as The Free Minded Institute which then misappropriated the funds by unlawful means and spent them for illegal purposes. (*See generally*, PIQC Appeal Statements.) Instead, PIQC attempts to segregate Scarver from PIQC the entity, portraying Scarver as a rogue former employee/board member of an otherwise upstanding institution.

22. PIQC alleges, in relevant part:

> <u>Relying on Mr. Scarver's representations</u> to PIQC [via a text message], PIQC informed MDE of its understanding that Mr. Scarver did not receive remuneration associated with his role at Free Minded Institute.

(PIQC Appeal Statements, at para. 25, emphasis added.) At the hearing, PIQC's counsel answered the Appeal Panel's question regarding this statement regarding Scarver's representation to PIQC via a text message:

> **MS. ANDERSON:** Okay, thank you. PIQC states on page 11 of its appeal statement, relying on Mr. Scarver's representations to PIQC, PIQC informed MDE of its understanding that Mr. Scarver did not receive remunerations associated with his role at Free Minded Institute.
>
> If PIQC simply took Mr. Scarver's words at face value, did that not reflect a lack of internal controls to protect funds from fraud, abuse and mismanagement from PIQC?

**MR. WEINHARDT:** PIQC deals with hundreds of sites and those sites are independent entities and PIQC isn't able to audit the books of each and every one of them. And at the time that any of these events was going on, PIQC had know[*sic*] reason to view Mr. Scarver's agency any different any other. So PIQC relied in good faith, as it does in dealing with hundreds of sites, on the information that is provided to them.

Mr. Scarver was, by the way, fully separate from PIQC as an employee and had no authority to manage funds, approve claims, or do anything like that before any of the things involving The Free Minded Institute occurred, before the creation of that institute or before the flow of any funds into that institute.

If, theoretically and with clairvoyance, MDE had said, well, one of the things in your corrective action plan you have to do is you can't let Julius Scarver work there so that he has got any ability to control any of the funds, that actually happened before any of this Free Minded Institute activity occurred.

(Sept. 12, 2022 Hrg. Tr. 20:17–21:24.)

## III. PIQC's Reported Connection with the Federal Child Nutrition Programs Fraud Scheme Revealed by the Affidavits

23. As illustrated in the above select paragraphs, the May 20, 2022 affidavit describes how PIQC's board member and former site monitor, Julius Scarver, as the founder and authorized representative of The Free Minded Institute reportedly defrauded the government through its dealings with PIQC. (*Id*.) The Free Minded Institute is under a contract to provide reimbursement to Empire Cuisine & Market (MDE-NPS Att. 17, at 17.) PIQC is reported to have paid meal reimbursements to Empire Cuisine and Market, which in turned misappropriated the funds by using them to purchase real estate, cars, liquor, other luxury goods, and pay kickbacks. (*See generally* MDE-NPS Att. 5.)

24. In the Principal Identification Form submitted by PIQC to MDE-NPS on August 29, 2021, PIQC identified the following responsible principals:

- Jim Handrigan, Board President
- Christine Twait, Board Secretary
- <u>Julius Scarver, Board Treasurer</u>
- <u>Kara Lomen, Executive Director</u>
- Jodie Luzum, Director of Operations

(MDE-NPS Att. 24, emphasis added.)

25. The form also states "No" when asked whether Julius Scarver received compensation for serving on PIQC's board. (*Id*.) While the federal affidavits report a more in-depth involvement by Scarver, Kara Lomen's name is also identified as the person who signed the contract with Empire Cuisine & Market as the Executive Director of PIQC. (*See* MDE-NPS Att. 2, at para. 54.)

26. According to MDE-NPS, Julius Scarver was listed as a Site Monitor of PIQC from October 2018 to June 30, 2021. (*See* MDE-NPS Summary, at 5.) Scarver was then listed by PIQC as a board member from August 2021 to May 2022 (*see* MDE-NPS Att. 24), which was after Scarver created The Free Minded Institute on July 29, 2021. PIQC states that Scarver "worked as site support at PIQC from September 5, 2017, to May 28, 2021, when he left the employ of PIQC." (PIQC Appeal Statements, at para. 25, citing PIQC Ex. G-3.) PIQC represents that Scarver then joined the Board of Directors of PIQC in August 2021. (*Id*. citing PIQC Ex. G-4, G-5.)

27. MDE-NPS represents that, on August 15, 2021, Kara Lomen began creating sites for The Free Minded Institute and that, in October 2021, she began submitting claims for The Free Minded Institute under PIQC's sponsorship. (*See* MDE-NPS Summary, at 5.) MDE-NPS states that the agency first became aware of The Free Minded Institute on November 24, 2021 when the agency reached out to Kara Lomen for information regarding this organization (MDE-NPS Att. 28.) In the email, MDE-NPS's Emily Honer stated to Kara Lomen: "FMI is not a sponsor of CACFP with MDE. FMI is listed as the name on a number of sites that your organization sponsors as sites." (*Id*.) To which Lomen responded, among other things, "Yes, that is an afterschool program that works under our sponsorship. They have a few active sites and a few pending sites with us." (*Id*.)

28. After the January 20, 2022 search warrant affidavits were made public, on February 11, 2022, PIQC was asked to explain to MDE-NPS regarding a former board member that had resigned over a year ago but whose information remained on PIQC's Principal Identification Form. (MDE-NPS Att. 13-1.) In her effort to provide an explanation, PIQC's Christine Twait submitted an updated Less-Than-Arms-Length description which confirms Julius Scarver's dual roles as the founder of The Free Minded Institute and simultaneously on the board of PIQC:

> Julius Scarver, board member, is also a board member of the Free Minded Institute. <u>The Free Minded Institute</u> has afterschool programs that participate in the CACFP under the sponsorship of Partners in Quality Care. <u>Julius is not compensated for serving on their board nor compensated for serving on the Partners in Quality Care Board.</u>

(MDE-NPS Att. 13-2, emphasis added.) Although this form represents that Julius Scarver was not receiving compensation from either The Free Minded Institute or PIQC, the Farah Affidavit's statements suggest that, while serving in his dual roles for these two organizations, Scarver had two invoices with different dollar amounts prepared for the reimbursement of the same 150,000 meals with which he would keep approximately 5% of the Federal Child Nutrition Programs funds received from PIQC. (MDE-NPS Att. 5, at paras. 36–47.)

29. On June 7, 2022, PIQC removed Julius Scarver from the board in response to the affidavits, as shown by PIQC's updated organizational chart. (MDE-NPS Att. 21.) The chart shows Robyn Tousignant as the interim Executive Director and Kara Lomen as the Director of Administration. (*Id*.) On June 10, 2022, PIQC notified MDE-NPS that Robyn Tousignant had become PIQC's interim Executive Director, and that PIQC had also elected a new board president and added new board members to the Board of Directors. (MDE-NPS Att. 27.)

## IV. MDE-NPS's May 27, 2022 Decision Letter and June 17, 2022 Decision Letter

30. On May 27, 2022, seven days after the Farah Affidavit was made public, MDE-NPS issued a letter that states, *inter alia*, the following:

> Effective May 27, 2022, the Minnesota Department of Education (MDE) is terminating Partner in Nutrition dba Partner in Quality Care's (PIQC) permanent agreement and all pending site applications under the Child and Adult Care Food Program (CACFP) due to affidavits unsealed by the United States District Court for the District of [Minnesota] as part of the federal investigation into the scheme to defraud the federal government using the Child Nutrition Programs in Minnesota and the arrest of two targets of the federal investigation for fraudulently obtaining a passport from the U.S. State Department.
>
> Effective May 27, 2022, MDE will also withhold all payments in response to the ongoing noncompliance based on the new information released. This action is taken based on MDE's determination that the role of PIQC in the federal food aid fraud, as demonstrated by the federal affidavits, cannot be corrected by imposing additional conditions found in 2 CFR 200.208.
>
> These actions are being taken with the authority under 2 CFR 200:
>
> - CFR 200.339 Remedies for noncompliance
>   - 2 CFR 200.339(e) Withhold further Federal awards for the project or program.
> - 2 CFR 200.340 Termination
>   - 2 CFR 200.340(a)(1) By the Federal awarding agency or pass-through entity, if a non-Federal entity fails to comply with the terms and conditions of a Federal award;
>
> * * *
>
> Although CACFP federal regulations under 7 CFR 226 support these actions, MDE is terminating and withholding payment under 2 CFR 200. The 2 CFR 200 federal regulations apply to the administration of all federal programs including CACFP and SFSP.
>
> * * *

(PIQC Ex. I-1.)

31. On June 17, 2022, echoing the May 27, 2022 Decision Letter's statement that MDE-NPS was "terminating . . . all [of PIQC's] pending site applications under the Child and Adult Care Food Program (CACFP) due to affidavits [unsealed in the federal fraud investigation]," MDE-NPS issued a letter denying

"213 sites applications found in Attachment A . . . for the CACFP 2022 Program Year beginning October 2022." (*Id*. at 1; PIQC Ex. I-2.) In Attachment A, MDE-NPS lists all the 213 sites, of which five appear to be related to "Mind Foundry"—an entity already under investigation by the FBI for at least a year. (*See supra,* Findings of Fact, at para. 16.)

32. On June 10 and 27, 2022, PIQC appealed MDE-NPS's May 27, 2022 Decision Letter and June 17, 2022 Decision Letter before the Appeal Panel.

**CONCLUSIONS OF LAW**

1. The United States Department of Agriculture (USDA) carries out the Child and Adult Care Food Program pursuant to federal regulations at 7 C.F.R. Part 226. *See* 7 C.F.R. § 226.1.

2. Federal regulations at 7 C.F.R. § 226.7 provide the state agency [MDE in this context] "shall maintain an acceptable financial management system, adhere to financial management standards and otherwise carry out financial management policies in accordance with 2 C.F.R part 200[.]" 7 C.F.R. § 226.7(b).

3. Federal regulations at 7 C.F.R. § 226.6(k) provide for administrative appeal rights with respect to thirty categories of agency actions, including a catch-all provision, and prohibit the state agency from affording administrative appeal rights with respect to seven categories of agency actions, which does not include a catch-all provision.

4. Federal regulations at 7 C.F.R. § 226.6 provide: "[a]ny information on which the State agency's action was based must be available to the institution and the responsible principals and responsible individuals for inspection from the date of receipt of the request for an administrative review." 7 C.F.R. § 226.6(k)(5)(iv). *See also* CACFP Appeal Procedure, sec. 4.

5. Federal regulations at 2 C.F.R. § 200.303 provide that "the non-Federal entity [MDE in this context] must . . . [t]ake prompt action when instances of noncompliance are identified[.]" 2 C.F.R. § 200.303(d).

6. If MDE-NPS determines that the noncompliance by a participating institution cannot be remedied by imposing additional conditions, it may take one or more actions as appropriate under the circumstances, including, for instance, to "[w]ithhold further Federal awards for the project or program." 2 C.F.R. § 200.339(e).

7. Federal regulations provide that the state agency "shall establish procedures for institutions to properly submit claims for reimbursement." 7 C.F.R. § 226.7(k). Such procedures should ensure that "payments are made only for approved meal types[.]" *Id*. Generally, "[a]ll records to support the claim shall be retained for a period of three years after the date of submission of the final claim for the fiscal year to which they pertain[.]" 7 C.F.R. § 226.10(d). "All accounts and records pertaining to the [CACFP] shall be made available, upon request, to representatives of the State agency, of the Department, and of the U.S. Government Accountability Office for audit or review, at a reasonable time and place." *Id*. "If, based on the results of audits, investigations, or other reviews," MDE-NPS has reason to believe that an institution has engaged in unlawful acts with respect to CACFP operations, "the evidence found in audits, investigations, or other reviews is a basis for non-payment of claims for reimbursement." 7 C.F.R. § 226.10(f).

8. PIQC acknowledges that, as a sponsor, its responsibilities include, for instance, providing sites under its sponsorship with program assistance, such as reviewing and reconciling sites' reimbursement documentation, as well as three facility reviews per year (at least two of which must be unannounced and one of those two unannounced reviews must include observation of a meal service), as set forth in further detail under 7 C.F.R. § 226.16(d)(4). (*See* PIQC Appeal Statement, at para. 10.)

**I. Applicability of subpart D of 2 C.F.R. Part 200 including §§ 200.339(e) and 200.340(a)(1) to the CACFP as MDE's Regulatory Authority**

9. Paragraphs 38 through 49 of PIQC's Appeal Statements challenge MDE-NPS's authority to invoke 2 C.F.R. §§ 200.339(e) and 200.340(a)(1) as the bases for the agency's actions set forth in the May 27, 2022 Decision Letter. Therefore, this overarching issue is addressed first:

10. The National School Lunch Act of 1946, as amended (the "Act"), was enacted "to safeguard the health and well-being of the Nation's children and to encourage the domestic consumption of nutritious agricultural commodities and other food, by assisting the States, through grants-in-aid and other means, in providing an adequate supply of foods and other facilities for the establishment, maintenance, operation, and expansion of nonprofit school lunch programs." 42 U.S.C. § 1751. The Act's Section 1766, titled "Child and Adult Care Food Program" (abbreviated as CACFP), authorizes USDA to "establish procedures for the termination of participation by institutions and family or group day care homes under the program." 42 U.S.C. § 1766(d)(5)(A).

11. The CACFP federal regulations at 7 C.F.R. § 226.7 expressly incorporates subpart D of 2 C.F.R. Part 200 by reference. It provides that the state agency [MDE in this context] "shall maintain an acceptable financial management system, adhere to financial management standards and otherwise carry out financial management policies in accordance with 2 C.F.R part 200[.]" 7 C.F.R. § 226.7(b). *See also* 7 C.F.R. §§ 226.4(k) ("Method of funding. FNS shall authorize funds for State agencies in accordance with 2 C.F.R. part 200, subpart D. . ."), 226.6(c)(3)(ii)(C) (referencing 226.6(b)(1)(xviii) and (b)(2)(vii), which incorporate subpart D of 2 C.F.R. Part 200), 226.6(f)(iv) ("administrative budget must demonstrate that the sponsoring organization will expend and account for funds in accordance with . . . 2 C.F.R. part 200, subpart D").

12. Subpart D of 2 C.F.R. Part 200[8] refers to subpart D of the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards ("Uniform Federal Award Regulations"). The Uniform Federal Award Regulations provides: "[f]or Federal awards subject to this part, all administrative requirements, program manuals, handbooks and other non-regulatory materials that are inconsistent with the requirements of this part must be superseded upon implementation of this part by the Federal agency [in this context, the USDA], except to the extent they are required by statute or authorized in accordance with the provisions in § 200.102." Section 200.102 emphasizes that the exceptions should be construed and applied "[i]n the interest of maximum uniformity[,]" and the three exceptions do not appear to apply to the CACFP. *See* 2 C.F.R. § 200.102(a).

[8] The relevant regulatory sections in 2 C.F.R. Part 200 relied on by MDE-NPS for its agency actions in question are 2 C.F.R. §§ 200.339 and 200.340, both of which are found under **subpart D**. (*See also infra*, Conclusions of Law, para. 21.)

13. The Uniform Federal Award Regulations also provides that "[t]he specific requirements and responsibilities of Federal agencies [such as USDA] and non-Federal entities [such as PIQC] are set forth in this part [2 C.F.R. Part 200]. Federal agencies making Federal awards to non-Federal entities must implement the language in subparts C through F of this part [which covers subpart D] in codified regulations unless different provisions are required by Federal statute or are approved by OMB." 2 C.F.R. § 200.106.

***A. The Uniform Federal Award Regulations' express provisions excluding the applicability of subpart D of 2 C.F.R. Part 200 do not mention the National School Lunch Program or the CACFP.***

14. The Uniform Federal Award Regulations at 2 C.F.R. § 200.101(e) sets forth a specific, exhaustive list of programs to which "the requirements in subparts C, D, and E of [Part 200] do not apply, as follows:

> (e) Program applicability. Except for §§ 200.203, 200.216, and 200.331 through 200.333, the requirements in <u>subparts</u> C, <u>D,</u> and E of this part <u>do not apply to the following programs</u>:
>
> (1) The block grant awards authorized by the Omnibus Budget Reconciliation Act of 1981 (including Community Services), except to the extent that subpart E of this part apply to subrecipients of Community Services Block Grant funds pursuant to 42 U.S.C. 9916(a)(1)(B);
>
> (2) Federal awards to local education agencies under 20 U.S.C. 7702–7703b, (portions of the Impact Aid program);
>
> (3) Payments under the Department of Veterans Affairs' State Home Per Diem Program (38 U.S.C. 1741); and
>
> (4) Federal awards authorized under the Child Care and Development Block Grant Act of 1990, as amended:
>
> (i) Child Care and Development Block Grant (42 U.S.C. 9858).
> (ii) Child Care Mandatory and Matching Funds of the Child Care and Development Fund (42 U.S.C. 9858).

2 C.F.R. § 200.101(e) (emphasis added).

15. The relevant regulatory sections in 2 C.F.R. Part 200 relied on by MDE-NPS for its agency action in question are 2 C.F.R. §§ 200.339 and 200.340, both of which are found under **subpart D**. Notably, the USDA Child Nutrition Programs (including the CACFP) are not enumerated in the above-quoted applicability exclusion list, and subsection 200.101(e) does not contain a catch-all provision allowing the potential inclusion of other federal programs not expressly named therein. Moreover, the drafter of the federal regulations intended the exceptions to be construed and applied "[i]n the interest of maximum uniformity[.]" *See supra* 2 C.F.R. § 200.102(a).

16. "A standard axiom of statutory interpretation is *expressio unius est exclusio alteriuse*, or the expression of one thing excludes others not expressed." *Watt v. GMAC Mortg. Corp.*, 457 F.3d 781, 783 (8th Cir. 2006). Applying this canon of statutory construction, because the list in 2 C.F.R. § 200.101(e) does not reference The National School Lunch Act or the CACFP, the Appeal Panel concludes that the drafter of the federal regulation intended subpart D to apply to CACFP.

17. Elsewhere in the same section further supports the Appeal Panel's interpretation that the general federal award provisions under subpart D of 2 C.F.R Part 200 do apply to CACFP. Section 200.101(f)'s exclusion of "subpart C" actually carves out an exception that specifically applies to The National School Lunch Act which includes the CACFP.[9] Namely, it provides that only "subpart C" does not apply to CACFP. *See also Kosmic Kidz Outreach, Inc. v. Arkansas Dep't of Hum. Servs.*, 2020 567, 27, 614 S.W.3d 860, 876 (Ark. App. 2020) (Arkansas CACFP case, appellate court applied both subpart E of 2 C.F.R. Part 200 and 7 C.F.R part 226 in affirming the state agency's findings that the nonprofit's claims for CACFP reimbursement were improper and that the overpayments should be repaid to the state). Put differently, had the drafter of the regulations intended to exclude subpart D from applying to the CACFP, it would have expressly stated so similar to what it has done for the exclusion of subpart C in the regulatory language.

18. Therefore, the express provisions on applicability in 2 C.F.R. Part 200 and the incorporation and cross-referencing language in 7 C.F.R. Part 226 both support the proposition that subpart D of 2 C.F.R. Part 200 can be applied to CACFP.

***B. The Uniform Federal Award Regulations provisions under 2 C.F.R. §§ 200.339(e) and 200.340(a)(1) do not "differ from" the CACFP provisions under 7 C.F.R. § 226.6; instead, the former is consistent with, supplements and is supplemented by the later.***

19. Ignoring the specific applicability exclusion provisions of 2 C.F.R. § 200.101(e) and (f) that PIQC knows to be unfavorable to its position (*see supra*, Conclusions of Law at paras. 14–18.), PIQC's Appeal Statements resorts to relying on the more general language under 2 C.F.R. § 200.101(d) to support its position. Subsection 200.101(d) provides that, "in any circumstances where the provisions of Federal

---

9

> (f) Additional program applicability. Except for §§ 200.203 and 200.216, the guidance in <u>subpart C</u> of this part <u>does not apply to the following programs</u>:
> 2 C.F.R. § 200.101
>
> * * *
>
> (4) <u>Entitlement awards under the following programs of The National School Lunch Act:</u>
>
> (i) National School Lunch Program (section 4 of the Act, 42 U.S.C. 1753);
> (ii) Commodity Assistance (section 6 of the Act, 42 U.S.C. 1755);
> (iii) Special Meal Assistance (section 11 of the Act, 42 U.S.C. 1759a);
> (iv) Summer Food Service Program for Children (section 13 of the Act, 42 U.S.C. 1761); and
> <u>(v) Child and Adult Care Food Program</u> (section 17 of the Act, 42 U.S.C. 1766).

2 C.F.R. § 200.101(f) (emphasis added).

statutes or regulations differ from the provisions of this part, the provision of the Federal statutes or regulations govern." 2 C.F.R. §§ 200.101(d) (emphasis added). PIQC argues that the Uniform Federal Award Regulations provisions cannot be relied on by MDE-NPS because they "'differ' from the specific CACFP regulations in 7 C.F.R. § 226.6." (PIQC Appeal Statements, at para. 44).

20. To determine whether the provisions in 2 C.F.R. Part 202 are indeed different from those in 7 C.F.R. Part 226, as insisted by PIQC, they must be compared side-by-side:

21. MDE-NPS's May 27, 2022 Decision Letter states that it relies on 2 C.F.R. § 200.340(a)(1) as its basis for terminating PIQC's CACFP agreement. The relevant provision reads:

> **§ 200.340 Termination.**
>
> (a) The Federal award may be terminated in whole or in part as follows:
>
> (1) By the Federal awarding agency or pass-through entity, if a non–Federal entity fails to comply with the terms and conditions of a Federal award;

2 C.F.R. §§ 200.340(a)(1) (emphasis added).

22. As the modal verb "may" suggest, the Uniform Federal Award Regulations cited by MDE-NPS provides the state agency with a permissive basis for terminating the federal award in the CACFP context. That basis is—when an institution "fails to comply with the terms and conditions of a [CACFP] Federal award [in a CACFP agreement and applicable law,]" the state agency "may "exercise its authority to terminate that award by way of terminating the CACFP agreement. In contrast, 7 C.F.R. § 226.6(c)(3) uses the modal verb "must," which provides the state agency with a mandatory basis for terminating a CACFP federal award agreement. It states that, when the institution commits one or more of the serious deficiencies, MDE would have no choice but to both terminate the CACFP agreement "and initiate action to disqualify the institution and any responsible principals." 7 C.F.R. § 226.6(c)(3)(i). In other words, the mandatory termination and disqualification procedure under 7 C.F.R. § 226.6(c)(3) is for one of the many degrees of "fail[ing] to comply with the terms and conditions of a Federal award" scenarios that amounts to serious deficiencies.

23. Moreover, the cross-references within 7 C.F.R. Part 226 to subpart D of 2 C.F.R. Part 200 indicate that the drafter of the CACFP regulations intended the CACFP federal award to be subject to the same level of scrutiny as required by subpart D of the Uniform Federal Award Regulations. *See* 7 C.F.R. §§ 226.4(k), 226.6(c)(3)(ii)(C), 226.6(f)(iv), 226.7(b), *see supra*, Conclusions of Law, at para. 11).

24. Therefore, a permissive provision that incorporates a mandatory provision that falls within the scenarios contemplated by the permissive provision, i.e. 2 C.F.R. §§ 200.340(a)(1), does not differ from the mandatory provision, i.e. 7 C.F.R. § 226.6(c)(3). Rather, the former incorporates, is consistent with, supplements, and is supplemented by the latter.

25. Next, the remedy of withholding further federal award payments provided by the Uniform Federal Award Regulations of 2 C.F.R. Part 200 is also contemplated by the CACFP regulations of 7 C.F.R. Part 226. MDE-NPS's notice makes it an appealable action because it constitutes "[a]ny other action of the

State agency affecting an institution's participation or its claim for reimbursement" 7 C.F.R. § 226.6(k)(2)(xii). Here, MDE-NPS's May 27, 2022 letter states that the agency relies on 2 C.F.R. § 200.339(e) as its basis for withholding further federal award PIQC in the CACFP. The relevant provision reads, in context, the following:

> **§ 200.339 Remedies for noncompliance.**
>
> If a non-Federal entity [such as PIQC] fails to comply with the U.S. Constitution, Federal statutes, regulations or the terms and conditions of a Federal award, the Federal awarding agency or pass-through entity may impose additional conditions, as described in § 200.208. If [USDA] or [MDE] determines that [PIQC] noncompliance cannot be remedied by imposing additional conditions, the Federal awarding agency or pass-through entity may take one or more of the following actions, as appropriate in the circumstances:
>
> * * *
>
> (d) Initiate suspension or debarment proceedings . . . .
>
> (e) Withhold further Federal awards for the project or program.
>
> (f) Take other remedies that may be legally available.
>
> * * *

2 C.F.R. § 200.339(d),(e),(f) (emphasis added).

26. PIQC attempts to challenge MDE-NPS's authority in withholding further federal award payments by claiming MDE-NPS cannot do so because it has not gone through the procedure of having a "suspension review official" hear and review the state agency's action to suspend PIQC from participation in the CACFP. (*See* PIQC Appeal Statements, at para. 47–48.) PIQC's contention confuses a suspension from federal award participation proceeding, which is provided by 2 C.F.R. §§ 200.339(d)[10]—a regulatory provision that MDE-NPS expressly did not invoke, with the agency action of "[w]ithholding further Federal awards for the [CACFP] program", which is provided by 2 C.F.R. §§ 200.339(d)—a regulatory provision that MDE-NPS did invoke. PIQC has not proffered another reason as to why it believes 2 C.F.R. § 200.339(e) "differ[s] from" 7 C.F.R. Part 226.

27. Furthermore, MDE's authority to withhold CACFP federal award payments is also found in the contractual language in the CACFP agreement PIQC signed. (PIQC Ex. K, "[f]ailure to submit accurate

[10] PIQC's Appeal Statements favorably cites the May 17, 2022 Panel Decision and also included the May 17, 2022 Panel Decision as an exhibit in support of its administrative appeal. PIQC did not appeal the May 17, 2022 Panel Decision. (PIQC Ex. H-3.) In the May 17, 2022 Panel Decision, the Appeal Panel took the consistent position that withholding further federal award payments, under 2 C.F.R. § 200.339(e), is a separate action that MDE-NPS has authority to take. It is distinct from the agency action of suspension from participation, under 2 C.F.R. § 200.339(d), which allows a state agency to "[i]nitiate suspension . . . proceedings" and that 7 C.F.R. § 226.6(c)(5)(ii) provides for a set of procedural requirements for the suspension from participation proceeding contemplated by 2 C.F.R. § 200.339(d). (*See* PIQC Ex. H-3, Conclusions of Law, at paras. 13–14.) PIQC, as the recipient of the May 17, 2022 Panel Decision, was previously informed of such a distinction. This example also confirms the Appeal Panel's interpretation that the relevant provisions under subpart D of 2 C.F.R. Part 200 do not differ from 7 C.F.R. Part 226 and should apply to CACFP.

claims . . . may result in the withholding of payments . . . .") This contractual provision essentially echoes the permissive provision of 2 C.F.R. § 200.339(e), which allows MDE to withhold program payments as a discretionary measure against failure to submit accurate claims (which violates the terms and conditions of the CACFP federal awards) when appropriate under the circumstances. Therefore, the Appeal Panel finds PIQC's said argument unconvincing.

28. For these reasons, the Appeal Panel concludes that 2 C.F.R. §§ 200.339(e) and 200.340(a)(1) apply to the CACFP and can be invoked by MDE-NPS as its regulatory authority for taking agency actions.

**II. MDE-NPS's Withholding of Program Payments Action in the May 27, 2022 Decision Letter**

29. As discussed in depth in paragraphs 14 through 18 and 25 through 28 in the Conclusions of Law section, MDE-NPS may withhold further federal award payments under the CACFP if PIQC "fails to comply with . . . the terms and conditions of a Federal award" and if MDE-NPS "determines that [PIQC's] noncompliance cannot be remedied by imposing additional conditions[.]" 2 C.F.R. §§ 200.339(e).

30. The terms and conditions of PIQC's federal award under the CACFP are set forth in the CACFP agreement signed by PIQC and all the applicable law. PIQC signed the agreement and agreed that "[f]ailure to submit accurate claims will result in recovery of any overclaims by MDE and <u>may result in the withholding of payments</u> and suspension or termination from the Program." (PIQC Ex. K, emphasis added.)

31. PIQC vehemently denies it "knowingly submitted a false or fraudulent claim." (*See e.g.*, PIQC Appeal Statements, at para. 33.) However, to withhold further federal award payments does not require it. Instead, it only requires (1) a finding of failure to comply with the terms and conditions of the federal award, i.e., the CACFP agreement and applicable law, and (2) a determination that the incompliance cannot be remedied by imposing additional conditions. Here, the Appeal Panel is satisfied that both prerequisites are met:

32. With respect to the first prerequisite: Had PIQC complied with the terms and conditions of the CACFP agreement and the applicable law, the reported instances of fraud revealed in the affidavits—irrespective of whether PIQC knowingly engaged in or merely negligently allowed millions of dollars in federal awards to flow into the hands of scammers—invariably speak to PIQC's failure to comply with the terms and conditions of the federal award despite being charged with supervisory duties and is supposed to maintain proper oversight. To highlight a few examples of such duties imposed on PIQC as a sponsor in the signed agreement, PIQC agreed to:

- Provide adequate supervisory and operational personnel for management and monitoring of the Program.
- Operate a nonprofit food service using all of the income solely for the operation or improvement of the food service, except program income shall not be used to purchase land, to acquire or construct buildings, or to make alterations of existing buildings.

- Comply with all regulations issued by USDA, all instructions and handbooks issued by USDA to clarify or explain existing regulations, and all instructions and handbooks issued by MDE.
- [Ensure that s]taff counted and documented the number of reimbursable meals served to participants with actual time-of-service meal counts for each daily meal service.
- [Accept] final financial and administrative responsibility for management of a proper, efficient, and effective food service.
- Expend and account for funds in accordance with 7 CFR 226, USDA-FNS Instruction 796-2 ("Financial Management in the Child and Adult Care Food Program"), and 7 CFR parts 3015, 3016, and 3019.
- Maintain appropriate and effective management practices to ensure that Program requirements are met, including having adequate supervisory and operational personnel for management and monitoring of the Program.
- Maintain internal controls and other management systems to ensure fiscal accountability.

(*Id*., the full text of PIQC's signed CACFP agreement can be found in PIQC Ex. K.) Similar language and requirements are found throughout the applicable regulations. Therefore, the Appeal Panel agrees with MDE-NPS's finding that PIQC has failed to comply with the terms and conditions of the federal award.

33. With respect to the second prerequisite: the CACFP regulations provide that "the evidence found in . . . investigations . . . is a basis for non-payment of claims for reimbursement." 7 C.F.R. § 226.10(f). As the phrase "reason to believe" indicates, there does not need to be a definitive conclusion of guilt or a conviction for the agency to have "reason to believe" PIQC has engaged in unlawful conduct. A smoking gun is sufficient to provide such a basis for its belief. To date, PIQC has not proffered any testimony, affidavits of its own, or other evidence that factually contradict the sworn statements regarding the reported Child Nutrition Programs fraud scheme described in the Farah Affidavit, Savage Affidavit, Brooklyn Park Affidavit, and the Rosemount Affidavit. PIQC has not affirmatively denied that any of the reported fraud involving The Free Minded Institute, Empire Cuisine & Market, S&S Catering, or others had occurred. Instead, PIQC attempts to segregate PIQC from those entities and individuals reported as heavily involved with the reported scheme. (*See generally*, PIQC Appeal Statements; Sept. 12, 2022 Hrg. Tr. 20:16–21:24.) The sworn statements in the affidavits collectively constitute "results of . . . investigations" that gives MDE-NPS "reason to believe that [PIQC and its affiliated entities have] engaged in unlawful acts with respect to Program operations[.]" 7 C.F.R. § 226.10(f).

34. The Appeal Panel notes, that, despite not having factually contested the reported wrongdoing involving Empire Cuisine & Market or S&S Catering, to this date (more than half a year after the first round of FBI affidavits implicating these two entities as key players in the reported fraud scheme became known), PIQC has not withdrawn a single submitted reimbursement claim that appear to connect with alleged meal services provided by Empire Cuisine & Market or S&S Catering, and there are a number of them in PIQC's pending reimbursement claims.

35. The appeal record reflects that, even though PIQC has received numerous incompliance findings during the administrative reviews in 2016 to 2019, and provided corrective action plans in 2019 and then 2021, and even after the reported fraud scheme (that is still ongoing) has thus far reached individuals and entities that work for and do business with PIQC, PIQC still has not demonstrated efforts to scrutinize its own internal controls mechanism, supervising procedures, or other management and operational functions for red flags[11] that might have led to millions of dollars being reportedly channeled to unlawful purposes instead of feeding needy children. PIQC has not modified in any way its reimbursement claims associated with those high suspect entities, has not revisited any of those claims for accounting inaccuracies and dubious documentation (which this Appeal Panel had given examples of in previous Panel Decisions), and has not conducted a systemic self-review of all of the submitted claims given the prior failings. Instead, PIQC simply continues to incessantly press MDE-NPS to pay all of its pending reimbursement claims. When MDE-NPS asked PIQC for the claims' supporting documentations (PIQC is required under the regulations to retain these records for three years), and which MDE is authorized by 7 C.F.R. § 226.10(d) to ask PIQC to make available to MDE for inspection, PIQC submitted records that are vastly incomplete and contain numerous internal inconsistencies and ineligible items. (*See* June 7 and July 5, 2022 Panel Decisions re PIQC.)[12]

36. In light of these circumstances, the Appeal Panel agrees with MDE-NPS's determination that, given the agency's earlier incompliances from 2016 to 2021, as well as the reported fraud scheme reflecting PIQC's organizational-level failure to properly fulfill its role as a CACFP sponsor, PIQC's incompliance cannot be remedied by imposing additional conditions. Thus, the Appeal Panel is satisfied that both prerequisites are met, and that MDE-NPS's decision to withhold further federal award payments should be affirmed.

## III. MDE-NPS's Termination of CACFP Permanent Agreement in the May 27, 2022 Decision Letter

### *A. MDE-NPS may invoke 2 C.F.R § 220.340(a)(1) in terminating PIQC's CACFP agreement.*

37. Subsection I of the Conclusions of Law has established that MDE-NPS can draw authority from subpart D of 2 C.F.R. Part 200 as well as from 7 C.F.R. Part 226 when discharging its CACFP-related duties as a state agency. MDE-NPS and PIQC dispute the meaning of the federal award termination-related provisions in subpart D of 2 C.F.R. Part 200 and 7 C.F.R. Part 226 as applied to CACFP. The doctrine of *in pari materia* is "a tool of statutory interpretation that allows two statutes with common purposes and subject matter

[11] Julius Scarver—who is heavily implicated in the portion of the fraud scheme that passed through PIQC and its affiliated entities— was a former PIQC site monitor and then served as one of PIQC's board members until June 7, 2022. PIQC claims that Scarver was "fully separate from PIQC as an employee and had no authority to manage funds, approve claims, or do anything like that before any of the things involving The Free Minded Institute occurred[.]" (Sept. 12, 2022 Hrg. Tr. 21:11–15.) PIQC claims that it took Scarver's representation to PIQC at face value without scrutiny because "at the time that any of these events was going on, PIQC had [no] reason to view Mr. Scarver's agency any different [than] any other. So PIQC relied in good faith, as it does in dealing with hundreds of sites, on the information that is provided to them." (*Id*. 21:5–10, emphasis added.) PIQC admits that it deals with Scarver's entity similar to "dealing with hundreds of sites[.]" *Id*. This shows PIQC clearly lacks effective and accountable internal controls and procedures to catch the reported fraud involving Scarver and the entity he founded, and may very well let similar schemes by "hundreds of sites" slide by given these statements and its unwillingness to self-scrutinize.

[12] The Appeal Panel takes judicial notice of its own decisions.

to be construed together to determine the meaning of ambiguous statutory language." *Fay v. Dep't of Emp. & Econ. Dev.*, 860 N.W.2d 385, 387 (Minn. Ct. App. 2015). Since both sets of federal regulations are applicable to CACFP and they share a common purpose of regulating programs under the National School Lunch Act including CACFP, they should be construed together for consistency.

38. Subpart D of 2 C.F.R. Part 200 uses the permissive modal verb "may," which allows an agency to terminate a federal award for failure "to comply with the terms and conditions of" the award. 2 C.F.R. § 200.340(a)(1) ("The Federal award may be terminated in whole or in part. . . [,]" emphasis added). As discussed earlier, the terms and conditions are set forth in the CACFP agreement and in the applicable law. Incompliance with terms and conditions of a federal award can vary in severity and factual circumstances, therefore, it makes sense for the drafter of the regulations to leave exercising authority to terminate the agreement to the discretion of the agency.

39. 7 C.F.R. Part 226.6 employs the imperative modal verb "must," which provides for a mandatory action that the state shall take when a prescribed condition precedent occurs. 7 C.F.R. § 226.6(c)(3)(i) ("If the State agency determines that a participating institution has committed one or more serious deficiency listed in paragraph (c)(3)(ii) of this section, the State agency must initiate action to terminate the agreement of a participating institution and initiate action to disqualify the institution and any responsible principals[,]" emphasis added.) The condition precedent here is the state agency's determination that a participating institution has committed one or more listed serious deficiencies, and the mandatory action triggered is **both** a proposed termination of agreement **and** a disqualification of the institution and its responsible principals. 7 C.F.R. Part 226 does not state that the only way a state agency can terminate an institution's agreement is through findings of serious deficiencies. It merely states that if the agency finds that institution has committed serious deficiencies, the agency has no alternative but to initiate the dual actions of termination and disqualification.

40. It is noteworthy that the drafter prescribed a narrower set of situations that are "serious deficiencies" to grant the state agency mandatory authority to terminate a CACFP agreement and disqualify the institution and responsible individuals. This is logically consistent with permissive authority granted to the state agency where the institution's conduct falls into the broader category of "fail[ure] to comply with the terms and conditions" of a federal award.

41. PIQC insists that MDE-NPS should have followed 7 C.F.R. § 226.6(c)(3) in finding PIQC seriously deficient, giving PIQC an opportunity to take corrective action, and if the corrective action is unsatisfactory, moving forward with proposing to terminate PIQC's agreement. Had PIQC's interpretation of the regulatory language been adopted, it would follow that the ultimate agency action should include both proposed termination and proposed disqualification of the institution and its responsible principals. PIQC's counsel has not expressly advanced the proposition that his clients (PIQC and responsible principals) should additionally face proposed disqualification, but that would be a logical corollary of PIQC's argument.

42. In this matter, it appears to the Appeal Panel that, through the May 27, 2022 and June 17, 2022 letters, MDE-NPS is trying to take precautionary, mitigating measures to prevent funds not yet paid to PIQC from continuing to reach reportedly and potentially fraudulent entities and individuals amidst an ongoing federal investigation where information is still limited but continue to be revealed as time

progresses.[13] For instance, MDE-NPS has decided to withhold further federal award payments to PIQC, as analyzed in Subsection II. To the Appeal Panel's knowledge, MDE-NPS has not yet taken other actions it also has authority to take (when it can be justified by the circumstances) such as seeking repayments from PIQC of approximately $1.3 million of Child Nutrition Programs funds that, according to the affidavits, reportedly had already been funneled to highly suspect entities. (*See supra*, Findings of Facts, Subsection II.)

43. By the same token, the Appeal Panel recognizes MDE-NPS's decision to exercise its permissive authority under 2 C.F.R. § 200.340(a)(1) to terminate PIQC's agreement to mitigate future loss[14] of federal funding while holding back on taking the more drastic step of invoking procedures that would trigger a mandatory (proposed) disqualification. (Proposed) disqualification is a more severe form of action as it would place the institution and responsible individuals on the National Disqualified List (NDL) that would prevent them from further participation in the pertinent federal programs even when they try to apply for other programs and through different organizations. *See* 7 C.F.R. 226.6(c)(3)(ii)(B).

44. Indeed, alternative to invoking the permissive sections under 2 C.F.R. Part 200, MDE-NPS also had (and still retains) the potential[15] options to (1) find that the reported fraud scheme in the affidavits reflects a

---

[13] PIQC has not expressly denied the reported wrongdoings of the five entities named in the affidavits that have transacted business with PIQC. (*See generally* PIQC Appeal Statements; Sept. 12, 2022 Hrg. Tr.) In PIQC's written and oral arguments, it has carefully denied PIQC in any way knowingly engaged with these highly suspect entities and their associated individuals. (*Id*.) In Attachment A to the Denial Letter, MDE-NPS lists the site IDs and names of all 213 site applications. Judging solely by the names of the sites, the following five sites are of note:

| Site ID | Site Name |
|---|---|
| 9000018936 | Mind Foundry Learning Foundation Minneapolis |
| 9000018936 | Mind Foundry Learning Foundation Minneapolis |
| 9000020253 | Mind Foundry: 515 on the Park |
| 9000018928 | Mind Foundry: Coopers Court |
| 9000020254 | Mind Foundry: The Rose |

(PIQC EX. I-2, at 4.) The five sites' names contain "Mind Foundry," suggesting a possible connection with the entity suspected of fraud in the Savage Affidavit. (*See Supra*, Findings of Facts, paras. 16–18.) The available appeal record shows that the five site's applications remain pending, which means they have not been withdrawn. PIQC has neither indicated it delayed the applications of these five sites to review and ensure these sites are not potentially connected to the reported fraud scheme, nor made an affirmative representation that these five sites are not related to the entity of the same name that has been identified in the Savage Affidavit.

[14] While the CACFP agreement is in effect, PIQC has continued and continues to submit voluminous monthly reimbursement claims and demand MDE-NPS to issue federal award payments; PIQC also continues to try to expand its operation by submitting pending applications for 213 new sites.

[15] The agency's determination of serious deficiency and determination that corrective action is inadequate are unappealable actions. 7 C.F.R. § 226.6(k)(3)(ii),(iii). In mentioning these "potential" options if and when MDE-NPS has sufficient factual basis to take those actions to explain the procedural avenues, the Appeal Panel in no way opines on whether there should be a finding of recurrence of previously deferred serious deficiencies or a finding of occurrence of new serious deficiencies given the recent federal affidavits.

recurrence[16] of some of the previously-deferred serious deficiencies, and proceed with immediate termination and disqualification without an opportunity to take corrective action; or (2) find that new serious deficiencies have occurred[17] and give PIQC an opportunity to take corrective action, and if it is not adequate (the adequacy of corrective action is not administratively appealable), move forward with proposed termination and proposed disqualification.

45. Noticeably, MDE-NPS's May 27, 2022 Decision Letter does not state that it bases its action on recurrence of previously deferred serious deficiencies and MDE-NPS has not made findings of new serious deficiencies. MDE-NPS's May 27, 2022 Decision Letter makes finding of failure to comply with the terms and conditions of the federal award, and does not foreshadow an additional action (proposing to) disqualify PIQC and its responsible principals. This suggests that perhaps MDE-NPS recognizes the federal investigation is still in progress and have at this time invoked its more flexible regulatory authority in prescribing only the termination of agreement and withholding of further payments (which serve to mitigate future loss of federal funds) without necessarily seeking to find a condition precedent that could lead to triggering a disqualify PIQC and its responsible principals and individuals that has more severe future consequences for PIQC and those individuals.

46. For the above reasons, the Appeal Panel finds that MDE-NPS's decision to invoke 2 C.F.R § 220.340(a)(1) in terminating PIQC's CACFP agreement is reasonable, supported by, and commensurate to substantial

---

[16] MDE-NPS submitted documentation in the appeal record that presents the earlier procedural history where PIQC was first found to be incompliant during administrative reviews 2016–2019, and then found to be serious deficient in 2021 in failing to meet all three performance standards and lacking effective policies and internal control procedures to properly monitor staff, finances, and ensure compliance and accountability as its business volume grows. Those serious deficiencies findings were then deferred but in the event of a finding of recurrence would trigger the mandatory requirement for MDE-NPS to propose to terminate and disqualify. (*See supra*, Findings of Facts, paras. 10 to 13.)

[17]

> (ii) List of serious deficiencies for participating institutions. . . . Serious deficiencies for participating institutions are:
>
> * * *
>
> (C) Failure to operate the Program in conformance with the performance standards set forth in paragraphs (b)(1)(xviii) and (b)(2)(vii) of this section;
>
> * * *
>
> (H) Claiming reimbursement for meals not served to participants;
>
> * * *
>
> (I) Claiming reimbursement for a significant number of meals that do not meet Program requirements;
>
> * * *
>
> (Q) Failure to perform any of the other financial and administrative responsibilities required by this part;
>
> * * *
>
> (U) Any other action affecting the institution's ability to administer the Program in accordance with Program requirements.

7 C.F.R. § 226.6(c)(3).

evidence based on information from PIQC's participation history and the ongoing federal investigation current available to MDE-NPS.

***B. The pertinent agency action in MDE-NPS's May 27, 2022 Decision Letter is construed as a "proposed termination" based on substantial evidence.***

47. Federal regulations at 7 C.F.R. § 226.6(k)(1) states that the state agency "must develop procedures for offering administrative reviews to institutions and responsible principals and responsible individuals . . . consistent with [7 C.F.R. § 226.6(k)]." Federal regulations at 7 C.F.R. § 226.6(k)(2) provide that the state agency "must offer an administrative review for" actions listed in 7 C.F.R. § 226.6(k)(2)(i)–(xii). Of the twelve categories, in pertinent part, the following actions require a right to administrative review:

> (iii) Notice of proposed termination. Proposed termination of an institution's agreement (see paragraphs (c)(2)(iii)(C), (c)(3)(iii)(C), and (c)(5)(i)(B) of this section, dealing with proposed termination of agreements with renewing institutions, participating institutions, and participating institutions suspended for health or safety violations);
>
> * * *
>
> (xii) Other actions. Any other action of the State agency affecting an institution's participation or its claim for reimbursement.

7 C.F.R. § 226.6(k)(2)(iii), (xii) (emphasis added).

48. Federal regulations at 7 C.F.R. § 226.6(k)(3) provide that a state agency "is prohibited from offering administrative reviews of" actions listed in 7 C.F.R. § 226.6(k)(3)(i)–(vii). Of the seven categories, the following actions shall not afford a right to administrative review:

> (v) Termination. Termination of a participating institution's agreement, including termination of a participating institution's agreement based on the disqualification of the institution by another State agency or FNS (see paragraphs (c)(3)(i) and (c)(7)(ii) of this section);

7 C.F.R. § 226.6(k)(3)(v) (emphasis added).

49. The above-quote provisions suggest that, if the state agency takes a final step effectuating termination of a CACFP agreement—whether it is based on 7 C.F.R. § 226.6(c)(3)(i) and (c)(7)(ii) (termination triggered by serious deficiency) or otherwise—that final step of actual termination cannot give rise to a right to administrative review. However, as the regulations state, whenever the state agency takes an action such as proposing to terminate a CACFP agreement under "[7 C.F.R. § 226.6](c)(2)(iii)(C), (c)(3)(iii)(C), and (c)(5)(i)(B)" or "[a]ny other action . . . affecting an institution's participation or its claim for reimbursement[,]" the state agency must make the action appealable. 7 C.F.R. § 226.6(k)(2)(xii).

50. The preceding paragraphs have analyzed that 2 C.F.R. § 200.340(a)(1) and 7 C.F.R. Part 226 should be construed together to ensure consistency. (*See supra*, Conclusions of Law, at paras. 37 to 41.) Subpart D of 2 C.F.R. Part 200 does not contain a provision regard administrative review rights that differs from the prohibitive language of 7 C.F.R. § 226.6(k)(3) where the federal regulations expressly enumerate an

exhaustive list of agency actions that the agency shall not offer an administrative appeal right. Therefore, MDE-NPS's termination action under 2 C.F.R. § 200.340(a)(1) is also subject to the limitation of 7 C.F.R. § 226.6(k)(3).

51. The permissive termination under 2 C.F.R. § 200.340(a)(1) is an action affecting PIQC's participation in the CACFP. The permissive withholding of federal award payments under 2 C.F.R. § 200.339(e) is an action affecting PIQC's claims for reimbursement. While the prohibitive provisions of 7 C.F.R. § 226.6(k)(3)(i)–(vii) do not mention actions akin to withholding of payments, it expressly lists termination of agreement. The drafter's choice of the term "including[18]" rather than "only if" or "when" to follow the general phrase "termination of . . . agreement" indicates that whenever a final termination of agreement takes place, whether or not it was initiated under "paragraphs (c)(3)(i) and (c)(7)(ii)[,]" Therefore, MDE is prohibited from administratively review an action of final termination.

52. Here, within the four corners of MDE-NPS May 27, 2022 Decision Letter: the subject line of the letter states "Termination of CACFP Permanent Agreement. . . [,]" and the body of the letter states the termination would be "[e]ffective May 27, 2022 [the date of the agency action letter]." (PIQC I-1.) On the lower right corner of the first page of the May 27, 2022 letter, it states "Appealable Action" and on the last page it again states "This is an appealable action. If you wish to appeal this decision, the appeal procedure document is attached." (PIQC I-1.) The "appeal procedure document" refers to the CACFP Appeal Procedure, which echoes 7 C.F.R. § 226.6(k)." (CACFP Appeal Procedure, at 1–2.) Therefore, although MDE-NPS appears to have stated "termination," the substantive contents of the letter actually intended the agency action to be a "proposed termination" to be able to afford PIQC a right to appeal pursuant to 7 C.F.R. § 226.6(k). PIQC utilized its appeal rights and administratively appealed the matter before this Appeal Panel, indicating agreement with MDE-NPS's intention.

53. Therefore, the Appeal Panel finds that the pertinent action regarding termination of PIQC's CACFP agreement described in MDE-NPS's May 27, 2022 Decision Letter should be properly construed as a proposed termination. Consequently, the timing and finality of said action is construed to be consistent with 7 C.F.R. § 226.6(k).

## IV. MDE-NPS's Denial of All Pending Site Applications Action, Which Decision MDE-NPS Alluded to in the May 27, 2022 Decision Letter and Officially Announced in the June 17, 2022 Denial Letter

54. MDE-NPS's May 27, 2022 Decision Letter states that, effective May 27, 2022, it was terminating PIQC's CACFP agreement and all pending CACFP site applications. On June 17, 2022, MDE-NPS issued another decision letter citing the May 27, 2022 termination of PIQC's agreement as the basis for denying the 213 pending site applications. Understandably, in the event PIQC's CACFP agreement is terminated, there would not be a contractual basis for PIQC to submit new site applications.

55. Because this Appeal Panel affirms MDE-NPS's agency action of proposed termination, as construed above, the proposed termination becomes a termination as of the date of this Appeal Panel decision. As

[18] The term "include" is not defined in the federal regulations. In this context, the meaning of "include," according to the Merriam-Webster Collegiate Dictionary, is "to take in or comprise as a part of a whole or group[.]" (*See* Definition 1 of "include," https://www.merriam-webster.com/dictionary/include.)

a result of the termination of PIQC's CACFP agreement, PIQC is no longer eligible to submit and have MDE approve new site applications. Therefore, MDE-NPS's June 17, 2022 agency decision denying all of PIQC's pending site applications is also affirmed.

## V. PIQC's Argument that MDE-NPS Did not Timely Share Documents on Which the Agency's Decision Relied Is Not Supported by Substantial Evidence

56. The CACFP Appeal Procedure, which incorporates the federal regulations, requires that information on which MDE's action was based "must be available" to each appellant "from the date of receipt of the appeal request." CACFP Appeal Procedure, at para. 4; *see also* 7 C.F.R. § 226.6(k)(5)(vi). PIQC alleges that MDE-NPS did not timely make available to PIQC any of the documentary attachments that MDE-NPS later uploaded to SharePoint on June 24, 2022. (*See* PIQC Appeal Statements at para. 36.) PIQC argues that these should have been available to PIQC on or before June 10, 2022 (date of PIQC's notice of appeal) or June 17, 2022 (date of MDE's acknowledgement of its receipt of PIQC's appeal request). (*Id*. at n. 8.)

57. After reviewing the appeal record and considering the substantial evidence, this Appeal Panel disagrees. In fact, all but one of MDE-NPS's supporting documents in the appeal record were available to PIQC because the documents were either generated by PIQC, already in PIQC's possession, or provided by MDE-NPS to PIQC before June 17, 2022 by other means. To demonstrate this point, all of MDE-NPS's supporting documents (listed as MDE-NPS's attachments to its summary of facts and memorandum of law, along with table of contents) are listed in the below chart along with the Appeal Panel's notes as to when they became available to PIQC:

| **Chart: MDE-NPS Documents and When They Became Available to PIQC** | |
|---|---|
| **MDE-NPS Documents** | **Appeal Panel's Notes** |
| **Category: *Affidavits*** | |
| MDE-NPS Atts.1, 2, 3 | MDE-NPS made available to PIQC on multiple occasions in earlier administrative appeals. |
| MDE-NPS Att. 5 | MDE-NPS made available to PIQC on May 25, 2022. |
| MDE-NPS Att. 4 | Did not appear to have been made available to PIQC before June 10 or 17, 2022. However, most of the sworn statements regarding the reported fraud scheme that involved PIQC are found in Atts. 1, 2, 3, and 5. Therefore, even if this affidavit is excluded from the appeal record, it would not make a difference to the Appeal Panel's decision. |
| **Category: *MDE-NPS notices issued to PIQC*** | |
| MDE-NPS Atts. 6, 7, 8, 9-1, 9-2, 10, 11, 12, 15, 16-1, 16-2, 18, 19, 26 | MDE-NPS notices of action, administrative review letters, and MDE's earlier Appeal Panel decisions issued to PIQC on the dates noted below the letterhead of each document, the latest of which date is June 7, 2022. |
| **Category: Charts** | |
| MDE-NPS Att. 9-3 | MDE-NPS made it available to PIQC in an earlier administrative appeal's record |

| **Chart: MDE-NPS Documents and When They Became Available to PIQC** | |
|---|---|
| **Category: *Email Correspondence and Email Attachments*** | |
| MDE-NPS Atts. 13-1, 13-2, 27, 28-1, 29 | Emails threads in which PIQC's representatives were senders or recipients, which means they are already in PIQC's possession and available to PIQC. |
| **Category: Agreements** | |
| MDE-NPS Atts. 14, 17, 22, 28-2 | PIQC, as one of the signing parties of these agreements, possesses copies of them, which means they are already available to PIQC. |
| **Category: Documents Authored by PIQC** | |
| MDE-NPS Atts. 20, 21, 23, 24, 25 | PIQC authored these documents and submitted them to MDE-NPS in support of its applications or in response to MDE-NPS's earlier agency actions. In other words, they are already in PIQC's possession and available to PIQC. |
| **Category: MDE-NPS's Unnumbered Attachments** | |
| MDE TA Response to Claim Denials (Nov-Dec 2021) | MDE-NPS made it available to PIQC in an earlier administrative appeal's record |
| 06.07.22 Letter to the Appeal Panel | MDE-NPS made it available to PIQC on the date it was created, June 7, 2022. |
| 06.17.22 Notice of Site Denials | This is one of the notices of agency action PIQC is appealing. MDE-NPS made it available to PIQC on the date the document was created, June 17, 2022. |

58. The one document that did not appear to have been made available to PIQC before June 10 or 17, 2022 is the April 21, 2022 affidavit ("Ismail Affidavit") (MDE-NPS Att. 4). The Ismail affidavit appears to be of less relevance to MDE-NPS's decision in the PIQC matter in comparison to the other cited affidavits (Farah Affidavit, Savage Affidavit, Brooklyn Park Affidavit, and Rosemount Affidavit) and is not dispositive of the Appeal Panel's decision. In other words, whether the Appeal Panel considers the Ismail affidavit does not make a difference to the Appeal Panel's dispositive conclusions.

59. Therefore, excluding MDE-NPS's Attachment 4, the Ismail affidavit, does not change the dispositive conclusions reached by the Appeal Panel under Subsections I, II, III and IV, above.

---

60. Based on the above analysis:

- MDE-NPS's agency decision to withhold further federal award payments effective May 27, 2022 pursuant to 2 C.F.R. § 200.339(e) is affirmed.
- MDE-NPS's decision to terminate PIQC's federal award by proposing to terminate PIQC's CACFP agreement as of May 27, 2022 is affirmed.
- MDE-NPS's June 17, 2022 agency action denying all of PIQC's pending site applications is affirmed.

61. This Appeal Decision does not preclude MDE-NPS from working with individual sites of PIQC and determining on a case-by-case basis the compliance and validity of each reimbursement claim and

ensure that, if a portion of a claim can be verified independently of the remainder of that claim, that portion be properly paid.

**CONCLUSION**

For all the reasons stated above, and based on the information reviewed, the Appeal Panel affirms MDE-NPS' May 27 and June 17, 2022 agency actions.

In accordance with 7 C.F.R. § 226.6(k)(5)(x), the determination by the Appeal Panel is the final administrative determination regarding the appellant.

Respectfully,

Dr. Stephanie S. Burrage

Dr. Stephanie Burrage, Appeal Panel Chair
Jill Bemis, Appeal Panel Member
Kristie Anderson, Appeal Panel Member

CC: Monica Herrera, Director, MDE-NPS
Kristine Nogosek, attorney for MDE-NPS

**DOCUMENTS REVIEWED**

MDE's Appeal Panel considered the following documents submitted or referenced by MDE-NPS and PIQC, and the September 12, 2022 hearing transcript:

1. Federal Regulations: 7 C.F.R. Part 226; 7 C.F.R. Part 225; 2 C.F.R. Part 200

2. Child and Adult Care Food Program Appeal Procedure

3. May 27, 2022 MDE-NPS Decision to Terminate PIQC CACFP Permanent Agreement and Withhold Payments

4. June 7, 2022 Panel Decision re PIQC

5. June 10, 2022 PIQC Notice of Appeal of May 27, 2022 MDE-NPS Decision

6. June 17, 2022 MDE Appeal Acknowledgement Letter

7. July 5, 2022 Panel Decision re PIQC

8. July 21, 2022 First Amended Notice of Hearing

9. August 16, 2022 Second Amended Notice of Hearing

10. MDE-NPS Submissions:

    a. MDE-NPS Memorandum of Law
    b. MDE-NPS Summary
    c. June 7, 2022 MDE-NPS Letter to Appeal Panel
    d. June 17, 2022, MDE-NPS Decision Denying Sites Applications for CACFP PY22 Beginning October 2022
    e. Attachment 1: 13299 Bronze Parkway, Rosemount, MN Search Warrant and Affidavit, Case No. 22-MJ-040 (D. Minn.)
    f. Attachment 2: 13825 Edgewood Avenue South, Savage, MN Search Warrant and Affidavit, Case No. 22-MJ-009 (D. Minn.)
    g. Attachment 3: 10032 Scott Avenue North Brooklyn Park, MN Search Warrant and Affidavit, Case No. 22-MJ-31 (D. Minn.)
    h. Attachment 4: Criminal Complaint, United States v. Mohamed Jama Ismail, Case No. 22-MJ-328 (D. Minn.), Affidavit of Travis Wilmer
    i. Attachment 5: Criminal Complaint, United States v. Abdiaziz S. Farah, Affidavit of Travis Wilmer, Case No. 22-MJ-432 (D. Minn.), Affidavit of Travis Wilmer
    j. Attachment 6: January 20, 2022 MDE-NPS Decision re Suspension of Payments
    k. Attachment 7: January 31, 2022 MDE-NPS Decision re Proposed Termination and Disqualification
    l. Attachment 8: March 25, 2022 MDE-NPS Decision re November 2021 Claims Denial
    m. Attachment 9-1: April 22, 2022 MDE-NPS Decision re December 2022 Claims Denial (1 of 2)
    n. Attachment 9-2: April 26, 2022 MDE-NPS Decision re December 2022 Claims Denial (2 of 2)

o.  Attachment 9-3: December Claim Denial Details (Spreadsheet)
p.  Attachment 10: May 17, 2022 Panel Decision Reversing and Remanding MDE-NPS January 20 and 31, 2022 Decisions
q.  Attachment 11: June 7, 2022 Panel Decision Affirming in Part and Vacating and Remanding in Part MDE-NPS's March 25, 2022 Decision
r.  Attachment 12: May 27, 2022 MDE-NPS Decision to Terminate PIQC CACFP Permanent Agreement and Withhold Payments
s.  Attachment 13-1: February 11, 2022 Email Thread from Christine Twait to MDE-NPS's Emily Homer with Subject Line "Re: Principal Identification Form"
t.  Attachment 13-2: Attachment Titled "C3. Less-Than-Arms-Length Relationships" to February 11, 2022 Email Thread from Christine Twait to MDE-NPS's Emily Homer with Subject Line "Re: Principal Identification Form"
u.  Attachment 14: PIQC Permanent Agreement Executed on November 6, 2015
v.  Attachment 15: March 31, 2021 MDE-FNS Notice of Serious Deficiency Determination
w.  Attachment 16-1: June 1, 2021 MDE-FNS Letter Concerning PIQC's Corrective Action
x.  Attachment 16-2: June 16, 2021 MDE-FNS Notice of Temporary Deferment of Serious Deficiency Determination
y.  Attachment 17: Free Minded Institute Contract with Empire Cuisine
z.  Attachment 18: July 21, 2016 MDE-NPS PIQC CACFP Administrative Review Letter
aa. Attachment 19: June 15, 2018 MDE-NPS CACFP Administrative Review Letter
bb. Attachment 20: April 28, 2021 PIQC Corrective Action Plan
cc. Attachment 21:  June 7, 2022 PIQC Organizational Chart
dd. Attachment 22: Mind Foundry Empire Contract
ee. Attachment 23: December 20, 2019 Principal Identification Form
ff. Attachment 24: August 29, 2021 Principal Identification Form
gg. Attachment 25: June 7, 2022 Principal Identification Form
hh. Attachment 26: April 29, 2021 MDE-NPS Letter re Denial of Site Application
ii. Attachment 27: June 10, 2022 Robyn Tousignant Email Thread to MDE-NPS with Subject Line "Change of Leadership"
jj. Attachment 28-1: November 24, 2021 Kara Lomen Email Thread to MDE-NPS with Subject Line "The Free Minded Institute"
kk. Attachment 28-2: PIQC SPSF Permanent Agreement
ll. Attachment 29: April 2, 2021 Mohamud Isse Email Thread to MDE-NPS's Emily Honer with Subject Line "Fw: Important: Suspension of Program"
mm. MDE-NPS Response to PIQC's Technical Assistance Requests 2022-001, 002, 003
nn. MDE-NPS Table of Contents

11. PIQC Submissions:

a.  June 27, 2022 PIQC Statement in Support of Appeal
b.  Exhibit A: 2022 05 27 MDE Termination of Perm Agreement and Withholding of Payment
c.  Exhibit B-1: USDA Policy Memo #2 Nationwide Waiver to Allow Noncongregate Feeding in the Child Nutrition Programs (March 20, 2020)

d.  Exhibit B-2: USDA Policy Memo #87 Nationwide Waiver to Allow Noncongregate Meal Service for School Year 2021-2022 (April 20, 2021)

e.  Exhibit B-3: USDA Policy Memo #1 Nationwide Waiver to Allow Meal Service Time Flexibility in the Child Nutrition Programs (March 20, 2020)

f.  Exhibit B-4: USDA Policy Memo #88 Nationwide Waiver to Allow Meal Service Time Flexibility for School Year 2021-2022 (April 20, 2021)

g.  Exhibit B-5: USDA Policy Memo #5 Nationwide Waiver to Allow Parents and Guardians to Pick Up Meals for Children (March 25, 2020)

h.  Exhibit B-6: USDA Policy Memo #89 Nationwide Waiver to Allow Parents and Guardians to Pick Up Meals for School Year 2021-2022 (April 20, 2021)

i.  Exhibit C-1: PIQC Email to MDE Requesting Technical Assistance (April 14, 2022)

j.  Exhibit C-2: MDE Response to PICQ Technical Assistance Request (April 28, 2021)

k.  Exhibit C-3: PIQC Communication to Sites Regarding Bulk Food Items (April 30, 2021)

l.  Exhibit D: USDA Covid-19 Guidance on Multiple Meals

m.  Exhibit E: USDA CACFP Policy Update - National CACFP Sponsor Association Annual Conference (April 20, 2022)

n.  Exhibit F-1: Feeding Our Future Search Warrant Application

o.  Exhibit F-2: ThinkTechAct (Mind Foundry) Foundation_Search Warrant Application

p.  Exhibit F-3: S+S Catering_Search Warrant Application

q.  Exhibit F-4: Crim. Compl. Ismail (Empire Cuisine) Passport Fraud

r.  Exhibit F-5: Crim. Compl. Farah (Empire Cuisine) Passport Fraud

s.  Exhibit G-1: Scarver text msg to Twait re conflicts

t.  Exhibit G-2: PIQC Less-Than-Arms-Length Disclosure

u.  Exhibit G-3: Scarver Acceptance of Resignation

v.  Exhibit G-4: 2021 08 29 PIQC Principal Identification Form

w.  Exhibit G-5: 2022 02 11 Updated PIQC Principal Identification Form

x.  Exhibit H-1: 2022 01 20 MDE Suspension Letter

y.  Exhibit H-2: 2022 01 31 MDE Proposed Termination and Disqualification Letter

z.  Exhibit H-3: 2022 05 17 Appeal Panel Decision

aa. Exhibit H-4: 2022 03 25 MDE Claims Denial Letter for Nov. 2021 Meals

bb. Exhibit H-5: 2022 04 22 MDE Claims Denial Letter for Dec. 2021 Meals (1)

cc. Exhibit H-6: 2022 04 26 MDE Claims Denial Letter for Dec. 2021 Meals (2)

dd. Exhibit I-1: 2022 05 27 MDE Immediate Termination and Withholding of Payments Letter

ee. Exhibit I-2: 2022 06 17 MDE Site Application Denial Letter

ff.  Exhibit I-3: 2022 06 10 Notice of Appeal - MDE May 27, 2022 action

gg. Exhibit I-4: 2022 06 27 Notice of Appeal - MDE June 17, 2022 action

hh. Exhibit J-1: SharePoint Screenshot1

ii.  Exhibit J-2: SharePoint Screenshot2

jj.  Exhibit J-3: SharePoint Screenshot3

kk. Exhibit J-4: SharePoint Screenshot4

ll.  Exhibit K: Signed CACFP Agreement between PIN and MDE

mm.         Exhibit L-1: [THERE IS NO L-1]

nn. Exhibit L-2: MDE Appeal Review Panel Decision (June 30, 2021)

oo. Exhibit L-3: [THERE IS NO L-3]

pp. Exhibit L-4: 2022 04 05 Appellant's Combined Statement in Response to MDE's Untimely [Submissions]

12. Appeal-Related Correspondence:

a. May 27, 2022 Emily Honer Email to PIQC Attaching Notice of Immediate Termination and Withholding of Payments

b. June 10, 2022 Maura McNally-Cavanagh Email to MDE-NPS Attaching PIQC's Notice of Appeal

c. July 1, 2022 Emily Honer Email to MDE's Allison Loomis and Monica Herrera Agreeing that the June 17, 2022 Decision is Appealable

d. July 21, 2022 Allison Loomis Email to PIQC Attaching MDE's First Amended Hearing Notice

e. August 16, 2022 Allison Loomis Email to PIQC Attaching MDE's Second Amended Hearing Notice

13. Attorney Mark Weinhardt Pro Hac Vice Correspondence and Updated Documentation (retroactive)

a. September 20, 2022 Email Thread between attorney Weinhardt and MDE's Allison Loomis

b. September 22, 2022 Email Thread between attorney Weinhardt and MDE's Allison Loomis

c. September 22, 2022 Updated Written Request to Appear as Counsel Pro Hac Vice Signed by attorney Weinhardt

d. September 22, 2022 Declaration in Support of Pro Hac Vice Request Signed by attorney Conneely.